RICHMAN LAW GROUP
Kim E. Richman (*Pro Hac Vice*)
krichman@richmanlawgroup.com
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 687-8291

ELSNER LAW & POLICY, LLC
Gretchen Elsner (*Pro Hac Vice*)
Gretchen@ElsnerLaw.org
150 Washington Avenue, Suite 201-220
Santa Fe, NM 87501
Telephone: (505) 303-0980

CENTER FOR FOOD SAFETY
Paige Tomaselli (CSB No. 237737)
Adam Keats (CSB. No. 191157)
ptomaselli@centerforfoodsafety.org
akeats@centerforfoodsafety.org
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
Telephone: (415) 826-2770

*Additional Plaintiffs' counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORGANIC CONSUMERS ASSOCIATION, a Minnesota non-profit corporation, on behalf of the general public; FRIENDS OF THE EARTH, a Washington, D.C. non-profit corporation, on behalf of the general public; CENTER FOR FOOD SAFETY, a California non-profit corporation, on behalf of the general public, <br><br> Plaintiffs, <br><br> v. <br><br> SANDERSON FARMS, INC., a Mississippi corporation, <br><br> Defendant. | CASE NO. 3:17-CV-03592-RS <br><br> **FIRST AMENDED COMPLAINT** <br><br> JURY TRIAL DEMANDED |

The Organic Consumers Association (the OCA), a national non-profit corporation based in Finland, Minnesota, Friends of the Earth (FoE), a Washington, D.C. based non-profit corporation, and Center for Food Safety (CFS), a national non-profit corporation based in Washington, D.C., (collectively, "Plaintiffs"), acting on behalf of the general public, by and through their counsel, bring this action against Sanderson Farms, Inc. ("Defendant" or "Sanderson"), a Mississippi corporation, and allege the following based upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters:

**NATURE OF THE CASE**

1.      Defendant Sanderson produces, markets, and advertises Chicken Products, as defined *infra*, ¶ 9.

2.      When tested by governmental entities, Sanderson's chickens have been found to contain residues of antibiotics important for human medicine, residues of veterinary antibiotics, and other pharmaceuticals, as well as residues of hormones, steroids, and pesticides. The residues include chemicals such as chloramphenicol, melengesterol acetate, and prednisone. Governmental entities conducted 69 inspections in 2015 and 2016 at Sanderson facilities, and in 33% of those inspections, Sanderson samples appeared positive for such residues.

3.      The presence of these chemicals in the Sanderson samples means that consumers, when they eat Sanderson's Chicken Products, are unknowingly ingesting these antibiotics and other pharmaceuticals.

4.      The presence of these chemicals in the Sanderson samples indicates that drugs and other chemicals were used in the raising and/or harvesting of Sanderson's chickens.

5.      The use of these drugs and other chemicals in the raising and/or harvesting of Sanderson's chickens indicates that Sanderson's chickens, before they wind up in the Chicken Products, are raised in unnatural, intensive-confinement, warehouse conditions, and ultimately creates unnatural Chicken Products.

6.      Despite these facts, Sanderson markets and advertises the Chicken Products as "100% Natural."

7.      Sanderson's "100% Natural" marketing and advertising scheme falsely and

misleadingly suggests that (1) consumers are ingesting nothing but chicken, and certainly no synthetic drugs or other chemicals; (2) no antibiotics or other pharmaceuticals are employed in the raising or slaughtering of Sanderson's chickens; and (3) the chickens who wind up in the Chicken Products are raised in natural conditions.

8.       Plaintiffs, which are three non-profit organizations dedicated to safeguarding the rights of consumers, bring this action pursuant to California law in order to end Sanderson's deceptive practices.

## FACT ALLEGATIONS

9.       The Sanderson Chicken Products at issue (collectively, the "Chicken Products"), all of which are marketed as "100% Natural" (*see infra*, ¶¶ 36-71) include the following[1]:

- Clipped Chicken Tenderloins
- Boneless Skinless Chicken Thigh Fillets
- Boneless Skinless Breast Strips
- Thinly Slices Boneless Skinless Breast Fillets
- Boneless Skinless Breast Fillets
- Best of Boneless
- Boneless Skinless Breast Chunks
- Family Pack Whole Legs
- Whole Legs
- Family Pack Wingettes
- Wingettes
- Drumsticks & Thighs Combo
- Skinless Drumsticks
- Chicken Hearts
- Value Pack Chicken Gizzards
- Skinless Split Breast

---

[1] Discovery may indicate that additional products should be included within the scope of this Complaint, and Plaintiffs reserve the right to add those products.

CASE 3:17-CV-03592-RS
FIRST AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF                    2

- Family Pack Chicken Tenderloins
- Chicken Tenderloins
- Family Pack Boneless, Skinless Chicken Breast Fillets with Rib Meat
- Skinless Thighs
- Family Pack Thighs
- Thighs
- Value Pack Thighs
- Value Pack Leg Quarters
- Value Pack Wings
- Value Pack Drumsticks
- Value Pack Split Breasts
- Chicken Necks
- Wing Drumettes
- Family Pack Drumsticks
- Family Pack Thighs
- Family Pack Leg Quarters
- Whole Roasting Chicken
- Pick of the Chicken
- Family Pack Wings
- Family Pack Split Breasts
- Livers
- Chicken Gizzards
- Stripped Back Portions
- Wings
- Thighs
- Drumsticks
- Split Breasts
- Whole Cut-Up Chicken with Giblets and Neck

1      •      Whole Frying Chicken (Whole Young Chicken).

2      10.      The Chicken Products are available for purchase under the Sanderson Farms brand at

3   retail locations such as Food 4 Less, Foods Co, and WinCo Foods,[2] with the Sanderson Farms logo.

4   Sanderson also sells chickens under other brand names at retail locations. The retail customer base

5   that Sanderson reported to its investors on June 6, 2017[3] is summarized below:



11.      Sanderson sells chickens to casual dining operators widely throughout the United

States. Sanderson highlighted these prepared foods customers to its investors on June 6, 2017.[4]

---

[2] Sanderson Farms, "Find A Store," http://www.sandersonfarms.com/store-finder/ (last visited August 22, 2017).

[3] Sanderson Farms, Slides presented by Sanderson to its investors in New York, New York on June 6, 2017, at 10, *available at* http://files.shareholder.com/downloads/ABEA-6BBVPE/4604132325x0x945735/E5261C1B-F34E-47F8-A9E7-749D3EC2CDC0/Stephens_-_20170606.pdf (last visited August 22, 2017). The presentation concludes with "100% Natural."

[4] *Id.* at 8.

12.     Sanderson also sells minimally prepared chickens to distributors and food service establishments.[5] Sanderson's foodservice customers are summarized below, as Sanderson communicated this list to its investors on June 6, 2017.[6] Thus, many individuals have ingested Sanderson Chicken Products without knowing the provenance of the product.

---

[5] Sanderson Farms, "2016 Annual Report," at 2 of the PDF, *available at* http://ir.sandersonfarms.com/ (last visited August 22, 2017).
[6] Sanderson Farms, *supra* note 3, at 9.

13.     Through these foodservice providers, Sanderson chickens are distributed to hospitals, schools, and governmental institutions in large quantities. For example, Sysco, a large foodservice company that distributes Sanderson chickens, had $50.36 billion in total sales in fiscal year 2016; 9% of those sales were from the healthcare sector and 8% from education and government.[7] US Foods distributes Sanderson chickens, contracts with school districts, and describes itself as "the market leader in healthcare foodservice."[8]

14.     Sanderson exports to 40 countries outside the United States,[9] predominantly to countries that do not have food safety standards comparable to the United States.

---

[7] Sysco Corporation, "2016 Annual Report," *available at* http://s1.q4cdn.com/164202355/files/doc_financials/ annual/2016-Sysco-Corporation-Annual-Report.pdf, at 3, 48 (last visited August 22, 2017).
[8] US Foods, "Legacy,", https://usfoods.com/your-business/value-added-services/legacy.html (last visited August 22, 2017).
[9] Sanderson Farms, "Export Info," https://www.sandersonfarms.com/company/products/export-info/ (last visited August 22, 2017).

15.     The National Chicken Council surveyed United States consumers and found that 89% of survey respondents ate chicken during a two-week period, and consumers ate chicken an average of 6.1 times during a two-week period. The leading reason to increase consumption is "health/nutrition." The survey concludes, "[t]he primary reasons for altering consumption patterns are health/nutrition, taste and cost. These factors should be addressed in advertising."[10]

I.     **The Chicken Products Contain Antibiotics and Other Pharmaceuticals.**

16.     The National Residue Program (NRP) of the Food Safety and Inspection Service (FSIS) at the United States Department of Agriculture (USDA) routinely tests Sanderson poultry that becomes the Chicken Products. In 2015 and 2016, this process reported 49 instances in which Sanderson samples tested positive for residues that are not "100% Natural." The unnatural substances found in Sanderson Chicken Products included antibiotics for human and veterinary use, and other pharmaceuticals. The governmental sampling and testing process reported an additional 82 instances of unconfirmed residues that cause concern, including repeated instances of pesticides.

A.     **Antibiotics.**

17.     On its "Poultry Fact Sheet,"[11] Sanderson states that, "since 2009, no violative antibiotic residues have been found in poultry meat." Contrary to that claim, NRP testing found antibiotics residues in Sanderson Chicken Products in 2015 and 2016, including violative levels of chloramphenicol. NRP testing also found ciprofloxacin (present as its metabolite desethylene ciprofloxacin), norfloxacin, sulfadiazine, and sulfamethizole. NRP conducted 69 unique inspections of samples in 2015 and 2016, and detected residues of antibiotics for human use in 11 separate instances. The number of samples tested by government chemists are selected to provide a statistically significant assurance of detecting a violation that affects a given percentage of the sample's overall population, and are therefore representative of Sanderson's chickens.

