UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORGANIC CONSUMERS ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SANDERSON FARMS, INC.,<br><br>Defendant. | Case No. 17-cv-03592-RS<br><br>**ORDER DENYING MOTION TO DISMISS** |

## I. INTRODUCTION

Organic Consumers Association ("OCA"), Friends of the Earth ("FoE"), and Center for Food Safety ("CFS") bring suit against Sanderson Farms, Inc. over advertising and marketing materials that plaintiffs allege are designed to, and do, mislead consumers about the nature of Sanderson's chicken products and farming practices. Sanderson moves to dismiss, contending plaintiffs lack standing and assert claims that are preempted and/or implausible. For the reasons explained below, Sanderson's motion is denied.

## II. BACKGROUND[1]

Sanderson is a poultry processing company that produces, processes, markets, and

---

[1] The factual background is based on the averments in the complaint, which must be taken as true for purposes of this motion.

distributes fresh and frozen chicken products throughout the United States. It processed nearly four billion pounds of chicken in fiscal year 2016 for net sales of roughly 2.8 billion dollars.

OCA, FoE, and CFS are non-profit organizations that work to safeguard the rights and promote the views and interests of socially responsible consumers and farmers. They conduct research, policy, and advocacy work aimed at creating greater transparency around food production and encouraging practices that support a sustainable and healthy natural environment.

The instant dispute involves marketing materials distributed by Sanderson on the internet and via television. The web materials at issue include videos, fact sheets, and FAQs that make various claims about Sanderson's chicken including that it is "100% Natural," has no "hidden ingredients," and that "at Sanderson Farms, being 100% natural means there's only chicken in our chicken." The television advertisements at issue began airing in mid-2016. They include five videos featuring "Bob" and "Dale," two men wearing Sanderson Farms baseball caps who make comments such as, "no antibiotics to worry about here" and "good, honest chicken."

Plaintiffs allege the above claims are misleading, pointing in part to testing performed by the U.S. Department of Agriculture ("USDA") which found 49 instances in which Sanderson's products tested positive for antibiotics, pharmaceuticals, and other unnatural substance residues. In response, plaintiffs have undertaken various efforts to warn customers and educate the public about the true nature of Sanderson's products and chicken raising practices. They have conducted research on Sanderson's farming methods, released reports, alerts, and other materials designed to combat Sanderson's misrepresentations, and conducted advocacy efforts aimed at getting Sanderson's commercial customers to remove antibiotics from their supply chains.

The plaintiffs filed the instant suit on June 22, 2017 and a First Amended Complaint ("FAC") on August 23, 2017. They advance claims under California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL"), California Business and Professions Code sections 17200, *et seq.* and 17500, *et seq.*, respectively.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard asks for "more than a sheer possibility that a defendant acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id*. at 679.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotations and citations omitted).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *AlliedSignal, Inc. v. City of Phoenix*, 182 F.3d 692, 695 (9th Cir. 1999). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

Sanderson seeks dismissal on three grounds: 1) plaintiffs lack standing; 2) plaintiffs'

claims are preempted; and 3) plaintiffs' allegations are facially implausible.

## IV. DISCUSSION

### A. Standing

To satisfy Article III's standing requirements, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Generally, an organizational plaintiff can assert standing directly—by alleging injury to itself—or representationally—by basing its standing on that of its members. *See Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004). The plaintiffs here do not affirmatively assert representational standing. *See* Opp. at 7, n.1. Thus, the key issue is whether they have direct standing.

An organization may show an 'injury in fact' sufficient to confer direct standing by alleging: "(1) frustration of its organizational mission; and (2) diversion of its resources" to combat the challenged actions by defendant. *Id.* at 1105. An organization cannot "manufacture" an injury by sustaining litigation costs or by choosing to use resources to fix problems that otherwise would not have affected it. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). It is sufficient, however, for the organization to allege defendant's actions caused it to expend additional resources and "but for" those actions it would have spent those resources to accomplish other aspects of its organizational mission. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41 (9th Cir. 2015).

