REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1

2

3

4

**ELSNER LAW & POLICY, LLC**
Gretchen Elsner (*Pro Hac Vice*)
Gretchen@ElsnerLaw.org
150 Washington Avenue, Suite 201
Santa Fe, NM 87501
Telephone: (505) 303-0980

5

6

7

8

9

**CENTER FOR FOOD SAFETY**
Adam Keats (CSB No. 191157)
Kellan Smith (CSB No. 318911)
akeats@centerforfoodsafety.org
ksmith@centerforfoodsafety.org
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
Telephone: (415) 826-2770

10

*Counsel for Plaintiffs*

11

12

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13

14

15

16

17

18

19

| | |
|---|---|
| FRIENDS OF THE EARTH and CENTER FOR FOOD SAFETY,<br><br>        *Plaintiffs,*<br><br>        v.<br><br>SANDERSON FARMS, INC., a Mississippi corporation,<br>        *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:17-CV-03592-RS<br><br>**THIRD AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

20

21

22

23

24

25

26

27

28

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

### THIRD AMENDED COMPLAINT

Plaintiffs Friends of the Earth (FoE), a Washington, D.C. based non-profit corporation, and Center for Food Safety (CFS), a national non-profit corporation based in Washington, D.C., (collectively, "Plaintiffs"), on behalf of the general public, by and through their counsel, bring this action against Sanderson Farms, Inc. ("Defendant" or "Sanderson"), a Mississippi corporation, and allege as follows:

### INTRODUCTION AND NATURE OF ACTION

1. Plaintiffs—nonprofit public interest and environmental advocacy organizations working to protect human health and the environment—bring this civil action for declaratory and equitable relief under California's Unfair Competition Law (UCL), California Business & Professions Code § 17200, *et seq.*, and California's False Advertising Law (FAL), *id.* § 17500, *et seq.*, challenging Defendant Sanderson's advertising of its Chicken Products as "100% Natural."

2. Sanderson produces Chicken Products, as defined *infra*, ¶¶37-39.

3. Sanderson markets and advertises these Chicken Products as "100% Natural," as detailed *infra*, ¶¶40-46.

4. Reasonable consumers expect that "100% Natural" advertising indicates a meat and poultry product that was produced from a process where, among other things as detailed *infra*, ¶¶47-53, (1) the product does not contain any pharmaceutical residues; (2) animals were not given any pharmaceuticals, including antibiotics, and especially not on a routine basis; (3) pharmaceuticals were not used in a way, such as routinely for every flock, that contributes to unnatural, antibiotic resistant bacteria; and (4) animals were allowed to go outdoors and were raised in a natural environment.

5. By advertising its Chicken Products as "100% Natural," Sanderson's advertising scheme falsely and misleadingly suggests that its process and resulting product meet reasonable consumer expectations for "natural" poultry, including that (1) no pharmaceutical residues remain in the product; (2) pharmaceuticals, including antibiotics, are not routinely injected into the eggs of chickens or fed to the chickens during the majority of their lives; (3) Sanderson is not

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1    contributing to the spread of antibiotic resistant bacteria; (4) the chickens who become

2    Sanderson's Chicken Products were raised in natural conditions, such as going outdoors.

3         6.      As detailed *infra*, ¶¶59-68, in reality Sanderson's unnatural industrial production

4    practices include the routine use of pharmaceuticals, including antibiotics, to all birds in a flock

5    ███████████████████████████████████████████████████████████████████

6    ███████████████ This routine use of multiple antibiotics contributes to the growth of antibiotic

7    resistant bacteria, ████████████████████████ as detailed *infra*, ¶¶69-76. In addition,

8    as detailed *infra*, ¶¶77-78, living conditions for Sanderson's chickens do not meet the reasonable

9    consumer expectation for poultry advertised as "100% Natural."

10        7.      Accordingly, a significant portion of the general public, acting reasonably under

11   the circumstances, could be misled by the way Sanderson markets and advertises its products.

12        8.      As detailed *infra*, ¶¶79-82, Sanderson knows, or at the very least through the

13   exercise of reasonable care should know, its advertising claims, including "100% Natural"

14   claims, to be false and misleading, and thus, disseminates such untrue and misleading statements

15   as part of a plan or scheme with the intent not to sell its Chicken Products as advertised.

16        9.      Plaintiffs seek declaratory relief that Sanderson's advertising is unlawful under

17   California's UCL and FAL, and injunctive relief (a) enjoining Sanderson from continuing the

18   unlawful practices as set forth here and (b) ordering Sanderson to engage in a corrective

19   advertising campaign.

20

21                              **JURISDICTION**

22        10.     This case arises under California Bus. & Prof. Code § 17203, which provides that

23   any person who engages, has engaged, or proposes to engage in unfair competition may be

24   enjoined in any court of competent jurisdiction. As more fully alleged in this Complaint,

25   Sanderson's misrepresentations and omissions of material fact in its marketing of the Chicken

26   Products constitute false advertising under California Bus. & Prof. Code § 17500. This Court has

27   subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity).

28

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

11. This Court has personal jurisdiction over the parties in this case. Plaintiff FoE maintains a presence in Alameda County, including its Berkeley office located at 2150 Allston Way, Suite 360, Berkeley, California 94704, and, by filing this Complaint, consents to this Court having personal jurisdiction over it. FoE has approximately 1,213 members in Berkeley, approximately 1,493 members in Oakland, and approximately 10,400 members in the Bay Area counties of Alameda (2,467), Santa Clara (1,554), Contra Costa (1,249), San Francisco (1,528), Marin (1,068), Sonoma (1,226), San Mateo (882), Napa (173), and Solano (253). Plaintiff CFS maintains a presence in San Francisco, California, including its office at 303 Sacramento Street, San Francisco, California 94111. CFS has approximately 4,128 members in San Francisco, approximately 1,837 members in Oakland, and approximately 28,988 members in the Bay Area counties of Alameda (5,789), Santa Clara (4,286), Contra Costa (2,995), San Francisco (4,833), Marin (3,515), Sonoma (3,923), San Mateo (2,207), Napa (655) and Solano (785).

12. Sanderson, a citizen of Mississippi, is authorized to, and in fact does, conduct substantial business in California, including the Northern District of California. Sanderson purposefully avails itself of the laws of California to market, promote, distribute, and sell the Chicken Products to consumers in California and in the Northern District of California.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial portion of the events or omissions giving rise to the claims occurred in this District. Sanderson marketed, advertised, and sold Chicken Products in the Northern District of California, and Plaintiffs suffered an injury in the Northern District of California.

## PARTIES

*Plaintiffs*

14. Plaintiff **Friends of the Earth (FoE)** is a national non-profit environmental advocacy organization founded in 1969. FoE has offices in Berkeley, California, and Washington, D.C, where it is incorporated. Its mission is to defend the environment and champion a healthy and just world. To this end, FoE promotes policies and actions that ensure

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1  the food we eat and the products we use are sustainable and safe for our health and the

2  environment.

3    15. FoE has more than 330,000 members in all fifty states, of whom more than

4  55,000 are in California. Additionally, FOE has more than 1.5 million activists on its email list

5  throughout the United States, with more than 175,000 in California.

6    16. FoE's "Good Food Healthy Planet" program is focused on reducing the harmful

7  environmental, animal welfare, and public health impacts of industrial animal foods. The

8  program helps grow the consumer market and policy support for healthier, grass-fed and organic

9  meat and dairy, and plant-based foods. FoE's program educates the public about the impact of

10  meat consumption and production, especially related to the issue of antibiotics and other harmful

11  chemicals in animal products. FoE is a co-author of "Chain Reaction," an annual report and

12  scorecard that grades America's top restaurant chains on their policies and practices regarding

13  antibiotic use and transparency in their meat and poultry supply chains. The report also covers

14  the use of hormones and availability of organic and grass-fed options. FoE has campaigned over

15  the past several years to eliminate the routine use of antibiotics in animal agriculture, with a

16  focus on changing the purchasing policies of large restaurant chains, that buy large quantities of

17  industrial meat.