18.     All of these human antibiotic residues (chloramphenicol, ciprofloxacin (present as its

---

[10] National Chicken Council, "Chicken Usage Summary, July 2014," at 3-4,18, http://www.nationalchickencouncil.org/wp-content/uploads/2014/07/Consumer-Research-2014-Presentation-Final-0717141.pdf. The 2014 study is the most recent study available on the website.
[11] Sanderson Farms, "Poultry Fact Sheet," at 3, https://www.sandersonfarms.com/wp-content/uploads/2016/07/Poultry-Myths-Fact-Sheet_v9.compressed.pdf (last visited August 22, 2017).

1  metabolite desethylene ciprofloxacin), gentamicin, norfloxacin, sulfadiazine, and sulfamethizole)

2  appeared at levels detectable by USDA's testing methods.

3      19.    Contrary to Sanderson's marketing and advertising claims (*see infra*), Sanderson

4  Chicken Products tested positive for antibiotic residues ***after*** the chicken left the farm.

5      20.    Chloramphenicol, which is not "natural" at the levels in Sanderson samples, appeared

6  five times in test results from the USDA's 69 inspections of Sanderson samples, up to 3.226 ppb[12] in

7  Louisiana, Mississippi, North Carolina, and Texas in 2016. According to the FSIS NRP sampling

8  plan, "Chloramphenicol is a potent, broad-spectrum antibiotic with severe toxic effects in humans

9  including bone marrow suppression or aplastic anemia in susceptible individuals. While

10  microorganisms have developed resistance to this drug, it is still used selectively in human and

11  veterinary medicine to treat companion animal bacterial infections. This drug is AMDUCA [Animal

12  Medicinal Drug Use Clarification Act of 1994]-prohibited for extra-label use in animals intended for

13  food."[13] Because of a zero-tolerance policy, all five results exceeded the regulatory tolerance level,

14  and the USDA is permitted to seize poultry where chloramphenicol is found. Chloramphenicol has

15  never been approved to treat food-producing animals.[14] It is dangerous to public health to dose any

16  animal intended as human food with chloramphenicol, even in small amounts.[15]

---

17  [12] Throughout the Complaint, all figures with greater than three decimal places in the government
18  inspection data were rounded to three decimal places of precision.

18  [13] USDA, U.S. National Residue Program for Meat, Poultry, and Egg Products, "2015 Residue
19  Sampling Plans" (March 2015), at 15, available at
19  https://www.fsis.usda.gov/wps/wcm/connect/04c818ed-9bb1-44b2-9e3f-896461f1ffb9/2015-Blue-
Book.pdf?MOD=AJPERES.

20  [14] According to the U.S. Food & Drug Administration (FDA), "The CVM [Center for Veterinary
21  Medicine] had approved chloramphenicol to treat infections in dogs and cats, but it had never
approved it to treat food-producing animals because of the fear that harmful residues would remain
22  in food products. During the early 1980s, testing of American meat samples showed potentially
dangerous residue levels of chloramphenicol, indicating that veterinarians and farmers were using
23  the drug illegally to treat cattle and pigs." FDA, "Animal Health and Consumer Protection,"
*available at*
24  https://www.fda.gov/AboutFDA/WhatWeDo/History/ProductRegulation/AnimalHealthandConsum
erProtection/ (last updated October 7, 2010)..

25  [15] U.S. FDA, Compliance Policy Guides, Sec. 654.300, Chloramphenicol as an Unapproved New
Animal Drug – Direct Reference Seizure Authority (1996), states "The drug, when used in humans,
26  is associated with many toxic effects and, therefore, is used only in life-threatening situations when
less toxic drugs are not effective. The principal toxic effect is the development of a type of bone
27  marrow depression (aplastic anemia) in susceptible individuals, which is usually irreversible and
fatal. Since this condition only occurs in humans, an appropriate animal test model has never been
28  developed. *The onset of the condition is not dose dependent*." *Available at*

---

21.     Florfenicol, a synthetic analog of thiamphenicol that is not "natural," appeared in test results for a Sanderson sample in Louisiana in 2016, at a level of 11.329 ppb. The FDA has not approved the use of florfenicol in poultry.

22.     Desethylene ciprofloxacin, a metabolite of ciprofloxacin, a synthetic broad spectrum fluoroquinolone antibiotic that is not "natural," is an antibiotic of last resort when bacteria have become resistant to other antibiotics. The European Food Safety Authority and the European Centre for Disease Prevention and Control report that resistance to ciprofloxacin is growing in parallel to its use in poultry production.[16] Sanderson samples appeared positive for desethylene ciprofloxacin once in Georgia in 2015 and twice in Mississippi in 2016, at up to 13.11 ppb.

23.     Gentamicin, also known as gentamycin sulfate, a synthetic antibiotic for human use that is not "natural," appeared four times in test results in Louisiana, Mississippi, North Carolina, at up to 80.13 ppb. Regulations permit gentamicin to be injected into day-old chickens, provided that treated animals are not slaughtered for food until 5 weeks after treatment, 21 C.F.R. § 522.1044. The regulatory tolerance for gentamicin in chickens is 0.1 ppm, 21 C.F.R § 556.300, or stated in ppb, 100 ppb.

24.     Amoxicillin, a semisynthetic antibiotic that is not "natural," appeared six times in test results from USDA's 69 inspections of Sanderson samples, ranging from 8.350 ppb to 440.310 ppb across Georgia, Louisiana, Mississippi, and Texas in 2016. Amoxicillin is a medically important antibiotic for human use. The FDA has not approved the use of amoxicillin in poultry. Federal regulations limit amoxicillin residue in uncooked beef and milk to 10 ppb[17]; the regulation is silent on chickens and, consistent with lack of regulation and legal use amoxicillin in poultry, the governmental testing method has not been validated for poultry. Upon information and belief, this

---

https://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074681.htm (emphasis added).

[16] European Food Safety Authority, "Antimicrobial resistance on the rise in European union, EFSA and ECDC warn" (Feb. 11, 2016), *available at* https://www.efsa.europa.eu/en/press/news/160211.

[17] There is no listed regulatory limit for amoxicillin residue in chickens. Therefore, it is not lawful to use amoxicillin in poultry production. There is a regulatory limit for uncooked beef and milk, which is 0.01 parts per million. 21 C.F.R. § 556.38. For ease of comparison to the Sanderson sample results, which are stated in parts per billion instead of million for amoxicillin, the regulatory limit stated in parts per billion is 10 parts per billion. The FDA often states regulatory limits in parts per million or billion, depending on the residue.

residue indicates that Sanderson administers amoxicillin to the chickens or otherwise exposes the chickens to amoxicillin.

25.     Penicillin, for which the residue regulatory limit is zero for poultry, 21 C.F.R. § 556.510, appeared in three test results for Sanderson samples in Georgia and Louisiana, at up to 0.285 ppb. The FDA has not approved the use of penicillin in poultry. Upon information and belief, this residue indicates that Sanderson administers penicillin or otherwise exposes the chickens to penicillin, and upon information and belief, the penicillin as used in industrial poultry farming is not "natural."

26.     Desfuroylceftiofur, a metabolite of the veterinary antibiotic ceftiofur that is not "natural," appeared in three test results for Sanderson samples in 2016 across Georgia, North Carolina, and Texas, at rates as high as 72.907 ppb. The FDA has not approved the use of desfuroylceftiofur in poultry.

27.     Other unnatural veterinary antibiotics that appeared in test results for Sanderson samples included danofloxacin, metronidazole, and tulathromycin. The FDA has not approved the use of danofloxacin, metronidazole, and tulathromycin in poultry.

28.     Approximately 73% of all medically important antibiotics sold in the United States are for livestock use.[18]

29.     The World Health Organization's 2014 report, titled Antimicrobial Resistance: Global Report on Surveillance, stated, "[t]he classes of antibiotics used in food-producing animals and in human drug are mostly the same, thereby increasing the risk of emergence and spread of resistant bacteria, including those capable of causing infections in both animals and humans. Food-producing animals are reservoirs of pathogens with the potential to transfer resistance to humans." (citations omitted).[19]

30.     The Centers for Disease Control and Prevention (CDC), U.S. Department of Health

---

[18] The Pew Charitable Trusts, "Record-High Antibiotic Sales for Meat and Poultry Production" (July 17, 2013), *available at* http://www.pewtrusts.org/en/multimedia/data-visualizations/2013/recordhigh-antibiotic-sales-for-meat-and-poultry-production.

[19] World Health Organization, "Antimicrobial Resistance: Global Report on Surveillance" (June 2014), at 59, *available a*t http://apps.who.int/iris/bitstream/10665/112642/1/9789241564748_eng.pdf?ua=1.

and Human Services summarized the threat to public health posed by antibiotic use in agricultural operations, such Sanderson Farms:

> Antibiotics are widely used in food-producing animals, and according to data published by FDA, there are more kilograms of antibiotics sold in the United States for food-producing animals than for people [hyperlink omitted]. This use contributes to the emergence of antibiotic-resistant bacteria in food-producing animals. Resistant bacteria in food-producing animals are of particular concern because these animals serve as carriers. Resistant bacteria can contaminate the foods that come from those animals, and people who consume these foods can develop antibiotic-resistant infections. Antibiotics must be used judiciously in humans and animals because both uses contribute to not only the emergence, but also the persistence and spread of antibiotic-resistant bacteria.[20]

31.     An estimated 23,000 deaths and more than 2 million illnesses have been caused by antibiotic-resistant bacteria, as estimated in 2013 by the CDC.[21]

32.     Children experience the ill-effects of antibiotic overuse in agriculture, most especially children younger than 5 years who become infected with antibiotic resistant bacteria.[22]

33.     According to the President's Council of Advisors on Science and Technology and its Report to the President on Combatting Antibiotic Resistance, "[s]ubstantial evidence demonstrates that use of antibiotics in animal agriculture promotes the development of antibiotic-resistant microbes in animals and that retail meat can be a source of microbes, including antibiotic-resistant microbes."[23]

34.     A 2017 review of the research to date concludes, "taken together, the data support what the scientific community, national governments, and international organizations such as the World Health Organization, the Food and Agricultural Organization of the United Nations, and the

---

[20] CDC, "Antibiotic Resistance Threats in the United States, 2013" (Apr. 23, 2013), at 36-37, https://www.cdc.gov/drugresistance/pdf/ar-threats-2013-508.pdf. The report also contains a glossary of terms related to antibiotic resistance.
[21] *Id.* at 13.
[22] Jerome A. Paulson, Theoklis E. Zaoutis, , "Nontherapeutic Use of Antimicrobial Agents in Animal Agriculture: Implications for Pediatrics," Pediatrics 2015;136;e1670 (Nov. 16, 2015), at e1673, *available at* http://pediatrics.aappublications.org/content/pediatrics/136/6/e1670.full.pdf.
[23] Executive Office of the President of the United States, "Report to the President on Combatting Antibiotic Resistance," (September 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_carb_report_sept2014.pdf.