Here, plaintiff OCA has alleged an injury sufficient to confer direct organizational standing. OCA's mission includes promoting the views and interests of organic and socially responsible consumers. It pursues this mission by advocating for greater truth and transparency in advertising and labeling of consumer products and calling for the transition away from corporate-controlled agriculture that contributes to growing antibiotic-resistance. OCA alleges its mission is

frustrated by Sanderson's marketing materials which give the false impression that Sanderson's products are natural and antibiotic free. In response, OCA has conducted research into Sanderson's farming practices and advertising, prepared internal memoranda, conducted strategy meetings, and developed and coordinated a multi-organization consumer outreach plan including call-to-action emails and online alerts. OCA has also responded to concerns from consumers and its members related to Sanderson's misrepresentations. All of these efforts have required OCA to divert resources and staff time away from its policy and consumer education work on other issues such as soil and water pollution, genetic engineering, and strengthening organic standards.

OCA's diversion of resources is similar to that of the plaintiff in *Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002). In *Combs*, the plaintiff ("Fair Housing") was a non-profit community organization that worked to promote equal housing opportunities by investigating allegations of discrimination, conducting tests of housing facilities, conducting outreach and education to the community regarding fair housing, and taking whatever other steps it deemed "necessary to assure equal opportunity in housing and to counteract and eliminate unlawful discriminatory housing practices." *Id.* at 901. When Fair Housing received complaints that Combs was racially discriminating against black tenants, it responded to those complaints by conducting two sets of controlled tests in which a black tester was sent to view a unit at Combs' complex—both tests indicated that Combs was in fact discriminating. Even though investigation, testing, and outreach were activities that Fair Housing regularly engaged in, the Ninth Circuit found that the resources Fair Housing diverted from its other efforts in order to investigate and respond to Combs' discrimination were sufficient to support standing. *Id.* at 905. Combs' practices had frustrated Fair Housing's mission, and the resources diverted to deal with that frustration went above and beyond litigation. *Id.* The same is true here of OCA's expenditures.

Plaintiff FoE has also established an injury sufficient to confer direct organizational standing. FoE's mission is to defend the environment and champion a healthy and just world. The organization is focused on reducing the environmental, animal welfare and public health impacts of industrial animal foods by helping to grow the consumer market for healthier meat. FoE alleges

ORDER DENYING MOTION TO DISMISS
CASE NO. 17-cv-03592-RS

5

Sanderson's false portrayal of its industrial farming practices as "natural" frustrates its mission. To counteract Sanderson's misinformation, FoE has conducted research on Sanderson's customers (especially Darden restaurants) and worked to educate them on Sanderson's practices via phone calls, emails, setting up a website, writing blogs, and investor presentations. FoE has also devoted time and resources to organizing its members and collaborating with other non-profit organizations in delivering over 100,000 petitions to Olive Garden (a major buyer of Sanderson products) demanding it stop sourcing from companies that use routine antibiotics. All of these efforts have required FoE to divert resources from its core organizing and policy work related to promoting plant based foods in schools, educating consumers about organic agriculture, and pushing cities and counties to address climate change.

FoE's diversion of resources is similar to that of the plaintiff in *People for the Ethical Treatment of Animals* ("PETA") *v. Whole Foods Mkt. California, Inc.*, 2016 WL 362229 (N.D. Cal. Jan. 29, 2016). In *Whole Foods*, PETA's mission involved keeping the public "well-informed" about animal use and treatment in four main areas, including animals raised for food. PETA alleged that Whole Foods' in-store advertisements and "five step Global Animal Partnership" ratings misled consumers into believing the meat they were purchasing was treated in a humane manner exceeding industry standards. *Id.* at *1. PETA alleged it had diverted resources from other projects "in order to urge Whole Foods to stop its misleading advertising and to educate the public about the inadequacy of [Whole Foods]' standards." *Id.* at *4 (modification in original). This was enough, the court found, to survive dismissal. *Id. See also Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (organizational plaintiff had standing where it investigated defendant's alleged violations and, in response, expended resources not associated with litigation to conduct education and outreach campaigns targeted at discriminatory roommate advertising).