18    17. FoE, which has more than a dozen staff based in Berkeley, California, co-

19  authored a report in 2015 titled "Spinning Food: How Food Industry Front Groups and Covert

20  Communications Are Shaping the Story of Food,"[1] addressing the issues related to chemical-

21  intensive industrial agriculture. Berkeley-based FoE staff also educated the public through a blog

22  post in 2015 titled, "Antibiotic Resistance—with a side order of fries?"[2] FoE's Berkeley staff

23  authored "Redefining Good Food at the Nation's Largest Casual Restaurant Company,"[3] an

24  article produced as part of the Good Food Now campaign that was partially focused on the need

25  

26  [1] The report is available at https://foe.org/news/2015-06-big-food-and-chemical-corporations-spend-millions-to-attack-organic/ (last visited October 1, 2018).

27  [2] Blog post available at https://foe.org/2015-09-antibiotic-resistance-with-a-side-order-of-fries/ (last visited October 1, 2018).

28  [3] Article available at https://foodrevolution.org/blog/redefining-good-food-darden-restaurants/ (last October 1, 2018).

to change Darden Restaurant's sourcing practices around industrial meat production and the use of antibiotics. Sanderson sells its chicken to Darden Restaurants.

18.      As a result of Sanderson's legal violations, FoE has suffered injury in fact and has lost money or property. FoE has diverted staff time and resources away from its core organizing and policy work, including research and promotion of plant based foods in K-12 schools; research, policy development, and consumer education around organic agriculture; a campaign to get In-N-Out Burger to serve a grass-fed organic burger; and FoE's efforts to get cities and counties to address climate change through reduced meat consumption, in order to focus on educational efforts and campaigns designed to expose the truth about Sanderson's animal raising practices to counteract Sanderson's deceptive advertising. As part of this work, FoE staff members have devoted significant resources to educating and mobilizing FoE's members and consumers around concerns about the harmful heath impacts that arise from the misuse of antibiotics. In particular, FoE staff have spent hundreds of hours researching Sanderson's customers (particularly Darden restaurants) and educating these customers on Sanderson's practices by sending thousands of emails; making hundreds of telephone calls; holding dozens of internal coalition calls; setting up a website; giving presentations and formal advice to investors that are involved in Sanderson's supply chain; writing numerous blogs; and educating and organizing other non-profit organizations, FoE's members, and the public through media and direct outreach. FoE spent considerable time organizing more than a dozen nonprofit organizations to deliver over 100,000 petitions to Olive Garden (a major buyer of Sanderson Farms) asking it to stop sourcing from companies that use routine antibiotics.[4] FoE has been quoted in reports by CNN,[5] Reuters,[6] and Huffington Post[7] to address antibiotics in meat. FoE

---

[4] Alternet, "Olive Garden's Chief Got a Leadership Award—Even Though His Company Is Bad for Workers, Animals and the Environment" (Oct. 24, 2016), https://www.alternet.org/food/olive-gardens-chief-got-leadership-award-even-though-his-company-bad-workers-health-animals-and.
[5] CNN, "USDA doesn't care if our diets are climate friendly – but Americans do" (Oct. 7, 2015), http://www.cnn.com/2015/10/07/opinions/sutter-usda-dietary-guidelines-climate/.
[6] Reuters, "U.S. fast-food meat still mostly raised on antibiotics" (Sept. 15, 2015), http://www.reuters.com/article/restaurants-antibiotics-idUSL1N11K20Q20150915.
[7] Huffington Post, "Subway Is Transitioning To Antibiotic-Free Meat" (Oct. 20, 2015), https://www.huffingtonpost.com/entry/subway-antibiotic-free-

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1   and its allies, including Center for Food Safety, have spent considerable time researching and

2   drafting two major reports and scorecards[8] ("Chain Reaction I," "Chain Reaction II," and

3   subsequently "Chain Reaction III"[9]) that grade America's top restaurant chains, including

4   several that are customers of Sanderson Farms' customers that received F grades—Dairy Queen,

5   Denny's, Arby's, Chili's, and Olive Garden—on their policies and practices regarding antibiotic

6   use and transparency in their meat and poultry supply chains.

7       19.   Plaintiff **Center for Food Safety (CFS)** is a national nonprofit environmental and

8   consumer advocacy organization that empowers people, supports farmers, and protects the earth

9   from the harmful impacts of industrial agriculture. Through groundbreaking legal, scientific, and

10  grassroots action, CFS protects and promotes the public's right to safe food and the environment.

11  CFS has four offices nationally, including one in Washington, D.C. and one in San Francisco,

12  California, where it conducts much of its policy work and litigation challenging the use of

13  pharmaceuticals and chemicals in industrial animal agriculture. CFS has more than 950,000

14  consumer and farmer supporters across the country, with 103,631 in California.

15      20.   CFS's "Animal Factories" program uses regulatory action, citizen engagement,

16  litigation, and legislation to promote transparency and accountability in the food animal industry.

17  Through this work, the program aims to reduce the harmful impacts of animal factories on

18  animal welfare, the environment, and human health and to increase consumer awareness,

19  availability, and accessibility of suitable alternatives by highlighting humane, organic, and

20  pasture-based animal-raising practices and producers. Since 2009, CFS's Animal Factories

21  program has developed expertise and multi-faceted strategies on addressing the known impacts

22  and lack of robust information on approved animal drugs. CFS is a co-author of the annual Chain

23  Reaction report and scorecard, ranking the top 25 U.S. restaurant chains based on

24  implementation of policies restricting antibiotics use in their meat and poultry supply chains. In

25

26  meat_us_5626a723e4b0bce34702bc85.
    [8] Center for Food Safety's Chain Reaction II report and restaurant scorecard is available at

27  http://www.centerforfoodsafety.org/reports/4471/chain-reaction-ii-how-top-restaurants-rate-on-
    reducing-use-of-antibiotics-in-their-meat-supply (last visited October 1, 2018).

28  [9] FoE's Chain Reaction II report and restaurant scorecard is available at
    https://foe.org/resources/chain-reaction-iii-report/ (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1    coalition with several groups, CFS has also launched several public pressure campaigns against

2    individual restaurant chains to encourage strong commitments that address antibiotics use,

3    including campaigns against Subway and In-N-Out Burger.

4         21.    CFS's innovative work on animal drugs has long extended beyond antibiotics to

5    include the use of natural hormones, synthetic hormones, beta-agonists, heavy metal compounds,

6    and antiparasitics, commonly used for non-therapeutic, production purposes like growth

7    promotion or disease prevention. CFS successfully pressured the FDA to withdraw the approval

8    of arsenic-based animal drugs—the only intentional introduction of arsenic in to the food

9    supply—through successful litigation and grassroots mobilization. CFS staff in the San Francisco

10   and Washington, D.C. offices authored the 2014 report, "America's Secret Animal Drug

11   Problem," which highlighted FDA's insufficient oversight of the animal drug approval process

12   and the lack of publicly available scientific information demonstrating the safety of several

13   approved animal drugs for human health, animal welfare, and the environment. Leveraging

14   information gathered in this foundational report, CFS staff continues to educate consumers about

15   concerns of approved animal drugs through regular blog posts. Additionally, a 2016 factsheet,

16   "Pharming Profits: The Drugs that Make Cheap Meat," provides an update to the 2014 report.

17        22.    CFS has also spent considerable resources promoting transparency in advertising

18   and labeling and providing consumers with information about the meaning and integrity of

19   common advertising and label claims. This has included raising awareness about the lack of a

20   federal definition for the term "natural" on food product labels and advertising. To help ensure

21   that consumers are not misled by the term, CFS staff in California published a simple factsheet,

22   "What's in a Label? Natural: Another Name for Conventionally Grown."

23        23.    CFS is also a co-author of "Chain Reaction I," "Chain Reaction II" and "Chain

24   Reaction III." These reports uncovered that several of Sanderson's customers—Dairy Queen,

25   Denny's, Arby's, Chili's, and Olive Garden—received an "F" grade for failing to take steps to

26   end the misuse of medically important antibiotics in their chicken supply chain. Based on this

27   data, CFS deduced that several of the 16 companies that were refusing to phase out antibiotics

28

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1  were sourcing from Sanderson, the only company of the top four chicken producers that had

2  made no commitment to reduce the use of antibiotics.