1   World Organization for the Health of Animals (OIE) have long recognized: antimicrobial use on

2   farms clearly contributes to the emergence of resistance and poses a human public health risk."[24]

3      **B.   Other Pharmaceuticals.**

4      35.      Ketamine, a Schedule III non-narcotic substance under the Federal Controlled

5   Substances Act, 21 U.S.C. § 301 e*t seq.*, that is not "natural," appeared in test results for nine

6   Sanderson samples across Georgia, Louisiana, Mississippi, North Carolina, and Texas in 2015 and

7   2016, up to 24.380 ppb. The Drug Enforcement Agency describes ketamine as "a dissociative

8   anesthetic that has some hallucinogenic effects."[25] Ketamine's street names include Special K, Cat

9   Tranquilizer, and Cat Valium, the latter two referencing its veterinary uses, and it is commonly

10  referred to as a club drug because it is used illegally at dance clubs and raves. The FDA has not

11  approved the use of ketamine in poultry. The regulation addressing ketamine is silent on chickens

12  and, consistent with lack of regulation and legal use of ketamine in poultry, the governmental testing

13  method has not been validated for poultry. Upon information and belief, this residue indicates that

14  Sanderson administers ketamine to the chickens or otherwise exposes the chickens to ketamine.

15     36.      Ketoprofen, an anti-inflammatory drug that is not "natural," appeared in four test

16  results for Sanderson samples in 2016 in Louisiana, Mississippi, and Texas, at rates as high as 1.80

17  ppb. The FDA has not approved the use of ketoprofen in poultry. Additionally, ketoprofen is banned

18  from use in horses intended for human consumption, 21 C.F.R. § 522.1225.

19     37.      Prednisone, a steroid that is not "natural," appeared in three test results Sanderson

20  samples in 2016 in Louisiana and Mississippi, at up to 3.55 ppb. The FDA has not approved the use

21  of prednisone in poultry. Upon information and belief, these results indicate that Sanderson

22  administers prednisone to the chickens or otherwise exposes the chickens to prednisone.

23     38.      Melengesterol acetate, also known as MGA, a synthetic hormone that is not "natural,"

24

25  _____
    [24] Hoelzer et al., , "Antimicrobial drug use in food-producing animals and associated human health risks: what, and how strong, is the evidence?," BMC Veterinary Research (2017) 13:211, at 35,

26  *available at* https://link.springer.com/epdf/10.1186/s12917-017-1131-3?author_access_token=
    CbmecKjS4XscxgMn92-6rm_BpE1tBhCbnbw3BuzI2RMGFJmV0iy8Y06YFc2zc-

27  R5jN1X3crDybEToB_CzXCpRozpkwGnxg9ydolzETVy02VGkppjTRq1V0MGiTqrqtB8g2U114w
    U4Fb9RacLAHWYIA%3D%3D.

28  [25] U.S. Drug Enforcement Agency, "Drug Fact Sheet – Ketamine," at 1, *available at*
    https://www.dea.gov/druginfo/drug_data_sheets/Ketamine.pdf (last visited August 22, 2017).

1  appeared in test results for Sanderson samples in 2016 in Mississippi, at levels as high as 1.42 ppb.

2  The FDA has not approved the use of melengesterol acetate in poultry.

3      39.    Haldoperidol, an anti-psychotic drug that is also known as haldol and is not "natural,"

4  appeared in test results for two Sanderson samples in 2016 in Louisiana, albeit its presence is

5  unconfirmed because the result is below the scientist's screen cut-off. Upon information and belief,

6  these results indicate that Sanderson administers haldoperidol to the chickens or otherwise exposes

7  the chickens to haldoperidol.

8      40.    Ractopamine, a growth-promoting beta agonist commonly sold as a feed additive that

9  is not "natural," appeared in test results for Sanderson samples in Louisiana in 2016, up to 0.622 ppb,

10  albeit its presence is unconfirmed because the result is below the scientist's screen cut- off. Upon

11  information and belief, these results indicate that Sanderson has dosed its chickens with ractopamine,

12  which is a drug that maximizes lean muscle growth and thereby produces more marketable meat.[26]

13  Ractopamine has dire consequences for animal welfare and is linked to more adverse events in pigs

14  than any other animal drug on the market. The FDA has not approved the use of ractopamine in

15  chicken production. 21 C.F.R. § 558.500.

16      41.    Other pharmaceuticals that are not "natural" and appeared in test results for Sanderson

17  samples include 2-amino-flubendazole, an anti-parasitic drug; azaperone, a veterinary tranquilizer;

18  butorphanol, an opioid analgesic; carazolol, a beta blocker; dimetridazole, a drug that combats

19  protozoan infections and is banned in Canada;[27] and xylazine, a tranquilizer. Xylazine regulations

20  specifically state that the drug should not be used in domestic food-producing animals. 21 C.F.R.

21  § 522.2662. The presence of hydroxydimetridazole, ipronidazole, and ronidazole was also reported

22  in USDA test results for Sanderson samples. FDA has not approved a single one of these

23  pharmaceuticals for use in poultry.

24

25

---

26  [26] Center for Food Safety, "Ractopamine Factsheet," at 1, *available at*
http://www.centerforfoodsafety.org/files/ractopamine_factsheet_02211.pdf (last visited August 22,

27  2017).
[27] Canadian Food Inspection Agency, "Standards and Practices Manual," *available at*

28  http://www.inspection.gc.ca/food/fish-and-seafood/manuals/standards-and-methods/eng/1348608971859/1348609209602?chap=7, last updated May 10, 2017.

**C.    Pesticides.**

42.    Abamectin, a pesticide, appeared in 10 test results for Sanderson samples in 2016, across Georgia, Louisiana, Mississippi, North Carolina, and Texas, at up to 166.667 ppb, although the results have not been validated with a method specific to poultry. Any abamectin residue above 20 parts per billion in chicken violates federal regulations. 40 C.F.R. § 180.449. Upon information and belief, this residue indicates that Sanderson doses its chickens with abamectin, and upon information and belief, the abamectin as used in industrial poultry farming is not "natural."

43.    Emamectin, a pesticide, appeared in test results for Sanderson samples in Mississippi in 2016, at 0.387 ppb. The FDA has not approved the use of emamectin in poultry. The regulation addressing emamectin is silent on chickens and, consistent with lack of regulation, the governmental testing method has not been validated for poultry. Upon information and belief, this residue indicates that Sanderson administers emamectin to the chickens or otherwise exposes the chickens to enamectin, and upon information and belief, the emamectin as used in industrial poultry farming is not "natural."

44.    Other pesticides that are not "natural" and appeared in tested results for Sanderson samples, albeit unconfirmed because the result is below the scientist's screen cut-off, included malathion and permethrin.

**II.    The Chicken Products Are Marketed, Advertised, and Sold in California.**

45.    Upon information and belief, Sanderson markets and advertises its Chicken Products in California, and seeks to reach the vast California consumer base through broadcast television, print advertising, radio advertising, and online marketing such as Facebook, YouTube, and its own website.

46.    The Chicken Products are available for purchase at retail locations throughout California, such as Food 4 Less, Foods Co, and WinCo Foods,[28] with the Sanderson Farms logo. The Chicken Products are available from Redding in the north to San Diego in the south.

47.    Sanderson processing plants from which Chicken Products are shipped to California are located in Georgia, Louisiana, Mississippi, North Carolina, and Texas. Governmental entities detected unnatural residues in every state in which Sanderson has processing plants. Therefore, upon

---

[28] Sanderson Farms, *supra* note 2.

information and belief, Sanderson chicken that tested positive for unnatural residues at the processing

plants became Sanderson Chicken Products on grocery store shelves in California.

**III.   Sanderson's Marketing and Advertising Are Designed to, and Do, Mislead Consumers About the Nature of the Chicken Products.**

48.     Sanderson misleadingly markets and advertises the Chicken Products as "100% Natural" because it knows consumers will buy more of, and pay more for, a natural product, and for a product that originates from animals raised humanely, animals raised with higher welfare standards, or animals raised without intensive use of pharmaceuticals.

49.     In a 2015 Consumer Reports survey, consumers reported that they believed the following about meat and poultry products dubbed "natural":

   (a)  The animals were given no artificial growth hormones (64%);

   (b)  No artificial ingredients or colors were added (65%);

   (c)  The animals' feed contained no artificial ingredients or colors (61%);

   (d)  The animals' feed contained no GMOs (59%);

   (e)  No antibiotics or other drugs were ever used (57%); and

   (f)  The animals went outdoors (50%).[29]

50.     The same Consumer Reports survey also found that it is important to consumers that food not be produced via standard factory farm methods. For example, 82% of consumers said it was "important" or "very important" to reduce antibiotic use in food production, and 84% said the same about improving living conditions for animals.[30]

51.     The 2015 survey additionally found that 62% of consumers purchase "natural" products, and 87% of those purchasers are willing to pay more for products called "natural" that meet their expectations as to what "natural" means.[31] A 2016 Consumer Reports survey found the number of consumers who purchase "natural" products to be as high as 73%.[32]

---

[29] Consumer Reports National Research Center, "Natural Food Labels Survey" (2015), at 4, *available at* http://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf.

[30] *Id.* at 3.

[31] *Id.* at 2.

[32] Consumer Reports National Research Center, "Natural Food Labels Survey" (2016), at 2, *available at* http://greenerchoices.org/wp-content/uploads/2016/08/2016_CRFoodLabelsSurvey.pdf.