Plaintiff CFS's allegations generally parallel those of OCA and FoE and are similarly sufficient to confer standing. CFS's stated mission is to empower people, support farmers, and protect the earth from the harmful impacts of industrial agriculture. While one of its core activities

is challenging administrative actions, CFS also works to promote transparency in advertising and labelling and to provide consumers with information about the meaning and integrity of common advertising claims. CFS alleges Sanderson's deceptive advertising has frustrated its mission and has required it to divert resources and over 100 hours of staff time away from its core mission as a government watchdog. Specifically, it has conducted research into 16 companies that source from Sanderson and has engaged in various advocacy efforts aimed at encouraging these Sanderson customers to remove antibiotics from their supply chains. These efforts include drafting a petition expressing consumer dissatisfaction, developing language for public outreach, alerts, and social media posts, and creating a landing page on CFS's website to circulate and promote the petition. They also include contacting the executive leadership of the companies, electronically delivering the more than 125,000 petition signatures, issuing a press release and blog post announcing the delivery, and responding to media inquiries regarding the campaign.

In attempting to avoid the conclusion plaintiffs have standing, Sanderson points out that plaintiffs' alleged diversion of resources occurred *before* the five video advertisements featuring "Bob" and "Dale." While true, this ignores the allegedly misleading materials on Sanderson's website (videos, FAQs, etc.) which also frustrated plaintiffs' missions and prompted their diversion of resources. It also ignores plaintiffs' allegations of ongoing injury—i.e., that plaintiffs are continuing to divert resources to counteract Sanderson's evolving, but still misleading, advertising efforts. At the pleading stage, a diversion-of-resources injury is sufficient to establish organizational standing even when it is "broadly alleged." *Cegavske*, 800 F.3d at 1040 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Here, OCA, FoE, and CFS have all satisfied that burden.

**B. Preemption**

Federal law can preempt state law either expressly or impliedly. Implied preemption occurs when (1) a "scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or (2) "compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Generally, where federal law is said to bar state action in fields of traditional state regulation, there is a presumption that the "historic police powers of the States" are not to be superseded by federal law "unless that was the clear and manifest purpose of Congress." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Here, Sanderson argues plaintiffs' state law claims challenging its advertising are impliedly preempted due to their interference with the regulatory scheme created by Congress through passage of the Poultry Products Inspection Act ("PPIA") and Federal Meat Inspection Act ("FMIA").[2] Permitting the state claims to proceed, Sanderson contends, would foil Congress' intent in enacting the PPIA and FMIA to provide uniform national standards for monitoring food producers and ensuring they do not mislead consumers as to the contents of meat products. Moreover, allowing plaintiffs to challenge advertising using the same "100% Natural" language approved by the USDA for Sanderson's labels would undermine the USDA's authority and Congress's underlying delegation to the agency. Both of these arguments are unavailing.

First, as an initial matter, consumer protection laws such as the UCL and FAL are within the historic police powers resting with the states and are therefore subject to the presumption against preemption. *See In re Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1088 (2008). Consequently, they cannot be superseded by federal law or action unless it is the "clear and manifest purpose of Congress." Such purpose is not evident here. Neither the PPIA nor FMIA demonstrates express or implicit congressional intent to limit legislation like the UCL and FAL. In

---

[2] Sanderson's initial motion correctly argued that any challenge to its "100% Natural" labels is expressly preempted by USDA's guidelines. *See, e.g., Brower v. Campbell Soup Co.*, 243 F. Supp. 3d 1124, 1129 (S.D. Cal. 2017), *appeal dismissed*, 2017 WL 4349372 (9th Cir. Sept. 6, 2017). While the FAC references Sanderson's labelling at least once (*See* FAC ¶110), plaintiffs state in their opposition that they challenge only Sanderson's advertising. Opp. at 12. Thus, express preemption is not at issue.