3       24.    In 2016, CFS diverted resources and more than 100 hours of staff time away from

4  its core mission as a government watchdog organization with a focus on challenging

5  administrative agency actions in order to devote sufficient time to address these companies'—

6  Sanderson's customers—failures to remove antibiotics from their supply chain. As part of this

7  effort, CFS drafted and edited a petition expressing consumer dissatisfaction with Sanderson's

8  customers that were failing to address antibiotics in their supply, developed language for public

9  outreach and alerts to CFS members, created social media posts and a landing page on CFS's

10  website to circulate and promote the petition to CFS members and the public. CFS also directly

11  contacted the executive leadership of the 16 companies that failed to address antibiotics in their

12  food supply about the petition and delivered the letters and more than 125,000 signatures

13  electronically to the corporate headquarters of each company. CFS staff wrote and published a

14  press release and a blog announcing the delivery of the petition and signatures to all 16

15  companies, and responded to media inquiries regarding the campaign.

16       25.    Plaintiffs bring this action on behalf of the general public, and on behalf of their

17  members and supporters, who actively seek and wish to purchase organic, natural, and other

18  socially responsible products and who were deceived by Sanderson's marketing campaign.

19       26.    Because of Sanderson's false marketing materials, Plaintiffs have had to devote

20  organizational resources to counteract misinformation by educating consumers about this and

21  other "natural" claims, advocating for stronger standards for the "natural" claim that fall in line

22  with consumer expectations, and publicizing the truth about Sanderson's farming practices. This

23  misleading advertising of "100% Natural" products has caused Plaintiffs to divert their

24  organizational resources away from other priorities and campaigns that could have protected

25  more consumers. The injury to Plaintiffs is not speculative; instead, expenses incurred by the

26  efforts described above, which resulted from Sanderson's unlawful conduct, could have been

27  spent in ways that better furthered Plaintiffs' mission had Sanderson not launched its misleading

28  "Truth About Chicken" campaign.

27.     If Sanderson were to cease its "natural" advertising claims and its "Truth About Chicken" advertising campaign, including by the injunctive relief sought through this action, Plaintiffs would not have to continue diverting organizational resources to warn consumers and educate the public about Sanderson's products and chicken raising practices, and could redirect these resources to other projects in furtherance of their respective missions.

*Defendant*

28.     Defendant Sanderson is a Mississippi corporation with a principal place of business located at 127 Flynt Road, Laurel, Mississippi. Sanderson is "a fully integrated poultry processing company that produces, processes, markets and distributes fresh and frozen chicken products."[10] Sanderson contracts with more than 1,000 independent growers. It has approximately 12 processing plants, 11 hatcheries, nine feed mills and one prepared-foods division. Its operations span five states and 14 cities.[11] Sanderson markets and distributes throughout the nation, including to retailers and consumers in California. Sanderson processes up to 4.291 million pounds of chicken a year and has net sales of up to $3.3 billion.

## LEGAL BACKGROUND

29.     **California's Unfair Competition Law (UCL)**, California Business & Professions Code § 17200, *et seq*., prohibits businesses from engaging in "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" in addition to any act in violation of California Business & Professions Code § 17500, *et seq*., as discussed blow. *See Williams v. Gerber Products Co.,* 552 F.3d 934, 938 (9th Cir. 2008) (""[A]ny violation of the false advertising law . . . necessarily violates'" the UCL.) (alterations in original).

---

[10] Sanderson Farms, "Investor Relations," http://ir.sandersonfarms.com/ (last visited October 1, 2018).
[11] Sanderson's 2017 Corporate Responsibility Report is available at http://ir.sandersonfarms.com/static-files/6c684635-5467-430b-9cbc-969594af8d5b (last visited October 1, 2018).

1   30.     The UCL allows for any person to pursue representative claims or relief on behalf

2   of others if the claimant meets the standing requirements of California Business & Professions

3   Code § 17204 and California Civil Procedure Code § 382. California Bus. & Prof. Code § 17203.

4   31.     Plaintiffs have standing under California Business & Professions Code § 17204,

5   which provides that actions for relief pursuant to the UCL shall be prosecuted exclusively in a

6   court of competent jurisdiction by, *inter alia*, any person who has suffered injury in fact and has

7   lost money or property as a result of the unfair competition.

8   32.     **California's False Advertising Law (FAL)**, California Business & Professions

9   Code § 17500, *et seq.*, declares it unlawful for any person to disseminate before the public any

10  statement concerning personal property that the person knows, or through the exercise of

11  reasonable care should know, to be untrue or misleading, with intent to dispose of that property

12  or to induce the public to enter into any obligation relating thereto; or to disseminate such untrue

13  or misleading statements as part of a plan or scheme with the intent not to sell the property as

14  advertised.

15  33.     Pursuant to California Business & Professions Code § 17535, any person,

16  corporation, firm, partnership, or any other association or organization that violates the FAL may

17  be enjoined by any court of competent jurisdiction. Actions for injunctive relief under the FAL

18  may be prosecuted by any person who has suffered injury in fact and has lost money or property

19  as a result of a violation of the FAL, and the court may make such orders or judgments which

20  may be necessary to restore to any person in interest any money or property which may have

21  been acquired by means declared to be unlawful by the FAL.

22  34.     Claims under California consumer protection statutes are governed by the

23  "reasonable consumer test." *Williams*, 552 F.3d at 938. This standard "requires a probability that

24  a significant portion of the general consuming public or of targeted consumers, acting reasonably

25  in the circumstances, could be misled." *Hadley v. Kellogg Sales Co.*, 273 F.Supp.3d 1052, 1079

26  (N.D. Cal. 2017) (internal quotations omitted).

27  35.     Even technically true representations are actionable under California's consumer

28  protection laws. "The California Supreme Court has recognized that these laws prohibit not only

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams*, 552 F.3d at 938 (internal quotations and alterations omitted); *L.A. Taxi Cooperative v. Uber Technologies, Inc.,* 144 F.Supp.3d 852, 860 (N.D. Cal. 2015)). In addition, "[a] perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under" California's Consumer Legal Remedies Act (CLRA), False Advertising Law (FAL), and Unfair Competition Law (UCL). *Kellman v. Whole Foods Market, Inc*., 313 F.Supp.3d 1031, 1049 (N.D. Cal. 2018); *see also Dodson v. Tempur-Sealy International, Inc.,* No. 13–cv–04984–JST, 2014 WL 1493676 (N.D. Cal. April 16, 2014) ("The FAL encompasses not just false statements, but also those that 'may be accurate on some level, but will nonetheless tend to mislead or deceive.'").

36.    Past wrongful conduct, like ongoing wrongful conduct, still warrants injunctive relief. The U.S. Supreme Court has long recognized that a court's duty to determine the validity of alleged illegal practices does not cease at the assertion of voluntary cessation by a party. *See Friends of the Earth v. Laidlaw Environ. Serv.s (TOC), Inc.*, 120 S. Ct. 693, 708 (2000) (holding "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice...[i]f it did, the courts would be compelled to leave [t]he defendant … free to return to his old ways.") (internal citations and quotations omitted).

## FACTUAL BACKGROUND

### I.    Sanderson Chicken Products.

37.    Sanderson's Chicken Products, all of which are marketed as "100% Natural" include the following:[12]

- Clipped Chicken Tenderloins
- Boneless Skinless Chicken Thigh Fillets
- Boneless Skinless Breast Strips
- Thinly Sliced Boneless Skinless Breast Fillets

[12] Discovery may indicate that additional products should be included within the scope of this Complaint, and Plaintiffs reserve the right to add those products.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

- Boneless Skinless Breast Fillets
- Best of Boneless
- Boneless Skinless Breast Chunks
- Family Pack Whole Legs
- Whole Legs
- Family Pack Wingettes
- Wingettes
- Drumsticks & Thighs Combo
- Skinless Drumsticks
- Chicken Hearts
- Value Pack Chicken Gizzards
- Skinless Split Breast
- Family Pack Chicken Tenderloins
- Chicken Tenderloins
- Family Pack Boneless, Skinless Chicken Breast Fillets with Rib Meat
- Skinless Thighs
- Family Pack Thighs
- Thighs
- Value Pack Thighs
- Value Pack Leg Quarters
- Value Pack Wings
- Value Pack Drumsticks
- Value Pack Split Breasts
- Chicken Necks
- Wing Drumettes
- Family Pack Drumsticks
- Family Pack Thighs
- Family Pack Leg Quarters
- Whole Roasting Chicken
- Pick of the Chicken
- Family Pack Wings
- Family Pack Split Breasts
- Livers Chicken Gizzards
- Stripped Back Portions
- Wings
- Thighs
- Drumsticks
- Split Breasts
- Whole Cut-Up Chicken with Giblets and Neck
- Whole Frying Chicken (Whole Young Chicken).