52.    As set forth above, the Chicken Products contain antibiotics and other pharmaceuticals. Despite this, Sanderson heavily markets and advertises the Chicken Products as "100% Natural" and intentionally omits the true facts. Sanderson's Chicken Products marketing campaign is titled "The Truth About Chicken." Sanderson refers to this campaign as unique and creative.[33] The campaign was available online during the applicable limitations period.[34]

53.    Sanderson's advertising campaign has created consumer confusion as to whether the Chicken Products are natural, and this misleading advertising is independent of the residue results that indicate that Sanderson's "100% natural" claims are false.

54.    Upon information and belief, Sanderson also has aired its marketing videos as broadcast television commercials in markets in which it sells its Chicken Products, including in California; has aired its marketing messages as radio commercials in markets in which it sells its Chicken Products, including in California; and has issued its marketing messages as print advertisements in markets in which it sells its Chicken Products, including in California.

55.    Sanderson uses its marketing and advertising campaign to deceive and mislead consumers about what they are ingesting and what Sanderson's Chicken Products contain after they leave the farm, about Sanderson's use of antibiotics and other pharmaceuticals, and about how Sanderson's chickens are raised and treated.

56.    A neutral third party, the Council of Better Business Bureaus, National Advertising Division (NAD), concluded on August 11, 2017 that key claims in Sanderson's advertising are misleading. "NAD also determined that given the lack of any consensus in the scientific community over the safety of consuming meat from animals raised using antibiotics the advertiser should discontinue from its advertising language that characterizes the 'raised without antibiotics' labels on competitive chicken producers' products as a 'marketing gimmick,' 'just a trick to get you to pay more money,' a claim that is 'full of hot air and doesn't say much,' 'a phrase [that marketers] invented

---

[33] Sanderson Farms, *supra* note 5, at 7.
[34] Sanderson Farms, "The Truth About Chicken," available at http://www.sandersonfarms.com/truth-about-chicken/, last visited June 21, 2017. Since Plaintiffs filed suit, Sanderson has changed its website, though this URL still leads consumers to a "Truth About Chicken" campaign, which includes much of the same information, absent the videos that were previously included.

to make chicken sound safer … and it doesn't mean much' and similar language."[35]

57.      The NAD's decision that key claims in Sanderson's advertising are misleading was made wholly independently of the FSIS residue results.

58.      Consumers, including consumers who are members of Plaintiffs' organizations, have been misled by Sanderson's representations. Consumers, including consumers who are members of Plaintiffs' organizations, relied on Sanderson's representations, and purchased Sanderson's Chicken Products in California. Plaintiffs also purchased Sanderson's Chicken Products in California.

**A.      Sanderson's Marketing and Advertising Are Designed to, and Do, Mislead Consumers About Whether They Are Eating Only 100% Natural Chicken.**

59.      One of Sanderson's marketing campaigns featured "Bob" and "Dale," two men clad in Sanderson Farms baseball caps who speak directly to the viewer. In one video titled "Floppy Arms," Bob asserts that federal law requires chickens to be clear of antibiotics before they leave the farm[36]—giving the impression that Sanderson's Chicken Products do not contain antibiotics. As of August 22, 2017, "Floppy Arms" has been viewed approximately 779,132 times on YouTube, viewed more than 2.4 million times on a Facebook post dated October 13, 2016, and shared on Facebook 348 times. The commercial has an estimated 116,413,306 impressions on broadcast television.[37]

60.      In a second video, titled "Marketing Guru," Bob and Dale stand in front of an old-fashioned red barn with white trim. Bob asserts that the phrase "raised without antibiotics" was invented to make chicken sound safer but that it doesn't mean much because federal law requires that chickens be clear of antibiotics before they leave the farm—again giving the impression that Sanderson's Chicken Products do not contain antibiotics. As of August 22, 2017, "Marketing Guru" has been viewed approximately 1,057,016 times on YouTube, viewed more than 712,000 times on a Facebook post dated November 1, 2016, and shared on Facebook 226 times. The commercial has an

---

[35] Advertising Self-Regulatory Council, Press Release (Aug. 11, 2017), *available at* http://www.asrcreviews.org/nad-recommends-sanderson-farms-discontinue-claims-about-tricks-gimmicks-finds-company-can-support-certain-claims-referencing-federal-law/.
[36] Sanderson's "The Truth About Chicken" webpage (recently retitled as "Chicken Myths") also states, "By federal law, all chicken must be clear of antibiotics before they leave the farm."
[37] Viewing analytics are available at https://www.ispot.tv/ad/ARJ0/sanderson-farms-the-truth-about-chicken-mr-floppy-arms (last viewed June 12, 2017).

estimated 89,745,934 impressions on broadcast television, at an estimated cost of $2,293,431.[38]

*Below is a screenshot of the video titled "Marketing Guru."*



61.     In a third video, titled "Supermarket," Dale is wearing a blindfold and pulling chicken packages off the grocery store shelves. Bob announces that they blindfolded Dale and told him to find the chicken that does not contain antibiotics. Bob further asserts that competitors used the phrase "raised without antibiotics" to get consumers to pay more money. Bob clearly states, "No antibiotics to worry about here"—again giving the impression that Sanderson's Chicken Products do not contain antibiotics. Sanderson posted the "Supermarket" video to its Facebook page on November 22, 2016, where it was viewed more than four million times and shared 922 times, and was then viewed more than 2,230,983 times on YouTube. On broadcast television, "Supermarket" has an estimated 108,214,520 impressions.[39]

62.     In a fourth video, titled "Cooking Show," Bob wears a green apron and takes issues with competitors' "gimmick" labels claiming "no added hormones or steroids." Dale, also wearing a green apron, says, "It's funny because it's illegal to give chickens added hormones or steroids"— giving the impression that Sanderson's Chicken Products do not contain hormones or steroids. Bob

---

[38] Viewing analytics are available at https://www.ispot.tv/ad/ARHb/sanderson-farms-marketing-guru (last visited June 12, 2017).

[39] Viewing analytics are available at https://www.ispot.tv/ad/ArQM/sanderson-farms-chicken-the-truth-about-chicken-supermarket (last visited June 12, 2017).

then assures the viewer that Sanderson raises "good, honest chicken." This video was viewed more than 355,629 times on YouTube, 5.5 million times on Facebook after the April 18, 2017 post (this count was observed as of August 22, 2017 and it is more than double the number of views observed at the filing of the original complaint on June 22, 2017 when the total was 2.5 million), and shared on Facebook 680 times. The commercial has an estimated 59,351,385 impressions on broadcast television.[40]

*Below is a screenshot of the video titled "Cooking Show."*



63.     A fifth video, titled "Labels," shows Bob and Dale in front of the red barn again, where they assert that some brands use labels to trick people and charge higher prices. They reiterate that "raised without antibiotics" is just marketing speak, because federal law requires that all chickens be clear of antibiotics before they leave the farm—again giving the impression that Sanderson's Chicken Products do not contain antibiotics. The "Labels" video was viewed on YouTube 3,085,567 times as of August 22, 2017, which is nearly double since the filing of the original complaint on June 22, 2017 when the views totaled 1,675,972, viewed 34,000 times on Facebook after the May 3, 2017 post, and

---

[40] Viewing analytics are available at https://www.ispot.tv/ad/wL7N/sanderson-farms-truth-about-chicken-cooking-show (last visited on June 12, 2017).

shared 374 times on Facebook. The commercial received an estimated 44,239,858 impressions on broadcast television.[41]

64.    For several of these video advertisements, Sanderson flashes across the screen a brief message that is nearly illegible to the viewing public. As an example, the message below states, "[f]ederal law requires that if antibiotics are used while raising chickens, they must have cleared the chickens' systems before they can leave the farm." The message does not clarify for consumers that Sanderson **does** administer or otherwise expose its chickens to antibiotics.



65.    On its website for consumers,[42] Sanderson posted an interactive video titled "What Does It Mean to be 100% Natural?"[43] The animated video, which was removed after Plaintiffs filed their Complaint, is hosted by "Professor Chicken," and states, "But most of all, at Sanderson Farms, being 100% natural means there's only chicken in our chicken," and, "So it's easy for you to make your family a fresh, healthy meal without any hidden ingredients." The video concludes with, "And that's why, for more than 65 years, when we say 100% natural, we mean 100% natural." After Plaintiffs filed suit, Sanderson changed its website. Instead of asserting "100% natural," this URL now presents consumers with the message, "Good Honest Chicken."

---

[41] Viewing analytics are available at https://www.ispot.tv/ad/w72Z/sanderson-farms-truth-about-chicken-labels (last visited June 12, 2017).

[42] Sanderson Farms' website, http://www.sandersonfarms.com/ (last visited August 22, 2017).

[43] Sanderson Farms, "Our Philosophy," http://www.sandersonfarms.com/our-philosophy/100-natural/ (last visited on August 22, 2017).

*Below is a screenshot of the consumer website representing that the only thing in Sanderson chicken is chicken.*



66.     On its website, Sanderson advertises "The Truth About Hormones," and claims that "The Truth Is" that "Hormones and steroids are never given to chickens in any way. In fact, hormone and steroid use in chickens has been banned in the US since the 1950's"[44]—giving the impression that Sanderson's Chicken Products do not contain hormones or steroids and that Sanderson does not expose its chickens to hormones or steroids in anyway.

67.     In its website's Frequently Asked Questions section, Sanderson states, "The truth is, by law, all chickens must be clear of antibiotics before they leave the farm for harvest. So, all USDA inspected chicken you buy—no matter how it was raised—is, in fact, 'antibiotic free'"[45]—giving the impression that the Chicken Products are antibiotic free, when in reality the products are raised with antibiotics, and antibiotic residue remains in the chickens at slaughter and, upon information and

---

[44] Sanderson Farms, *supra* note 34.
[45] Sanderson Farms', "Frequently Asked Questions," https://www.sandersonfarms.com/frequently-asked-questions/ (accessed under the heading "Are Chickens Raised Without Antibiotics Safer to Eat?") (last visited August 22, 2017).

belief, at purchase.