fact, the state and federal laws at issue here are complementary. The UCL and FAL prohibit "unfair competition" including "misleading advertising" and "false advertising." *See* Cal. Bus. & Prof. Code §§ 17200, 17500. Allowing plaintiffs to proceed with their *advertising* claims in no way undermines the PPIA's objectives of ensuring that poultry products are "wholesome, not adulterated, and properly marked, labeled, and packaged." *See* 21 U.S.C. § 451. *Cf. Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1153 (9th Cir. 2017) (finding state law addressing cruel feeding practice was not preempted by PPIA). Nor does it hinder the FMIA's nearly identical objectives of assuring the quality and proper labeling of "meat and meat food products." *See* 21 U.S.C. § 602; *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 334 (5th Cir. 2007) ("[T]he FMIA contains a narrow inspection and labeling preemption clause, and Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.")[3]

Second, the "100% Natural" language approved by the USDA for Sanderson's labels may nonetheless be misleading in other contexts. Label language is reviewed for technical and scientific accuracy. Yet common sense suggests even "language that is technically and scientifically accurate on a label can be manipulated in an advertisement to create a message that is false and misleading to the consumer." *See Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 549 F. Supp. 2d 708, 720 (D. Md. 2008). Here, Sanderson's advertising includes images, representations, and language that go beyond what is included on the USDA approved label. Accordingly, a court or jury could conclude that Sanderson's advertisements are misleading—and violate both the FAL and UCL—without contradicting or interfering with USDA authority. Plaintiffs' claims therefore are not preempted.

---

[3] *See also Animal Legal Def. Fund v. Hormel Foods Corp.*, 2017 D.C. Super. LEXIS 9, *4 (D.C. Super. Ct. Sept. 20, 2017) (Finding the PPIA's and FMIA's preemption clauses preclude states from enacting different or additional marking, labeling, packaging, or ingredient requirements but do not expressly preclude state laws regulating false or misleading advertising of products covered under the PPIA and FMIA).

**C. Plausibility**

The final ground on which Sanderson seeks dismissal is that plaintiffs' allegations are implausible. At core, Sanderson contends a reasonable consumer would not interpret "natural" as stringently as the plaintiffs propose or be surprised to learn that Sanderson's products have trace amounts of synthetic materials like antibiotics. As with Sanderson's arguments on standing and preemption, this argument also is unpersuasive.

Whether a business practice is deceptive is generally a question of fact that requires weighing of evidence from both sides. *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134-35 (2007). For that reason, courts grant motions to dismiss under the reasonable consumer test only in rare situations in which the facts alleged in the complaint "compel the conclusion as a matter of law that consumers are not likely to be deceived." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 226-27 (2013). *See also Broomfield v. Craft Brew All.*, *Inc.,* 2017 WL 3838453, at *5 (N.D. Cal. Sept. 1, 2017), *on reconsideration in part*, 2017 WL 5665654 (N.D. Cal. Nov. 27, 2017) ("[T]he deceptive nature of a business practice under California's consumer protection statutes is usually a question of fact that is inappropriate for decision on demurrer or a motion to dismiss.") (citing *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)).

Here, plaintiffs plausibly allege a reasonable consumer could find Sanderson's marketing and advertising materials deceptive. Plaintiffs point to surveys indicating a majority of consumers believe: a) a "natural" poultry product is produced without the use of antibiotics or other drugs at any point; and b) it is important to reduce antibiotic use in food production and improve the living conditions of animals. In light of this information (and various other allegations), it is plausible a reasonable consumer could be misled by Sanderson's use of words and phrases like "natural," "there's only chicken in our chicken," and "no antibiotics to worry about here," and might purchase Sanderson's products based on a flawed understanding of how Sanderson's chickens are raised. At the very least, the facts alleged do not "compel the conclusion" that consumers are unlikely to be deceived by Sanderson's marketing and that this case must therefore be dismissed.

## V. CONCLUSION

For all of the foregoing reasons, Sanderson's motion to dismiss is denied.

**IT IS SO ORDERED**.

Dated: February 9, 2018

_____
RICHARD SEEBORG
United States District Judge