An example of Sanderson's Chicken Products is reproduced here:[13]

---

[13] Plaintiffs challenge the advertising of these products, not the product labels, as the Court previously observed: "Here, Sanderson's advertising includes images, representations, and language that go beyond what is included on the USDA approved label." Dkt. 48 at 9.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.



38.     The Chicken Products are available for purchase under the Sanderson Farms brand at retail locations throughout California such as Food 4 Less, Foods Co, and WinCo Foods,[14] with Sanderson Farms logo.

39.     Sanderson markets and advertises its Chicken Products in California, and seeks to reach the vast California consumer base through broadcast television, print advertising, radio advertising, and online marketing such as Facebook, YouTube, Instagram, Pinterest and its own website.

**II.     Sanderson's False and Misleading Advertising, Including "100% Natural" Representations.**

40.     Sanderson falsely and misleadingly markets and advertises its Chicken Products as "100% Natural." Examples of Sanderson's "100% Natural" advertising and marketing, include:

41.     Sanderson represents its chicken as "100% Natural" on the homepage of its current website.[15] The homepage does not disclose Sanderson's unnatural practices, such as routine pharmaceutical use, including antibiotics. The "Learn More" button on the homepage

---

[14] Sanderson Farms, "Find A Store," http://www.sandersonfarms.com/store-finder/ (last visited October 1, 2018).

[15] *See* https://sandersonfarms.com/ (last visited October 1, 2018.)

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1   takes consumers to a current webpage devoted to its "100% Natural" representation.[16] This

2   dedicated "100% Natural" webpage also does not disclose Sanderson's unnatural practices, such

3   as routine pharmaceutical use, including antibiotics.





13   42.   Sanderson represents that its Chicken Products are "100% Natural" in several TV

14   commercials, including "The Truth About Chicken: Mr. Floppy Arms," "Marketing Guru,"

15   "Employees," "The Truth About Chicken: Supermarket."[17] This "100% Natural" tagline appears

16   at the end of the TV commercials, adjacent to the Sanderson Farms logo, while announcer says

17   "Fresh, Delicious Chicken, from Sanderson Farms."

25   43.   Sanderson represents that its chickens are "100% Natural" on its current

26   newsletter subscription webpage and further adds that: "We firmly stand behind our commitment

---

[16] *See* https://sandersonfarms.com/our-chickens/100-natural/ (last visited October 1, 2018).
[17] Available at https://www.ispot.tv/brands/A1Z/sanderson-farms (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

to keep things the way nature intended."[18] The "Learn More" button takes consumers to a webpage devoted to "100% Natural," and neither of these webpages disclose Sanderson's unnatural practices, such as routine pharmaceutical use, including antibiotics.



44.     Sanderson further emphasizes its representation of "100% Natural" message by sending a monthly 100% Natural Newsletter to over 600,000 annual readers across 42 different states.[19] Sanderson has continued to publish this newsletter in 2018.

45.     Sanderson advertises itself as "100% Natural" in print magazines, including at least one magazine with national distribution. Sanderson advertises itself as "100% Natural" via billboards.

46.     All of these statements were made within the applicable statute of limitations, and many continue as of this filing. Discovery may reveal additional false and misleading statements.

### III.     Reasonable Consumer Expectations for Products Marketed and Advertised as "100% Natural."

47.     Consumer Reports ("CR"), founded in 1836, is "an independent, nonprofit member organization that works side by side with consumers for truth, transparency, and fairness

---

[18] Available at https://sandersonfarms.com/?s=subscribe (last visited October 1, 2018).
[19] *See* https://sandersonfarms.com/press-releases/sanderson-farms-awarded-twenty-public-relations-advertising-awards/ (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

in the marketplace." It has six million members and tests tens of thousands of products annually to provide consumers with product reviews.[20] CR has a Survey Research department that conducts more than one hundred surveys per year. Its surveys are not commissioned or financed by industry.[21] In October 2018, CR continued its science based consumer protection work specific to meat and poultry, and published a front page story on its monthly magazine titled, "What's Really in Your Meat?"[22]

48.     Over the past decade, CR has performed several surveys on food marketing, including in 2016,[23] 2015,[24] 2008[25] and 2007.[26]

49.     The 2015 survey found that when "natural" is used to describe meat and poultry:

a.   57% of consumers think that no antibiotics or other drugs were used;

b.   61% of consumers think that the animals' feed contained no artificial ingredients or colors and 59% think that there were no GMOs in the feed;

c.   85% of consumers think that no artificial ingredients or colors were added to the meat or poultry; and

d.   50% of consumers think that the animals went outdoors.[27]

---

[20] Consumer Reports, "About Us", available at https://www.consumerreports.org/cro/about-us/what-we-do/index.html (last visited October 1, 2018).
[21] Available at https://www.consumerreports.org/cro/about-us/what-we-do/research-and-testing/index.html (last visited October 1, 2018).
[22] Available at https://www.consumerreports.org/food-safety/are-banned-drugs-in-your-meat/ (last visited October 1, 2018). The article title for the online version is "Are Banned Drugs in Your Meat."
[23] Consumer Reports National Research Center, "Food Labels Survey" (2016), available at http://greenerchoices.org/wp-content/uploads/2016/08/2016_CRFoodLabelsSurvey.pdf (last visited October 1, 2018).
[24] Consumer Reports National Research Center, "Natural Food Labels Survey" (2015), available at https://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf (last visited October 1, 2018).
[25] Consumer Reports National Research Center, "Food-Labeling Poll 2008" (2008), available at http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/02/foodpoll2008.pdf (last visited October 1, 2018).
[26] Consumer Reports National Research Center, "Food Labeling Poll" (2007), not available online.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

50.    The 2007 survey found that:

    a.  88% of consumers expect that meat with a "natural" label meant that the meat "came from an animal whose diet was natural and free of chemicals, drugs and other artificial ingredients."[28]

    b.  83% expect that the "natural" label meant that the animal was raised in a natural environment.[29]

51.    The surveys also tested consumers' interest in buying "natural" products. The 2015 survey found that 62% of consumers purchase "natural" products, and that 87% of those purchasers are willing to pay more for products called "natural" that meet their expectations as to what "natural" means.[30] The 2016 survey found the number of consumers who purchase "natural" products to be as high as 73%[31].

52.    A reasonable consumer could be misled by Sanderson's use of imagery, representations, and language like "100% Natural," "natural," "there's only chicken in our chicken," and "no antibiotics to worry about here" because, as the surveys indicate, a significant portion of reasonable consumers expect that a poultry advertised as "100% Natural" is derived from a natural process and results in a natural product. As a result, consumers could purchase

---

[27] Consumer Reports National Research Center, "Natural Food Labels Survey" (2015), at 4, available at https://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf (last visited October 1, 2018).

[28] Consumer Reports National Research Center, "Food Labeling Poll" (2007), at 15, not available online.

[29] Consumer Reports National Research Center, "Food Labeling Poll" (2007), at 15, not available online.

[30] Consumer Reports National Research Center, "Natural Food Labels Survey" (2015), at 2, available at https://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf (last visited October 1, 2018).

[31] Consumer Reports National Research Center, "Food Labels Survey" (2016), at 5, available at http://greenerchoices.org/wp-content/uploads/2016/08/2016_CRFoodLabelsSurvey.pdf (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

Sanderson's products based on a flawed understanding of Sanderson's chicken production process and the resulting product.

53.     Furthermore, Sanderson advertises and markets its products not only as "natural," but "100% Natural," raising consumer expectations even higher.

**IV.   Sanderson's Advertising, Including Its "100% Natural" Representations, Are False and Misleading Because Sanderson Does Not Meet Reasonable Consumer Expectations for Poultry Products Advertised and Marketed as "100% Natural."**

54.     Sanderson's representation that its chicken is "100% Natural" is false because Sanderson's Chicken Products have ███████████████████

55.     Sanderson's representation that its chicken is "100% Natural" is false because Sanderson's process routinely uses unnatural, synthetic pharmaceuticals, including antibiotics, in order to raise its birds.