68.     At some point after Plaintiffs filed their Complaint, Sanderson launched a new advertising campaign, including video and radio advertisements, and a revised website. The new video advertisements asserts that "they've got the facts" on Sanderson Farms and that they sell good, honest chicken.[46]

69.     Sanderson also published a new website in which Dr. Hohenwarter, a fictional chicken psychiatrist, is featured in several videos, including "The Power of Crystals" and "Emotions and Your Chicken."[47]

*Below is a screenshot of the chicken psychiatrist at work.*



70.     Thus, through its marketing and advertising campaign, including but not limited to its prominent declarations of "100% Natural," Sanderson misleads consumers about how Sanderson raises its birds and what consumers are ingesting when they eat the Chicken Products. "100%

---

[46] Sanderson Farms, https://www.sandersonfarms.com (last visited August 22, 2017).
[47] Sanderson Farms, Old Mac Gimmick website, http://www.oldmacgimmick.com (last visited August 22, 2017).

Natural," to consumers, means just that—i.e., that the Chicken Products contain nothing but 100 percent chicken. Consumers do not expect to ingest synthetic antibiotics or other pharmaceuticals in a "100% Natural" food.

**B.    Sanderson's Marketing and Advertising Are Designed to, and Do, Mislead Consumers About Whether the Birds Are Fed, Injected With, or Exposed to Antibiotics or Other Pharmaceuticals.**

71.    Through its marketing and advertising campaign, including but not limited to its prominent declarations of "100% Natural," Sanderson misleads consumers about its use of antibiotics and other pharmaceuticals.

72.    A 2016 Consumer Reports survey of 1,001 adults in 2016 found that 65% of respondents were concerned that routinely feeding healthy animals antibiotics and other drugs may create new bacteria that cause illnesses that antibiotics cannot cure, and 84% think that the government should require meat from healthy animals routinely fed antibiotics to be labeled as "raised with antibiotics."[48]

73.    In its website's Frequently Asked Questions section, Sanderson states, "Are antibiotics used in chickens to artificially stimulate growth? No. Antibiotics are NOT steroids . . . these birds grow to their full potential 100% naturally"[49]—giving the false impression that Sanderson's chickens are raised without antibiotics and are free from steroids.

74.    In its website's Frequently Asked Questions section, reproduced below, Sanderson asks, "Are chickens given all the same antibiotics as humans . . . ?" Sanderson begins its response with "No"[50]—giving the false impression that the chickens were raised without antibiotics for human use like amoxicillin or penicillin.

---

[48] Consumer Reports National Research Center, *supra* note 32, at 2-3.
[49] Sanderson Farms, *supra* note 45.
[50] Sanderson changed this response after Plaintiffs' filed their Complaint. The new response is available at https://www.sandersonfarms.com/frequently-asked-questions/ (last visited August 22, 2017).

*Below is a screenshot of the website before Plaintiffs filed their Complaint.*

**ARE CHICKENS GIVEN ALL THE SAME ANTIBIOTICS AS HUMANS, AND WHAT ABOUT ANTIBIOTIC RESISTANCE?**

No. The group of antibiotics most commonly used to treat and prevent disease among chickens in the U.S.—ionophores—are NEVER used in humans.

In reality, very few antibiotics used in human medicine are actually approved by the FDA for use in chickens. In those rare cases, as of January 2017, human-used antibiotics will only be used on chickens to address disease and sickness. In all of those limited cases, the antibiotics must be administered under the exclusive supervision and prescription of a veterinarian at FDA-approved dosages. What's more, the FDA further ensures the medicine has completely cleared the chicken's system before they leave the farm. Veterinary oversight has been our standard practice years before this law was written.

These industry and governmental restrictions on the use of the human-used antibiotics is part of an ongoing effort to prevent any bacteria from becoming resistant to antibiotics, which is actually an ongoing genetic phenomenon in nature. In fact, it is not uncommon for bacteria to be resistant to multiple antibiotics. While some have theorized a "superbug" could somehow be formed from this, the FDA refuted this notion, stating, "it is inaccurate and alarmist to define bacteria resistant to one, or even a few, antibiotics as 'Superbugs' if these same bacteria are still treatable by other commonly used antibiotics."

75.     Sanderson posts on its website, and has shared at shareholder meetings, an infographic titled, "The Rumor Roost: Common Myths and Misconceptions of the Poultry Industry."[51] The purported myth, according to Sanderson, is, "If chickens use the same antibiotics as people, those antibiotics will become ineffective to humans over time." Sanderson continues, "Actually. . . the types of antibiotics used for chickens are different from the ones commonly used by humans"—giving the false impression that the chickens were raised without antibiotics for human use like amoxicillin or penicillin.

---

[51] Sanderson Farms, "The Rumor Roost," https://www.sandersonfarms.com/wp-content/uploads/2016/07/RumorRoost_V11-1.compressed.pdf (last visited August 22, 2017).

*Below is a screenshot of the Rumor Roost infographic.*



76.     The Rumor Roost infographic continues with a so-called myth that "Unnecessary antibiotics are used in poultry." Sanderson states, "Sanderson Farms does not use unnecessary antibiotics in their poultry. Dr. Phil Stayer explains, 'We don't think any antibiotics used in Sanderson Farms flocks are unnecessary. We don't order antibiotics to be used unless the veterinarians deem them needed for flock health reasons'." Upon information and belief, this is false, misleading, and deceptive, because Sanderson does use antibiotics unnecessarily, prophylactically, and for profit-related rationales instead of in response to particular flock health needs.

77.     Sanderson posts deceptive, false, and misleading representations about its Chicken Products on Facebook, and engages consumers who comment. Some of these comments further make Sanderson aware of its deceptive marketing practices, particularly regarding the confusion.

1    *Below is a Facebook conversation in which users complain about misleading advertising.*

2

3     **Eric Hartman** Whether or not antibiotics are a problem, this commercial is
4    misleading and deceptive. It speaks of "raised without" and "cleared of
     antibiotics before sale" as if they are one and the same. Sanderson farms
5    knows that they are not the same thing, and shouldnt try to mislead people
     that they are.

     Like · Reply · 👍 40 · September 5 at 10:13am

6     **Sanderson Farms Chicken** Hi Eric, we completely understand your
7    concern and value your opinion. You are correct in that "raised without
     antibiotics" and "clear of antibiotics" don't necessarily mean the same
8    thing. However, either definition, under USDA inspection, still
     produces chicken meat without antibiotic residues. It doesn't matter
9    the brand name or the labels on the package; if it is USDA inspected,
     you can be sure it's free of antibiotics. The reason our veterinarians
10   prescribe antibiotics are for your safety and the health of the chickens
     as well as the environmental sustainability. Sick chickens not treated
11   with antibiotics carry higher levels of bacteria and can post a greater
     risk to your health. Chickens raised without antibiotics may endure
12   unnecessary suffering for no apparent consumer or environmental
     benefit. If you'd like to learn more about our company practices you
13   can find more information on our website here:
     http://www.sandersonfarms.com/products/faqs/

14    Frequently Asked Questions |
     Sanderson Farms
15
     SANDERSONFARMS.COM

16   Like · Reply · 👍 3 · September 6 at 8:21am

17    **Eric Hartman** Sanderson Farms Chicken I'm not necessarily trying to
     say that antibiotics are a bad things in chickens, and I'm also not
18   trying to dispute usda's policy on use of antibiotics or regulations for
     clearing chickens of antibiotics. I've got no problem buying or eating
19   Sanderson farms chicken. What I am saying is that this is deceptive
     marketing where the message about antibiotics is not presented
     clearly and openly

20   Like · Reply · 👍 2 · September 6 at 9:38am

21    **Sanderson Farms Chicken** Eric, thanks for making your concerns
     clear. As far as our advertisements, we're sorry you feel that we are
22   being misleading. That is quite the opposite of what we intended. The
     primary goal of our advertising efforts is simply to better educate
23   American consumers about chicken so they can make informed
     purchasing decisions.

     Like · Reply · 👍 7 · September 6 at 10:05am

24   **Tony Evans** Sanderson Farms Chicken you know they are misleading.
     That's your marketing department's sole intention.
25   Like · Reply · 👍 4 · September 22 at 7:35pm

26

27

28

*Below is a second Facebook conversation in which a user complains about misleading advertising.*

 **Dannielle Eidson** You should be ashamed of your commercial that uses deception to try to fool folks into believing that your chicken is just as good as chicken that is RAISED antibiotic free! You are part of the problem! I will never buy anything from you again! 👎

Like · Reply · 🔵 1 · September 19 at 11:38am

 **Sanderson Farms Chicken** We sincerely appreciate your feedback regarding our advertising, Danielle. The intent of our current ads about antibiotics in poultry is intended to help educate consumers. Many of our competitors advertise that their products are antibiotic free and we wanted to help consumers understand that all chicken you buy at the grocery store is free of antibiotics whether they were used or not while raised on the farm. We conducted a lot of consumer research on this issue and learned consumers are very confused about many of the marketing terms and claims currently seen in the marketplace such as Raised Without Antibiotics, Raised Cage Free and No Added Hormones or Steroids so we are hoping to help educate consumers as to what these claims mean and if they are worth paying more for. We apologize if we have offended you and we do appreciate your feedback. I hope you'll visit our website to learn more about The Truth About Chicken here: http://bit.ly/2agCcFa

 **Sanderson Farms®**
Find Chicken recipes, cooking tips, and learn why Sanderson Farms 100% natural chicken is the...
SANDERSONFARMS.COM

Like · Reply · 🔵 3 · September 19 at 11:56am

78.     Sanderson knows—and as set forth above, has been reminded via social media—that consumers believe that "natural" means the chickens who wind up in its Chicken Products were not injected with or otherwise exposed to antibiotics and/or drugs. Sanderson also knows that, contrary to the impression it is misleadingly giving consumers, its chickens ***were*** injected with or otherwise exposed to antibiotics and/or other drugs.