56.     Sanderson's representation that its chicken is "100% Natural" is false because Sanderson's process contributes to unnatural antibiotic resistant bacteria ████████████ ██████ and Sanderson misleads the public regarding the threat to public health to which Sanderson's practices contribute.

57.     Sanderson's representation that its chicken is "100% Natural" is false because Sanderson raises its birds indoors in intensive confinement.

58.     Sanderson repeatedly makes false "100% Natural" representations in various media—television, website home page, website "Learn More" pages, social media, print magazines, radio advertising, billboards, etc.—when in fact its chicken production process and resulting product do not meet reasonable consumer expectations for products advertised as "100% Natural."

**A.  Sanderson Misleads Reasonable Consumers Who Expect That "100% Natural" Chicken Products Do Not Contain Unnatural Residues.**

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

59.     Sanderson represents to consumers that its chickens, once they leave the farm, are free of residues, such as pharmaceutical or biological residues. Specifically, Sanderson represents itself as "100% Natural" in multiple media and Sanderson asserts "no antibiotics to worry about here" in TV advertisements. On its website and other advertisements, Sanderson states: "There's Only Chicken In Our Chicken. Seriously."[32] Sanderson also references in its TV and website advertisements to consumers that a federal law requires that chickens be clear of residues before they leave the farm. These representations regarding being free of residues are misleading because:

60.     Contrary to its "100% Natural" advertising campaign, (a) Sanderson does routinely administer pharmaceuticals, including antibiotics, to its flocks, and (b) ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████    The pharmaceuticals that Sanderson administers include, but are not necessarily limited to, bacitracin, gentamicin, lincomycin, monensin, narasin, oxytetracycline, penicillin, rofenaid (Rofenaid is a brand name; the drug is sulfadimethoxine ormetprim), salinomycin, and virginiamycin.[33]

61.     Sanderson operates its own feed mills, and mixes ████████████ into the chickens' feed. Sanderson has described its use of antibiotics as ████████ including use of

---

[32] Available at https://sandersonfarms.com/our-chickens/100-natural/ (last visited October 1, 2018).

[33] This list is from Sanderson's response to Plaintiffs' Interrogatory No. 1. Sanderson fought to maintain the confidentiality of this list in the discovery process, undermining its argument that it discloses its pharmaceutical use to consumers. Magistrate Judge Sallie Kim ordered that the pharmaceutical list is not confidential, see Dkt. 94. Sanderson's interrogatory responses, including their reach into the agency that is charged with regulating Sanderson, is available at Dkt. 89-4. As one researcher and author noted, "Consumers can't cast a vote at the grocery store, choosing chicken with a lighter or heavier dose of antibiotics in its feed, for example, because the recipe for producing that chicken remains entirely hidden to them." Leonard, Christopher. The Meat Racket: The Secret Takeover of America's Food Business (p. 8). Simon & Schuster. Kindle Edition.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1   bacitracin and virginiamycin. ████████████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████   The purpose of

10   the withdrawal period is for the animal to metabolize the pharmaceutical before slaughter and to

11   eliminate the pharmaceutical residue in the animals' bodies before they become food for human

12   consumption. In order to have reasonable assurance that the animals have metabolized the

13   pharmaceuticals that Sanderson administers, Sanderson's feed mills and contract growers must,

14   at a minimum, strictly adhere to the withdrawal periods that are unique for each pharmaceutical.

15   

16   62.   Sanderson has experienced multiple instances in which its own feed mill has sent

17   feed containing pharmaceuticals to grow-out facilities and the feed mill has mislabeled the

18   pharmaceutical-laced feed as pharmaceutical-free withdrawal feed, including but not necessarily

19   limited to the Kinston, North Carolina plant in 2018.

20   63.   Sanderson conducts ████████████████████████████████████

21   ████████████████████   Contrary to its "100% Natural" advertising tagline and overall

22   advertising campaign, Sanderson's own ████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████   Discovery may reveal additional residues.

26   ████████████████████████   Discovery may reveal additional residues.

27   _____

28   [34] Monensin is deadly to horses, even at low levels. *See FDA Investigating Six Horse Deaths Due to Contaminated Feed from Gilman Co-op Creamery*, available at



REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

64.     Sanderson also misrepresents to consumers the level of protection that they can expect from the federal law regarding antibiotic residues. In one of the Bob and Dale TV advertisements,[35] Sanderson says, "The thing is, by federal law, all chickens must be cleared of antibiotics before they leave the farm . . . No antibiotics to worry about here." This statement is misleading because it omits the fact that USDA's own process allows for chickens with scientifically detectable antibiotic residues to be sold to consumers, as long as the detected residues stay below the regulatory "tolerance."[36]

65.     Sanderson's representations regarding being ████████████████████ Additionally, the statements are misleading and deceptive for a reasonable consumer, because after hearing or seeing such representations, a reasonable consumer could be misled as to Sanderson's routine use of pharmaceuticals, including antibiotics; a reasonable consumer could be misled as ████████████████████████████████████████████████████ ████████████████████████████████████████████████ As detailed *infra* ¶¶47-53, a majority of consumers think that "natural" means that no antibiotics or drugs were ever used in the process for creating the chicken product, and a majority of consumers think that a "100% Natural" product does not contain any residues of unnatural pharmaceuticals.

**B. Sanderson Misleads Reasonable Consumers Who Expect That "100% Natural" Means That No Antibiotics or Other Pharmaceuticals Were Used.**

66.     Sanderson gives consumers the false impression that it does not use unnatural, synthetic pharmaceuticals, including antibiotics, in order to raise its birds. This is false because

---

https://www.fda.gov/animalveterinary/newsevents/ucm614978.htm (last visited October 1, 2018).

[35] Available at https://www.ispot.tv/brands/A1Z/sanderson-farms (last visited October 1, 2018).

[36] Regarding USDA's residue data, this Court previously observed that Plaintiffs' false advertising case is not based entirely on USDA's residue data. "They also allege that Sanderson's advertising misleads consumers about its *process* for raising chickens. In other words, plaintiffs' case does not live or die in its entirety, as Sanderson suggests, on plaintiffs' ability to prove that there are trace amounts of antibiotics in Sanderson's products." This is something the prior order denying Sanderson's motion to dismiss acknowledged. *See* Order at 10 (Dkt. No. 48) (emphasis in original).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

Sanderson does **routinely** use pharmaceuticals, including antibiotics, in all its flocks as detailed *infra*, ¶61. Specifically, Sanderson represents itself as "100% Natural," which is additionally misleading because consumer surveys indicate that a significant portion of the general consuming public acting reasonably in the circumstances, could be misled because they understand "natural" to mean that no antibiotics were used,[37] let alone routine antibiotics. Sanderson makes the following statements to further mislead consumers into thinking that Sanderson does not routinely use synthetic pharmaceuticals such as sulfadimethoxine ormetprim:[38]

- "That means no additives, no unpronounceable ingredients, nothing extra. Just 100% natural chicken that's healthy and a treat for your taste buds."[39]
- "No Additives Or Artificial Ingredients. Not Ever."[40]
- "100% Natural. We firmly stand behind our commitment to keep things the way nature intended."[41]
- "At Sanderson Farms, we like to keep things the way nature intended, meaning we don't add anything to our fresh chicken — no additives, no artificial ingredients, no preservatives. Our chicken consists of one single ingredient: 100% natural chicken."[42]

---

[37] Consumer Reports National Research Center, "Natural Food Labels Survey (2015), at 4, available at https://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf (last visited October 1, 2018).

[38] This Court previously addressed these representations. "Here, plaintiffs plausibly allege a reasonable consumer could find Sanderson's marketing and advertising materials deceptive. Plaintiffs point to surveys indicating a majority of consumers believe: a) a "natural" poultry product is produced without the *use* of antibiotics or other drugs at any point; and b) it is important to reduce antibiotic use in food production and improve the living conditions of animals. In light of this information (and various other allegations), it is plausible a reasonable consumer could be misled by Sanderson's use of words and phrases like "natural," "there's only chicken in our chicken," and "no antibiotics to worry about here," and might purchase Sanderson's products based on a flawed understanding of how Sanderson's chickens are raised. At the very least, the facts alleged do not "compel the conclusion" that consumers are unlikely to be deceived by Sanderson's marketing and that this case must therefore be dismissed." Dkt. 48 at 10 (emphasis added).