> **C.     Sanderson's Marketing and Advertising Are Designed to, and Do, Mislead Consumers About the Conditions in Which Its Chickens Are Raised.**

79.     Through its marketing and advertising campaign, including but not limited to its prominent declarations of "100% Natural," Sanderson misleads consumers about the conditions in which its chickens are raised.

80.     According to a 2016 Consumer Reports survey of 1,001 adults, 68% of respondents are extremely or very concerned that feeding healthy animals antibiotics may allow animals to be raised in crowded and unsanitary conditions, 53% of respondents are extremely or very concerned

that antibiotic use may lead to environmental pollution, and 51% of respondents are extremely or very concerned that antibiotic use may artificially promote growth.[52]

81.     According to the 2016 survey, 87% percent of respondents think that animals should not be given hormones, ractopamine, or other growth promoting drugs, and 88% percent think that the government should require that meat raised with hormones or ractopamine be labeled as such.[53]

82.     Consumers care about animal welfare, and many are willing to pay extra money for products that they believe come from animals who were treated humanely, as numerous consumer studies have documented.[54] For instance, a 2007 consumer survey found that 58% of consumers are willing to pay more for animal products labeled as "humanely raised."[55] Similarly, a 2010 survey found that 57% of consumers are willing to pay a premium for "food that promises to be produced according to higher ethical standards."[56]

83.     Sanderson knows the advantages of leading consumers to believe that "100% Natural" suggests humane and environmentally sound animal husbandry. In a press release dated September 6, 2016, Sanderson wrote, "In a 2013 poll by the American Humane Association, 89 percent of consumers surveyed stated they were very concerned about farm animal welfare, and 74 percent stated they were willing to pay more for humanely raised meat, dairy and eggs."[57] On page 4 of its 2016 Annual Report, Sanderson claims, "We go beyond the highest animal welfare standards to support the healthy growth of our chickens and the safety of our products."[58]

84.     Consumers believe "100% Natural" Chicken Products to mean that the chickens were not injected with or exposed to antibiotics and/or other pharmaceuticals.

85.     Sanderson's website, prior to Plaintiffs filing their Complaint, bolstered consumers'

---

[52] Consumer Reports National Research Center, *supra* note 37, at 2-3.
[53] *Id.* at 3.
[54] Animal Welfare Institute, *Consumer Perceptions of Farm Animal Welfare*, https://awionline.org/sites/default/files/uploads/documents/fa-consumer_perceptionsoffarmwelfare_-112511.pdf (last visited August 22, 2017).
[55] *Id.* at 8.
[56] *Id.*
[57] Sanderson Farms, "Industry Experts, Veterinarians, and Sanderson Farms Discuss Issues Regarding Animal Welfare" (Sept. 6, 2016), *available at* https://corporate.sandersonfarms.com/press-releases/industry-experts-veterinarians-and-sanderson-farms-discuss-issues-regarding-animal-welfare/.
[58] Sanderson Farms, *supra* note 5.

expectations, stating, "Chickens are raised in spacious, climate controlled houses where they're free to eat, drink and walk around all they want," giving the consumer the false impression that Sanderson's Chicken Products are raised in something other than agro-industrial factory-farm conditions.

86.     On its website for consumers, Sanderson posted an interactive video titled "What Does It Mean to be 100% Natural?" The video, which was removed after Plaintiffs filed suit, is hosted by an animated "Professor Chicken."[59] The video depicts chickens lying on lounge chairs in front of fans and playing volleyball. The text accompanying the volleyball-playing chickens states, "They're all cared for in cage-free and comfortable, climate-controlled houses where they are protected from the elements, predators and diseases." Professor Chicken tells consumers, "All of our chicken houses are large enough to allow the birds to exhibit their natural behaviors. That includes eating, drinking, resting and playing. Look around any house, you'll find our chickens doing all four!"

*Below is a screenshot of the Professor Chicken video.*



---

87.     Sanderson's representations do not match the reality. Sanderson's use of antibiotics, and the steroids and other pharmaceuticals found in its Chicken Products, strongly indicate that the birds are raised in intensive-confinement, agro-industrial conditions where cruelty is inherent. While Sanderson represents that its chickens are sipping lemonade and playing volleyball, the Animal Welfare Institute conducted a four-year study of Good Commercial Practice violations, and Sanderson made the list of top six worst offenders.[60] Furthermore, a 2013 investigation revealed that 132 birds entered the scald tank alive due to a mechanical failure.[61]

## IV.     Sanderson's Conduct Has Injured, and Continues to Injure, Consumers.

88.     Sanderson's conduct has harmed, and continues to harm, California consumers. California consumers did not obtain the full value of their purchase prices because the Chicken Products were not "100% Natural" chicken. Moreover, California consumers bought more Chicken Products, and paid more for them, than they would have, had they known that the Chicken Products contained antibiotics and other pharmaceuticals; had they known that the chickens who end up in the Chicken Products were exposed to antibiotics and other pharmaceuticals; or had they known that the chickens who end up in the Chicken Products were not raised in natural conditions.

89.     Sanderson's false and misleading representations and omissions of fact violate the California Unfair Competition Law, California Bus. & Prof. Code § 17200, *et seq.* ("UCL"), and the California False Advertising Law, California Bus. & Prof. Code § 17500, *et seq.* ("FAL"). Plaintiffs seek an order requiring Sanderson to, among other things (1) cease the unlawful marketing of the Chicken Products, and (2) conduct a corrective advertising campaign.

## PARTIES

90.     Defendant Sanderson is a Mississippi corporation with a principal place of business located at 127 Flynt Road, Laurel, Mississippi.

---

[60] Animal Welfare Institute, *The Welfare of Birds at Slaughter in the United States*, at 6, available at https://awionline.org/sites/default/files/products/FA-Poultry-Slaughter-Report-2016.pdf (last visited August 22, 2017).
[61] A scald tank is tank of scalding water designed to loosen feathers from the carcass. *Id* at 12.

91.     Sanderson is "a fully integrated poultry processing company that produces, processes, markets and distributes fresh and frozen chicken products." Sanderson contracts with more than 900 independent growers.[62] It has 11 processing plants, 10 hatcheries, eight feed mills and one prepared-foods division. Its operations span five states and 14 cities.[63] Sanderson distributes throughout the nation, including to California.

92.     Sanderson processed 3.765 billion dressed pounds of chicken in fiscal year 2016, for net sales of $2.816 billion that same fiscal year.[64]

93.     Plaintiff the OCA is a national § 501(c)(3) organization based in Finland, Minnesota and is the only organization in the United States focused exclusively on promoting the views and interests of the nation's millions of organic and socially responsible consumers, approximately 110,000 of which live in California. The OCA's network members include both businesses and individual consumers, and its platform calls for truth and transparency in advertising and labeling of consumer products. The OCA's platform also calls for the transition away from corporate-controlled agriculture that contributes to the growing antibiotic-resistance crisis and produces products high in residues of unhealthful chemicals, antibiotics, growth hormones, and other substances. These corporate-controlled agricultural entities include factory farms that mistreat animals, employ unfair labor practices, put independent farmers at a competitive disadvantage, pollute the environment, and promote poor human health by producing consumer products low in nutritional value and contaminated with non-food substances.

94.     Through its "Myth of Natural" and "Truth and Transparency in Labeling" campaigns, the OCA helps consumers navigate the confusing array of advertising campaigns and labels companies use to describe their products. The OCA also works to hold corporations accountable for accurately representing, through labels and advertising, the production methods behind their products

---

[62] Sanderson Farms, "Investor Relations," http://ir.sandersonfarms.com/ (last visited August 22, 2017).
[63] Sanderson Farms, "History & Values," http://www.sandersonfarms.com/our-philosophy/history-values/ (last visited August 22, 2017). After Plaintiffs filed suit, Sanderson changed this website. Similar information is available online at http://files.shareholder.com/downloads/ABEA-6BBVPE/5005219733x0x923868/3C7FF84F-FE4A-40FF-95E8-BD9DD5886BF9/SAFM_2016_FINALweb.pdf (last visited August 16, 2017).
[64] Sanderson Farms, *supra* note 5.

as well as the product contents, including non-food substances.

95.     As a result of Sanderson's legal violations, the OCA has suffered injury in fact and has lost money or property. Specifically, the OCA has expended its resources to address Sanderson's misrepresentations. When the OCA became aware of Sanderson's misrepresentations, it diverted resources from other OCA programs in order to conduct research on Sanderson's agricultural practices and its advertising campaign. The OCA used its own research and research from other organizations to prepare internal memoranda, conduct internal strategy meetings, and develop an outreach strategy in order to counteract Sanderson's false advertising. The OCA also spent significant time making numerous phone calls to other organizations to share the information it had gathered and to develop a coordinated multi-organization outreach strategy. The OCA then developed a call to action for its email list titled, "Tell Sanderson Farms to End the Reckless Use of Antibiotics in its Poultry Factory Farms!" The online alert states, "Sanderson likes to brag that its chicken is '100% natural'. . . What the website doesn't tell you is that Sanderson is 100% committed to the over-use of antibiotics."[65] Members responded by directly contacting Sanderson via email, phone and customer contact forms, and Sanderson's social media (Facebook and Twitter). Most consumers communicated directly with the company, however the OCA managed many responses from its members as well as monitored and responded to concerns that consumers posed directly to the OCA.

96.     All of this work interfered with the OCA's organizational activities by taking staff time and resources away from the OCA's local and national policy and consumer education work on environmental issues, including pesticides, soil and water pollution, and climate change, and genetic engineering, food safety, health, fair trade, economic and social justice issues, as well as the organization's work to protect and strengthen organic standards.

97.     Plaintiff FoE is a national non-profit environmental advocacy organization founded in 1969. FoE has offices in Berkeley, California and Washington, D.C, where it is incorporated. Its mission is to defend the environment and champion a healthy and just world. To this end, FoE

---

[65] Organic Consumers Association, "Tell Sanderson Farms to End the Reckless Use of Antibiotics in its Poultry Factory Farms!" https://action.organicconsumers.org/o/50865/p/dia/action3/common/public/?action_KEY=18976 (last visited August 22, 2017).