[39] Available at https://sandersonfarms.com/our-chickens/100-natural/ (last visited October 1, 2018).

[40] *Id.*

[41] Available at https://sandersonfarms.com/?s=subscribe (last visited October 1, 2018).

[42] Available at https://sandersonfarms.com/our-chickens/animal-welfare/ (last visited October 1, 2018).

67.     The deception regarding pharmaceutical use, including antibiotics, continues elsewhere on the internet where Sanderson has made its advertising available. In a YouTube video[43] titled, "How We Grow Our Chicken," Sanderson describes the hatchery process and states, "This single combined injection under the shell is the only time we inject antibiotics, leaving little opportunity for resistance to develop and no residues in the grown broilers weeks later when they go to market." Sanderson continues, "At no point are Sanderson Farms broilers ever injected with anything and there are never any antibiotic residues in our broilers when they go to market." This representation is misleading for several reasons: Sanderson contradicts itself regarding whether Sanderson injects broiler chickens or not; it confuses consumers regarding the opportunity that Sanderson creates for antibiotic resistance to develop; and it seeks to take advantage of the fact that reasonable consumers do not know that broiler chickens are fed antibiotics, not exclusively injected with antibiotics in the eggshell. One YouTube viewer expressed confusion by stating, "'is the only time we use antibiotics'. I thought you guys said all Chickens in the US are supposedly antibiotic free or that you guys don't use them?"[44]

68.     Sanderson takes advantage of reasonable consumers who are confused by the nuances in regulated and non-regulated terms such as "no antibiotics ever," "raised without antibiotics," or, Sanderson's claim of being "cleared" of antibiotics. Sanderson misleads consumers into thinking its process and product are in the "no antibiotics ever" or "raised without antibiotics" categories when it is not. Specifically, Sanderson says in its TV commercial, ". . . 'Raised Without Antibiotics.' That's phrasing invented to make chickens sound safer, and it doesn't mean much because by federal law, all chickens must be cleared of antibiotics before they leave the farm…."[45] Sanderson's statements confuse consumers on this point by repeatedly

---

[43] Available at https://www.youtube.com/watch?time_continue=275&v=Fghbb4lYaiU (last visited October 1, 2018).
[44] *Id*.
[45] Available at https://www.ispot.tv/brands/A1Z/sanderson-farms (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

failing to clearly, affirmatively state in those same advertisements that it does use antibiotics and uses them routinely, as detailed *infra* ¶61. Sanderson's own documentation analyzing consumer understanding of its advertisements reveals, ███████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ (emphasis added). Perdue is known in the marketplace for switching to "no antibiotics ever" and Sanderson has significantly confused consumers into thinking that Sanderson, despite its routine use of antibiotics, and Perdue have the same practices regarding antibiotics.

### C. Sanderson Misleads Reasonable Consumers Regarding Whether the Threat to Public Health Is Antibiotic Residue Remaining Post-Slaughter, or Antibiotic Resistant Bacteria That Is Carried on Sanderson's Product.

69.     Sanderson's representation that its chicken is "100% Natural" is false because Sanderson's chicken-raising process—in which animals live in crowded, intensive confinement and which is pharmaceutically driven— (a) contributes to unnatural antibiotic resistant bacteria and (b) allows ████████████████████████ Additionally, Sanderson misleads consumers into thinking that the only concern is whether antibiotics residues remain on the product, diverting attention away from the greater public health threat of antibiotic resistant bacteria to which Sanderson's process contributes, and of ████████████████████████ ██████ According to 2016 consumer survey, 65% of consumers are concerned that feeding antibiotics or other drugs to animals leads to antibiotic resistance bacteria,[46] therefore, poultry producers are interested in addressing this concern in the marketplace.

---

[46] Consumer Reports National Research Center, "Food Labels Survey" (2016), at 10, available at http://greenerchoices.org/wp-content/uploads/2016/08/2016_CRFoodLabelsSurvey.pdf (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

70.   Sanderson's chickens 

71.   Sanderson's chickens

---

[47] For a user-friendly explanation of Sanderson's deception regarding antibiotic resistant bacteria, see National Resources Defense Council, *Sanderson Farms: Spreading Deception & Antibiotic Resistance*, available at https://www.nrdc.org/experts/sanderson-farms-spreading-deception-antibiotic-resistance (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

72.     Discovery may reveal additional antibiotic resistant bacteria, such as antibiotic resistant E. coli.

73.     Sanderson represents to consumers that antibiotic use in agriculture is not responsible for the spread of antibiotic resistant bacteria. Sanderson distracts attention from the scientific concern at issue by telling consumers, "no antibiotics to worry about here," and "The truth is, none of the chicken you buy in the grocery store contains antibiotics. By federal law, all chickens must be clear of antibiotics before they leave the farm."[48] Sanderson tells consumers, including in its TV advertisements, that "raised without antibiotics" is "a marketing gimmick." These representations are false, because antibiotic use in agriculture is a clear contributor of antibiotic resistant bacteria in humans, as detailed below:

    a.  Approximately 73% of all medically important antibiotics sold in the United States are for livestock use.[49]

    b.  The World Health Organization's 2014 report, titled Antimicrobial Resistance: Global Report on Surveillance, stated, "[t]he classes of antibiotics used in food-producing animals and in human drugs are mostly the same, thereby increasing the risk of emergence and spread of resistant bacteria, including those capable of

---

[48] This statement appears on the homepage of Sanderson's website, available at https://sandersonfarms.com/ (last visited October 1, 2018); on the hyperlink "Truth About Chicken" that appears right below the statement, to debunk "myths" about antibiotics, available at https://sandersonfarms.com/chicken-myths/#2nd (last visited October 1, 2018); and in the video "How We Grow Our Chicken," available at https://sandersonfarms.com/our-chickens/animal-welfare/ (last visited October 1, 2018). Similar statements are repeated by Sanderson in its Bob and Dale TV advertisements.

[49] The Pew Charitable Trusts, Record-High Antibiotic Sales for Meat and Poultry Production (July 17, 2013), available at http://www.pewtrusts.org/en/multimedia/data-visualizations/2013/recordhigh-antibiotic-sales-for-meat-and-poultry-production.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

causing infections in both animals and humans. Food-producing animals are reservoirs of pathogens with the potential to transfer resistance to humans."[50]

c.   The Centers for Disease Control and Prevention (CDC), U.S. Department of Health and Human Services, summarized the threat to public health posed by antibiotic use in agricultural operations, such Sanderson Farms:

> Antibiotics are widely used in food-producing animals, and according to data published by FDA, there are more kilograms of antibiotics sold in the United States for food-producing animals than for people [hyperlink omitted]. This use contributes to the emergence of antibiotic-resistant bacteria in food-producing animals. Resistant bacteria in food-producing animals are of particular concern because these animals serve as carriers. Resistant bacteria can contaminate the foods that come from those animals, and people who consume these foods can develop antibiotic-resistant infections. Antibiotics must be used judiciously in humans and animals because both uses contribute to not only the emergence, but also the persistence and spread of antibiotic-resistant bacteria.[51]

d.   An estimated 23,000 deaths and more than 2 million illnesses have been caused by antibiotic-resistant bacteria, as estimated in 2013 by the CDC.[52]

e.   Children experience the ill-effects of antibiotic overuse in agriculture, most especially children younger than 5 years who become infected with antibiotic resistant bacteria.[53]