1   promotes policies and actions that ensure the food that we eat and the products that we use are

2   sustainable and safe for our health and the environment. FoE has more than 175,000 members in all

3   fifty states, of whom 17,362 are in California. Additionally, FoE has more than 920,000 activists on

4   its email list throughout the United States, 51,055 of whom are in California.

5   98.   FoE's "Good Food Healthy Planet" program is focused on reducing the harmful

6   environmental, animal welfare, and public health impacts of industrial animal foods. The program

7   helps grow the consumer market and policy support for healthier, grass-fed and organic meat and

8   dairy, and plant-based foods. FoE's program educates the public about the impact of meat

9   consumption and production, especially related to the issue of antibiotics and other harmful chemicals

10  in animal products. FoE is a co-author of Chain Reaction,[66] an annual report and scorecard that grades

11  America's top restaurant chains on their policies and practices regarding antibiotic use and

12  transparency in their meat and poultry supply chains. The report also covers the use of hormones and

13  availability of organic and grass-fed options. FoE has campaigned over the past several years to

14  eliminate the routine use of antibiotics in animal agriculture, with a focus on changing the purchasing

15  policies of large restaurant chains, who buy large quantities of industrial meat.

16  99.   FoE, which has more than a dozen staff based in Berkeley, California, co-authored a

17  report in 2015 titled "Spinning Food: How Food Industry Front Groups and Covert Communications

18  Are Shaping the Story of Food,"[67] addressing the issues related to chemical-intensive industrial

19  agriculture. Berkeley-based FoE staff also educated the public through blog posts in 2015 titled,

20  "Antibiotic Resistance—with a side order of fries?"[68] FoE's Berkeley staff authored "Redefining

21  Good Food at the Nation's Largest Casual Restaurant Company,"[69] an article produced as part of the

22  Good Food Now campaign that was partially focused on the need to change Darden Restaurant's

23  sourcing practices around industrial meat production and the use of antibiotics. Sanderson sells its

---

[66] FoE's Chain Reaction report and restaurant scorecard is available at http://www.foe.org/projects/food-and-technology/good-food-healthy-planet/chain-reaction (last visited August 22, 2017).

[67] The report is available at http://www.foe.org/news/archives/2015-06-big-food-and-chemical-corporations-spend-millions-to-attack-organic (last visited August 22, 2017).

[68] Blog post available at http://www.foe.org/news/blog/2015-09-antibiotic-resistance-with-a-side-order-of-fries (last visited August 22, 2017).

[69] Article available at https://foodrevolution.org/blog/redefining-good-food-darden-restaurants/ (last visited August 22, 2017).

chicken to Darden Restaurants.

100.    As a result of Sanderson's legal violations, FoE has suffered injury in fact and has lost money or property. FoE has diverted staff time and resources away from its core organizing and policy work, including research and promotion of plant based foods in k-12 schools; research, policy development, and consumer education around organic agriculture; a campaign to get In-N-Out Burger to serve a grass-fed organic burger; and FoE's efforts to get cities and counties to address climate change through reduced meat consumption, in order to focus on educational efforts and campaigns designed to expose the truth about Sanderson's animal raising practices in order to counteract Sanderson's deceptive advertising. As part of this work, FoE staff members have devoted significant resources to educating and mobilizing its members and consumers around concerns about the harmful heath impacts that arise from the misuse of antibiotics. In particular, FoE has spent hundreds of hours researching Sanderson's customers (particularly Darden restaurants) and educating these customers on Sanderson's practices by sending thousands of emails, making hundreds of telephone calls, holding dozens of internal coalition calls, setting up a website, giving presentations and formal advice to investors that are involved in Sanderson's supply chain, writing numerous blogs and educating and organizing other non-profit organizations, FoE's members, and the public through media and direct outreach.[70] FOE spent considerable time organizing more than a dozen nonprofits to deliver over 100,000 petitions to Olive Garden (a major buyer of Sanderson Farms) asking them to stop sourcing from companies that use routine antibiotics. FoE has been quoted in reports by CNN,[71] Reuters,[72] and Huffington Post[73] to address antibiotics in meat. FoE and its allies—including Center for Food Safety—have spent considerable time researching and drafting two major reports and

---

[70] Alternet, "Olive Garden's Chief Got a Leadership Award—Even Though His Company Is Bad for Workers, Animals and the Environment" (Oct. 24, 2016), http://www.alternet.org/food/olive-gardens-chief-got-leadership-award-even-though-his-company-bad-workers-health-animals-and.
[71] CNN, "USDA doesn't care if our diets are climate friendly – but Americans do" (Oct. 7, 2015), http://www.cnn.com/2015/10/07/opinions/sutter-usda-dietary-guidelines-climate/.
[72] Reuters, "U.S. fast-food meat still mostly raised on antibiotics" (Sept. 15, 2015), *available at* http://www.reuters.com/article/restaurants-antibiotics-idUSL1N11K20Q20150915.
[73] Huffington Post, "Subway Is Transitioning To Antibiotic-Free Meat" (Oct. 20, 2015), http://www.huffingtonpost.com/entry/subway-antibiotic-free-meat_us_5626a723e4b0bce34702bc85.

scorecards[74] (Chain Reaction I and II) that grade America's top restaurant chains—including several Sanderson Farms' customers who received F grades—Dairy Queen, Denny's, Arby's, Chili's, and Olive Garden—on their policies and practices regarding antibiotic use and transparency in their meat and poultry supply chains.

101.    Plaintiff CFS is a national nonprofit environmental and consumer advocacy organization that empowers people, supports farmers, and protects the earth from the harmful impacts of industrial agriculture. Through groundbreaking legal, scientific, and grassroots action, CFS protects and promotes the public's right to safe food and the environment. CFS has four offices nationally, including one in Washington, D.C. and one in San Francisco, California, where it conducts much of its policy work and litigation challenging the use of pharmaceuticals in industrial animal agriculture. CFS has more than 900,000 consumer and farmer supporters across the country with 103,631 in California.

102.    CFS's "Animal Factories" program uses regulatory action, citizen engagement, litigation, and legislation to promote transparency and accountability in the food animal industry. Through this work, the program aims to reduce the harmful impacts of animal factories on animal welfare, the environment, and human health and to increase consumer awareness, availability, and accessibility of suitable alternatives by highlighting humane, organic, and pasture-based animal-raising practices and producers. Since 2009, CFS's Animal Factories program has developed expertise and multi-faceted strategies on addressing the known impacts and lack of robust information on approved animal drugs. CFS is a co-author of the annual Chain Reaction report and scorecard, ranking the top 25 U.S. restaurant chains based on implementation of policies restricting antibiotics use in their meat and poultry supply chains. In coalition with several groups, CFS has also launched several public pressure campaigns against individual restaurant chains to encourage strong commitments addressing antibiotics use, including campaigns against Subway and In-N-Out Burger.

103.    CFS's innovative work on animal drugs has long extended beyond antibiotics to include the use of natural hormones, synthetic hormones, beta-agonists, heavy metal compounds, and

---

[74] Center for Food Safety's Chain Reaction II report and restaurant scorecard is available at http://www.centerforfoodsafety.org/reports/4471/chain-reaction-ii-how-top-restaurants-rate-on-reducing-use-of-antibiotics-in-their-meat-supply (last visited August 22, 2017).

antiparasitics, commonly used for non-therapeutic, production purposes like growth promotion or disease prevention. CFS successfully pressured the FDA to withdraw the approval of arsenic-based animal drugs—the only intentional introduction of arsenic in to the food supply—through successful litigation and grassroots mobilization. CFS staff in the San Francisco and Washington, D.C. offices authored the 2014 report, "America's Secret Animal Drug Problem," which highlighted FDA's insufficient oversight of the animal drug approval process and the lack of publicly available scientific information demonstrating the safety of several approved animal drugs for human health, animal welfare, and the environment. Leveraging information gathered in this foundational report, CFS staff continues to educate consumers about concerns of approved animal drugs through regular blog posts. Additionally, a 2016 factsheet, "Pharming Profits: The Drugs that Make Cheap Meat," provides an update to the 2014 report.

104.    CFS has also spent considerable resources promoting transparency in advertising and labeling and providing consumers with information about the meaning and integrity of common advertising and label claims. This has included raising awareness of the lack of a federal definition for the term "natural" on food product labels and advertising. To help ensure that consumers are not misled by the term, CFS staff in California published a simple factsheet, "What's in a Label? Natural: Another Name for Conventionally Grown."

105.    CFS is also a co-author of Chain Reaction and Chain Reaction II. These reports uncovered that several of Sanderson's customers—Dairy Queen, Denny's, Arby's, Chili's, and Olive Garden—received an "F" grade for failing to take steps to end the misuse of medically important antibiotics in their chicken supply chain. Based on this data, CFS deduced that several of the 16 companies that were refusing to phase out antibiotics were sourcing from Sanderson, the only company of the top four chicken producers that had made no commitment to reduce the use of antibiotics.

106.    In 2016, CFS diverted resources and over 100 hours of staff time away from its core mission as a government watchdog organization with a focus on challenges to administrative agency actions in order to devote sufficient time to address these companies'—Sanderson's customers'—failures to remove antibiotics from their supply chain. As part of this effort, CFS drafted and edited

a petition expressing consumer dissatisfaction with Sanderson's customers that were failing to address antibiotics in their supply, developed language for public outreach and alerts to CFS members, created social media posts and a landing page on CFS's website to circulate and promote the petition to CFS members and the public. CFS also directly contacted the executive leadership of the 16 failing companies about the petition and delivered the letters and more than 125,000 signatures electronically to the corporate headquarters of each failing company. CFS staff wrote and published a press release and a blog announcing the delivery of the petition and signatures to all 16 companies, and responded to media inquiries regarding the campaign.

107.    Plaintiffs bring this action on behalf of the general public, and on behalf of their members and supporters, who actively seek and wish to purchase organic, natural, and/or socially responsible products and who were deceived by Sanderson's marketing campaign. Plaintiffs' members and supporters have purchased Sanderson's products based on Sanderson's false marketing materials and material misrepresentations about its Chicken Products. Plaintiffs' members are harmed because but for the false advertising and unfair competition, they would not have purchased these products, particularly because they contain unnatural substances.