---

[50] World Health Organization, Antimicrobial Resistance: Global Report on Surveillance at 59, available at http://apps.who.int/iris/bitstream/10665/112642/1/9789241564748_eng.pdf?ua=1 (last visited October 1, 2018) (internal citations omitted).
[51] Antibiotic Resistance Threats in the United States (2013), at 36-37, available at https://www.cdc.gov/drugresistance/pdf/ar-threats-2013-508.pdf (last visited October 1, 2018). The report also contains a glossary of terms related to antibiotic resistance.
[52] *Id.* at 13.
[53] American Academy of Pediatrics, Technical Report (December 2015), "Nontherapeutic Use of Antimicrobial Agents in Animal Agriculture: Implications for Pediatrics," at e1673, available at http://pediatrics.aappublications.org/content/pediatrics/136/6/e1670.full.pdf last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

f.   According to the President's Council of Advisors on Science and Technology and its Report to the President on Combatting Antibiotic Resistance, "[s]ubstantial evidence demonstrates that use of antibiotics in animal agriculture promotes the development of antibiotic-resistant microbes in animals and that retail meat can be a source of microbes, including antibiotic-resistant microbes."[54]

g.   A 2017 review of the research to date concludes, "taken together, the data support what the scientific community, national governments, and international organizations such as the World Health Organization, the Food and Agricultural Organization of the United Nations, and the World Organization for the Health of Animals (OIE) have long recognized: antimicrobial use on farms clearly contributes to the emergence of resistance and poses a human public health risk."[55]

74.   A neutral third party, the Council of Better Business Bureaus, National Advertising Division (NAD), concluded on August 11, 2017 that key claims in Sanderson's advertising are misleading. "NAD also determined that given the lack of any consensus in the scientific community over the safety of consuming meat from animals raised using antibiotics the advertiser [Sanderson] should discontinue from its advertising language that characterizes the 'raised without antibiotics' labels on competitive chicken producers' products as a 'marketing

---

[54] Report to the President on Combatting Antibiotic Resistance, Executive Office of the President of the United States (September 2014), at 50, available at https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_carb_report_sept2014.pdf (last visited October 1, 2018).

[55] Hoelzer et al., BMC Veterinary Research (2017) 13:211, "Antimicrobial drug use in food-producing animals and associated human health risks: what, and how strong, is the evidence?," at 35, available at https://link.springer.com/epdf/10.1186/s12917-017-1131-3?author_access_token= CbmecKjS4XscxgMn92-6rm_BpE1tBhCbnbw3BuzI2RMGFJmV0iy8Y06YFc2zc-R5jN1X3crDybEToB_CzXCpRozpkwGnxg9ydolzETVy02VGkppjTRq1V0MGiTqrqtB8g2U114wU4Fb9RacLAHWYIA%3D%3D (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

gimmick,' 'just a trick to get you to pay more money,' a claim that is 'full of hot air and doesn't say much,' 'a phrase [that marketers] invented to make chicken sound safer … and it doesn't mean much' and similar language."[56]

75.     Sanderson represents to consumers that it is unaware of the credible evidence regarding the public health issue. Specifically, Sanderson contends, "…we are aware of no credible scientific research that supports the notion that the use of antibiotics that are important to human medicine when treating chickens contributes to the development of human bacterial infections that are resistant to treatment…."[57] This is false because Sanderson is aware of the studies cited above, Sanderson is aware of further research on the elevated risk of poultry workers carrying bacteria that is resistant to the same antibiotics that Sanderson admits to using, and Sanderson is aware of studies on the relationship between chicken consumption and antibiotic resistant urinary tract infections. Furthermore, Sanderson's representation regarding "no credible evidence" misleads consumers into thinking that credible evidence does not exist that demonstrates the link between antibiotic use in agriculture and antibiotic resistant bacteria that threatens human health, when in fact, credible evidence does exist.

76.     Thus, Sanderson misleads the reasonable consumer through its "100% Natural" advertising, and its statements that there are "no antibiotics to worry about here," because the mere use of antibiotics, especially Sanderson's routine use, is a danger to consumers and contributes to ███████████████████████████████ that the reasonable

---

[56] Advertising Self-Regulatory Council, Press Release, available at http://www.asrcreviews.org/nad-recommends-sanderson-farms-discontinue-claims-about-tricks-gimmicks-finds-company-can-support-certain-claims-referencing-federal-law/ (last visited October 1, 2018).
[57] *See* https://sandersonfarms.com/policy-on-animal-welfare-and-antibiotic-use/ (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

consumer would not expect to be present after being subjected to Sanderson's false and misleading advertising.

### D. Sanderson Misleads Reasonable Consumers Who Expect That "100% Natural" Means That the Chickens Were Allowed Outside and/or Treated Humanely.

77.    Sanderson claims that its chickens are "100% Natural." Sanderson's words and imagery representing that the process and environment in which the birds are raised is "100% Natural" is false because Sanderson's birds are confined in sheds with thousands of other birds, and the birds do not go outdoors into a natural environment because they are raised exclusively indoors.[58] As for the crowding and stocking density inside chicken sheds, an industry guide recommended 1.097 to 1.180 square feet per bird, which Sanderson's ███████████ ████████████████████ The industry standard for a grow-out house is 20,000 birds or more, with eight-tenths of a square foot per bird.[59] Sanderson recently reported that it lost 2.1 million birds in Hurricane Florence who were housed in 70 grow-out sheds; that is approximately 30,000 birds per shed,[60] even more than the 25,000 to 27,000 birds per shed identified by Sanderson's veterinary staff. Sanderson's representations are also misleading to reasonable consumers because when consumers see "natural" on a poultry product, surveys

---

[58] The industry standard, including Sanderson, is indoors. "Almost all the chickens eaten in the United States, and increasingly in the rest of the world, have been raised for decades in this manner: always indoors, always under artificial light, always eating only what the farmer supplies." Maryn McKenna, "Big Chicken," iBooks (2017), available at https://itunes.apple.com/us/book/big-chicken/id1217089199?mt=11.

[59] National Chicken Council, "Animal Welfare for Broiler Chickens", available at https://www.nationalchickencouncil.org/industry-issues/animal-welfare-for-broiler-chickens/#one (last visited October 1, 2018).

[60] Mother Jones, "These Photos of Submerged North Carolina Livestock Farms Are Devastating," https://www.motherjones.com/food/2018/09/these-photos-of-submerged-north-carolina-livestock-farms-are-devastating/ (last visited October 1, 2018); *see also* https://sandersonfarms.com/press-releases/sanderson-farms-inc-provides-update-hurricane-florence-damage/ (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

indicate that 50% of consumers think that the animals went outdoors,[61] and 83% expect that "natural" means that the animal was raised in a natural environment.[62] A reasonable consumer would not think that sheds with approximately 25,000 to 30,000 birds with approximately one square foot per bird is "natural."

78.    Sanderson represents on its website addressing animal welfare that "At Sanderson Farms, we believe in raising our chickens humanely to ensure their safety, nutrition, and overall health."



**Our Birds Come First**

At Sanderson Farms, we believe in raising our chickens humanely to ensure their safety, nutrition, and overall health.

The words "humanely" and "raising" in the same sentence is essentially the same as "humanely raised." Sanderson reinforces this claim and the general false impression of high animal welfare standards with recent TV commercials of chickens being given pricey gifts from humans and chickens dining in restaurants, a TV commercial titled "Old MacGimmick,"[63] and images of chickens playing volleyball and sipping lemonade. According to a 2016 Consumer Reports

---

[61] Consumer Reports National Research Center, "Natural Food Labels Survey" (2015), at 4, available at https://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf (last visited October 1, 2018).

[62] Consumer Reports National Research Center, "Food Labeling Poll" (2007), at 15, not available online.

[63] Available at https://www.ispot.tv/ad/w10S/sanderson-farms-old-macgimmick?autoplay=1 (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

survey,[64] a significant portion of consumers could be misled by Sanderson's statements regarding how it treats its birds. Specifically, 82% of consumers think that a "humanely raised" representation means that the farm was inspected to verify this claim, 77% think the animals had adequate living space, 71% think that "humanely raised" means the animals were slaughtered humanely, and 68% think the animals went outdoors, and 65% think the animals were raised in houses with clean air.[65] Sanderson's statements on how it treats its chickens are false and misleading because in reality, Sanderson's chickens are raised in crowded barns (that contribute to the growth of antibiotic resistant bacteria), and the chickens are raised in intensive confinement where they never see the sunlight except when they are transported for slaughter. Sanderson also subjects its birds to cruel, inhumane treatment. A recent 2016 investigation at the Kinston, N.C. hatchery farm has revealed the horrific conditions in which Sanderson's chicks are left to die.[66] The Animal Welfare Institute, based on the USDA inspection records, determined that Sanderson chicken plant in Collins, Mississippi, was one of the nine worst chicken plants of three hundred surveyed for animal cruelty.[67] AWI also found that two Sanderson plants have been cited at least 20 times for not complying with humane handling standards[68] (the Palestine, Texas facility had 20 humane handling reports in 2015-2016, and the Kinston, North Carolina

---

[64] Food Labels Survey (2016), available at http://greenerchoices.org/wp-content/uploads/2016/08/2016_CRFoodLabelsSurvey.pdf (last visited October 1, 2018).