108.    Because of Sanderson's false marketing materials, Plaintiffs have had to devote organizational resources to counteract misinformation, educating consumers about this and other "natural" claims, advocating for stronger standards for the "natural" claim that fall in line with consumer expectations, and publicizing the truth about Sanderson's farming practices. This misleading advertising of "100% Natural" products has caused Plaintiffs to divert their organizational resources away from other priorities and campaigns that could have protected more consumers. The injury to Plaintiffs is not speculative; instead, expenses incurred by the efforts described above, which resulted from Sanderson's unlawful conduct, could have been spent in ways that better furthered Plaintiffs' mission had Sanderson not launched its misleading "Truth About Chicken" campaign.

109.    If Sanderson were to cease its "natural" advertising claims and its "Truth About Chicken" advertising campaign, including by the injunctive relief sought through this action, Plaintiffs would not have to continue diverting organizational resources to warn consumers and educate the public about Sanderson's products and chicken raising practices, and could redirect these

1  resources to other projects, in furtherance of their respective missions.

2  **JURISDICTION AND VENUE**

3  110.  This case arises under California Bus. & Prof. Code § 17203, which provides that any

4  person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in

5  any court of competent jurisdiction. As more fully alleged in this Complaint, Sanderson's

6  misrepresentations and omissions of material fact in its labeling and marketing of the Chicken

7  Products constitute false advertising under California Bus. & Prof. Code § 17500. This Court has

8  subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity).

9  111.  This Court has personal jurisdiction over the parties in this case. Plaintiff the OCA

10  maintains a presence in Alameda County with approximately 3,460 subscribers in the County, and

11  by filing this Complaint, consents to this Court having personal jurisdiction over it. Plaintiff FoE

12  maintains a presence in Alameda County, including its Berkeley office located at 2150 Allston Way,

13  Suite 360, Berkeley, California 94704 and, by filing this Complaint, consents to this Court having

14  personal jurisdiction over it. FoE has approximately 134 members in Berkeley, approximately 142

15  members in Oakland, and approximately 1,992 members in the Bay Area counties of Alameda (450),

16  Santa Clara (343), Contra Costa (267), San Francisco (248), Marin (243), Sonoma (202), San Mateo

17  (172), Napa (35), and Solano (32). Plaintiff CFS maintains a presence in San Francisco, California,

18  including its office at 303 Sacramento Street, San Francisco, California 94111. CFS has

19  approximately 4,128 members in San Francisco, approximately 1,837 members in Oakland, and

20  approximately 28,988 members in the Bay Area counties of Alameda (5,789), Santa Clara (4,286),

21  Contra Costa (2,995), San Francisco (4,833), Marin (3,515), Sonoma (3,923), San Mateo (2,207),

22  Napa (655) and Solano (785).

23  112.  Sanderson, a citizen of Mississippi, is authorized to, and in fact does, conduct

24  substantial business in California, including in the Northern District of California. Sanderson

25  purposefully avails itself of the laws of California to market, promote, distribute, and sell the Chicken

26  Products to consumers in California and in the Northern District of California.

27  113.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), because a

28  substantial portion of the events or omissions giving rise to the claims occurred in this District.

Sanderson marketed, advertised, and sold Chicken Products in the Northern District of California, and Plaintiffs suffered an injury in the Northern District of California.

## STATUTORY FRAMEWORK

114.  The UCL, California Bus. & Prof. Code § 17200 *et seq.*, prohibits businesses from engaging in unlawful, fraudulent, or unfair business practices, including violations of other statutes.

115.  California Bus. & Prof. Code § 17203 allows any person to pursue representative claims or relief on behalf of others if the claimant meets the standing requirements of California Bus. & Prof. Code § 17204 and California Civ. Proc. Code § 382.

116.  Plaintiffs have standing under California Bus. & Prof. Code § 17204, which provides that actions for relief pursuant to the UCL shall be prosecuted exclusively in a court of competent jurisdiction by, *inter alia*, any person who has suffered injury in fact and has lost money or property as a result of the unfair competition.

117.  Plaintiffs have standing under California Civ. Proc. Code § 382, which provides that "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

118.  The FAL, California Bus. & Prof. Code § 17500, declares it unlawful for any person to disseminate before the public any statement concerning personal property that the person knows, or through the exercise of reasonable care should know, to be untrue or misleading, with intent to dispose of that property or to induce the public to enter into any obligation relating thereto; or to disseminate such untrue or misleading statements as part of a plan or scheme with the intent not to sell the property as advertised.

119.  Pursuant to California Bus. & Prof. Code § 17535, any person, association, or organization which violates the FAL may be enjoined by any court of competent jurisdiction. Actions for injunctive relief under the FAL may be prosecuted by any person who has suffered injury in fact and has lost money or property as a result of a violation of the FAL, and the court may make such orders or judgments which may be necessary to restore to any person in interest any money or property which may have been acquired by means declared to be unlawful by the FAL.

**CAUSES OF ACTION**

**COUNT I**
**(Violation of California Unfair Competition Law –**
**California Bus. & Prof. Code § 17200, *et seq*.)**

120.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

121.    Sanderson engaged in unlawful, unfair, and/or fraudulent conduct under the California UCL, California Business & Professions Code § 17200, *et seq*., by representing in its advertising that the Chicken Products are "100% Natural" food products.

122.    Sanderson engaged in unlawful, unfair, and/or fraudulent conduct under the California UCL, California Business & Professions Code § 17200, *et seq*., by representing in its advertising that its chickens are raised with "100% Natural" farming procedures.

123.    Sanderson's conduct is unlawful in that it violates the California False Advertising Law ("FAL"), California Business & Professions Code § 17500 *et seq*., described more fully in Count II.

124.    Sanderson's conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiffs, Plaintiffs' members, and California consumers. The harm to Plaintiffs arising from Sanderson's conduct outweighs any legitimate benefit Sanderson derived from the conduct. Sanderson's conduct undermines and violates the stated spirit and policies underlying the FAL and other legal regulations as alleged herein.

125.    Sanderson's advertising actions and practices with regard to the food product and the farming practices constitute "fraudulent" business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers. As a direct and proximate result of Sanderson's violations, Plaintiffs suffered injury in fact because they were forced to divert substantial organizational resources away from their core missions. Sanderson's unlawful encouragement of such practices have frustrated Plaintiffs' efforts to promote transparency in the food system and to end cruel agro-industrial practices.

126.    Plaintiffs seek (a) injunctive relief in the form of an order requiring Sanderson to cease the acts of unfair competition alleged herein and to correct its advertising, promotion, and marketing

campaigns; (b) interest at the highest rate allowable by law; and (c) the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure Section 1021.5.

## COUNT II
### (Violation of California False Advertising Law –
### California Bus. & Prof. Code § 17500, *et seq.*)

127. Plaintiffs incorporate by reference and re-alleges the preceding paragraphs.

128. Sanderson publicly disseminated untrue or misleading advertising, or intended not to sell the Chicken Products as advertised, in violation of the California FAL, Business & Professional Code § 17500, *et seq.*, by representing that the Chicken Products are "100% Natural" food products when they are not.

129. Sanderson publicly disseminated untrue or misleading advertising, or intended not to sell the Chicken Products as advertised, in violation of the California FAL, Business & Professional Code § 17500, *et seq.*, by representing that its farming procedures "100% Natural" when they are not.

130. Sanderson publicly disseminated untrue or misleading representations in its advertising regarding the Chicken Products, which it knew, or in the exercise of reasonable care should have known, were untrue or misleading, in violation of the FAL.

131. As a direct and proximate result of Sanderson's violations, Plaintiffs suffered injury in fact because they were forced to divert substantial organizational resources away from their core missions. Sanderson's unlawful encouragement of such practices have frustrated Plaintiffs' efforts to promote on behalf of the general public transparency in the food system and to end cruel farming practices.

132. Plaintiffs seek (a) injunctive relief in the form of an order requiring Sanderson to cease the acts of unfair competition alleged herein and to correct its advertising, promotion, and marketing campaigns; (b) interest at the highest rate allowable by law; and (c) the payment of Plaintiffs' attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5, *inter alia*.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Sanderson, as follows:

A.     Declaring that Sanderson violated the UCL and FAL;

B.     Ordering an accounting by Sanderson for any and all profits derived by Sanderson from its herein-alleged unlawful, unfair, and/or fraudulent conduct and/or business practices;

C.     Ordering an awarding of injunctive relief as permitted by law or equity, including enjoining Sanderson from continuing the unlawful practices as set forth herein, and ordering Sanderson to engage in a corrective advertising campaign;

D.     Ordering Sanderson to pay attorneys' fees and litigation costs to Plaintiffs pursuant to California Code of Civil Procedure Section 1021.5 and the common-law private-attorney-general doctrine;

E.     Ordering Sanderson to pay both pre- and post-judgment interest on any amounts awarded; and

F.     Ordering such other and further relief as may be just and proper.

Dated: August 23, 2017               Respectfully submitted,

**RICHMAN LAW GROUP**

*Kim E. Richman* (signature)

—————————————————
Kim E. Richman (*Pro Hac Vice*)
krichman@richmanlawgroup.com
Jaimie Mak, Of Counsel (CSB No. 236505)
jmak@richmanlawgroup.com
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 687-8291
Facsimile: (212) 687-8292

**ELSNER LAW & POLICY, LLC**
Gretchen Elsner (*Pro Hac Vice*)
150 Washington Avenue, Suite 201-220
Santa Fe, NM 87501

Telephone: (505) 303-0980
gretchen@elsnerlaw.org

**CENTER FOR FOOD SAFETY**
Paige Tomaselli (CSB No. 237737)
Adam Keats (CSB. No. 191157)
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
Telephone: (415) 826-2770
ptomaselli@centerforfoodsafety.org
akeats@centerforfoodsafety.org

*Counsel for Plaintiffs*