[65] *Id.* at 16.

[66] PETA, "Chicks Dropped Live Into Mincer at Chicken Supplier of Kroger, Arby's," available at https://investigations.peta.org/chicken-supplier-kroger-arbys/ and https://www.peta.org/media/news-releases/exposed-chicks-left-suffer-die-chicken-meat-supplier-kroger-arbys/ (last visited October 1, 2018).

[67] *See* Animals 24-7, "Pilgrim's Pride & Case Farms have "worst chicken plants for animal cruelty," say Animal Welfare Institute & Farm Sanctuary," available at https://www.animals24-7.org/2014/11/22/pilgrims-pride-case-farms-have-worst-chicken-plants-for-animal-cruelty-say-animal-welfare-institute-farm-sanctuary/ (last visited October 1, 2018).

[68] Animal Welfare Institute, "New Report Exposes Pattern of Animal Mistreatment in Some US Poultry Plants," available at https://awionline.org/press-releases/new-report-exposes-pattern-animal-mistreatment-some-us-poultry-plants (last visited October 1, 2018).

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

facility had 22 reports for 2011-2014).[69] The Palestine violations included, among others, excessive use of force, improper sorting of "DOAs and live birds" and birds drowning in the scald tank. In 2016, a USDA inspector determined the plant's slaughtering process was "out of control" for the scald tank violations and noted that similar incidents had taken place before.[70] Discovery may reveal additional living conditions and treatment of the animals that are contrary to Sanderson's representations. In light of Sanderson's statement that it believes in "raising" its chickens "humanely," consumer expectations as shown in the survey, and the actual conditions of Sanderson's raising (which consumers believe includes slaughtering practices) of its birds as shown by the AWI report, Sanderson representations that its chicken is "100% Natural," and raised humanely is false and misleading to consumers.

V.    **Sanderson Knows That Its "100% Natural" Advertising Claims Are Untrue And Could Mislead Reasonable Consumers.**

79.    Sanderson knows that consumers think that "natural" means chicken that was not given antibiotics or other pharmaceuticals, consistent with consumer surveys. Sanderson knows, or should reasonably know, that it is making false, misleading or deceptive statements to consumers as described above.

80.    In fact, Sanderson's own ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████

---

[69] Animal Welfare Institute, "The Welfare of Birds At Slaughter In The United States - 2017 Update", at 9, available at https://awionline.org/sites/default/files/uploads/documents/FA-AWI-Welfare-of-Birds-at-Slaughter-Update.pdf (last visited October 1, 2018).
[70] *Id.*

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

81.     Sanderson continues to ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████

82.     Sanderson has received numerous complaints about its deceptive advertising. The

complaints indicate consumer irritation at Sanderson's "100% Natural" advertising and its claim

that all chicken is "antibiotic free" per federal law so that "raised without antibiotics" used by

other chicken producers is merely a "gimmick." ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████

(emphasis added). Another states:

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

(emphasis added). Another states:

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

(emphasis added). Another:

(emphasis added). Finally:

(emphasis added).

## FIRST CLAIM FOR RELIEF
**(Violation of California Unfair Competition Law—California Business and Professions Code § 17200,** *et seq.***)**

83.    The allegations made in all preceding paragraphs are re-alleged and incorporated by reference herein.

84.    Sanderson engaged in unlawful, unfair, and/or fraudulent conduct under the California UCL, California Business & Professions Code § 17200, *et seq.*, by advertising its Chicken Products as "100% natural" when in fact, Sanderson knows that the process by which it creates its Chicken Products and the resulting product itself does not meet reasonable consumer expectations for a product marketed as "100% natural."

85.    Sanderson's conduct is unlawful in that it violates the California FAL, California Business & Professions Code § 17500 *et seq.*, described more fully in the Second Claim for Relief below.

86.     Sanderson's conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiffs, Plaintiffs' members, and California consumers. The harm to Plaintiffs arising from Sanderson's conduct outweighs any legitimate benefit Sanderson derived from the conduct. Sanderson's conduct undermines and violates the stated spirit and policies underlying the FAL and other legal regulations as alleged herein.

87.     Sanderson's advertising actions and practices with regard to the food product and process constitute "fraudulent" business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers. As a direct and proximate result of Sanderson's violations, Plaintiffs suffered injury in fact because they were forced to divert substantial organizational resources away from their core missions. Sanderson's unlawful encouragement of such practices have frustrated Plaintiffs' efforts to promote transparency in the food system.

88.     Plaintiffs seek (a) injunctive relief in the form of an order requiring Sanderson to cease the acts of unfair competition alleged here and to correct its advertising, promotion, and marketing campaigns; (b) the payment of Plaintiffs' attorneys' fees and costs pursuant to, inter alia, California Code of Civil Procedure Section 1021.5.; and (c) interest at the highest rate allowable by law.

**SECOND CLAIM FOR RELIEF**
**(Violation of California False Advertising Law—California Business & Professions Code §**
**17500, *et seq.*)**

89.     The allegations made in all preceding paragraphs are re-alleged and incorporated by reference herein.

90.     Sanderson publicly disseminated untrue or misleading advertising, or intended not to sell the Chicken Products as advertised, in violation of California FAL, California Business & Professions Code § 17500, *et seq.*, by advertising its Chicken Products as "100% natural" when in fact, Sanderson knew, or in the exercise of reasonable care should have known, that the

1  process by which it creates its Chicken Products and the product itself does not meet reasonable

2  consumer expectations for a product marketed as "100% natural."

3      91.    As a direct and proximate result of Sanderson's violations, Plaintiffs suffered

4  injury in fact because they were forced to divert substantial organizational resources away from

5  their core missions. Sanderson's unlawful practices have frustrated Plaintiffs' efforts to promote

6  transparency in the food system on behalf of the general public.

7      92.    Plaintiffs seek (a) injunctive relief in the form of an order requiring Sanderson to

8  cease the acts of unfair competition alleged here and to correct its advertising, promotion, and

9  marketing campaigns; (b) the payment of Plaintiffs' attorneys' fees and costs pursuant to, inter

10  alia, California Code of Civil Procedure Section 1021.5.; and (c) interest at the highest rate

11  allowable by law.

12

13  **JURY DEMAND**

14      Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

15

16  **REQUESTS FOR RELIEF**

17  WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in their favor

18  and against Sanderson, as follows:

19      A.    Declare that Sanderson violated the UCL and FAL;

20      B.    Order an award of injunctive relief as permitted by law or equity, including

21  enjoining Sanderson from continuing the unlawful practices as set forth herein, and ordering

22  Sanderson to engage in a corrective advertising campaign;

23      C.    Order Sanderson to pay attorneys' fees and litigation costs to Plaintiffs pursuant

24  to California Code of Civil Procedure Section 1021.5 and the common-law private-attorney-

25  general doctrine;

26      D.    Order Sanderson to pay both pre- and post-judgment interest on any amounts

27  awarded; and

28      E.    Order such other and further relief as may be just and proper.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.

1

2  Respectfully submitted this 2nd day of October, 2018 in San Francisco, California.

3

4  **ELSNER LAW & POLICY, LLC**

5

6

Gretchen Elsner (*Pro Hac Vice*)
7  gretchen@elsnerlaw.org
150 Washington Avenue, Suite 201
8  Santa Fe, NM 87501
Telephone: (505) 303-0980
9

10  **CENTER FOR FOOD SAFETY**

11

12  Adam Keats (CSB. No. 191157)
Kellan Smith (CSB No. 318911)
13  akeats@centerforfoodsafety.org
ksmith@centerforfoodsafety.org
14  303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
15  Telephone: (415) 826-2770

16

17  *Counsel for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28