REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1

ELSNER LAW & POLICY, LLC
Gretchen Elsner (*Pro Hac Vice*)
Gretchen@ElsnerLaw.org
150 Washington Avenue, Suite 201
Santa Fe, NM 87501
Telephone: (505) 303-0980

CENTER FOR FOOD SAFETY
Adam Keats (CSB No. 191157)
Kellan Smith (CSB No. 318911)
akeats@centerforfoodsafety.org
ksmith@centerforfoodsafety.org
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
Telephone: (415) 826-2770

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| FRIENDS OF THE EARTH and CENTER FOR FOOD SAFETY, | Case No. 3:17-CV-03592-RS |
| *Plaintiffs*, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT** |
| v. | |
| SANDERSON FARMS, INC., a Mississippi corporation, | **Hon. Richard Seeborg** **Date: November 29, 2018** **Time: 1:30 p.m.** |
| *Defendant*. | **Courtroom: 3 – 17th Floor** **450 Golden Gate Avenue** **San Francisco, CA 94102** |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

PROCEDURAL BACKGROUND................................................................................................ 2

STATEMENT OF ISSUES .......................................................................................................... 3

STANDARD OF REVIEW .......................................................................................................... 3

ARGUMENT ................................................................................................................................ 4

    I.      PLAINTIFFS' FALSE ADVERTISING AND UNFAIR COMPETITION
            CLAIMS ARE ACTIONABLE AND SUFFICIENTLY STATED IN THE
            AMENDED COMPLAINT. .................................................................................. 4

          A.     "100% Natural" Is Actionable. .................................................................. 5

          B.     Sanderson's "100% Natural" Advertising Does Not Contain "Disclosures"
                 as a Matter of Law. .................................................................................... 9

          C.     Plaintiffs' Amended Complaint Pleads Facts Sufficient as to All Four Sets
                 of Factual Allegations to Allege that "100% Natural" is False. ............... 15

              1.     █████████████████████████████████
                     █████████████████ Do Not Meet Consumer
                     Expectations for "100% Natural." ................................................ 16

              2.     Pharmaceutical Use, Including Routine Antibiotics Use, Does Not
                     Meet Consumer Expectations for "100% Natural." ...................... 19

              3.     The ██████████████████████████████ Is a
                     Threat to Public Health, and Does Not Meet Consumer
                     Expectations for "100% Natural." ................................................ 20

              4.     Birds Raised Exclusively Indoors Do Not Meet Consumer
                     Expectations for "100% Natural." ................................................ 22

    II.     PLAINTIFFS' AMENDED COMPLAINT COMPLIES WITH THIS COURT'S
            ORDER GRANTING LEAVE TO AMEND. ..................................................... 23

CONCLUSION............................................................................................................................ 24

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................3

*Bohac v. General Mills, Inc.*,
  12-cv-05280, 2014 WL 1266848 (N.D. Cal. Mar. 26, 2014) .......................... *passim*

*Brazil v. Dole Packaged Foods, LLC*,
  660 Fed.Appx. 531 (9th Cir. 2016) ...............................................................9

*Bruton v. Gerber Products Co.*,
  12-cv-0242-LHK, 2014 WL 172111 (N.D. Cal. Jan. 15, 2014)..............................21

*Carrea v. Dryer's Grand Ice Cream, Inc.*,
  475 F. App'x 113 (9th Cir. 2012) ................................................................14

*Castagnola v. Hewlett-Packard Co.*,
  C-11-05772-JSW, 2012 WL 2159385 (N.D. Cal. June 13, 2012)....................12, 14

*Chaquico v. Freiberg*,
  17-cv-02423-MEJ, 2017 WL 4805578 (N.D. Cal. Oct. 24, 2017) .........................24

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
  12-04000 SC, 2013 WL 57861 (N.D. Cal. Jan. 3, 2013)......................................21

*Coastal Abstract Service, Inc. v. First American Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) ..............................................................12, 21, 23

*Cover v. Windsor Surry Company*,
  14-cv-05262-WHO, 2016 WL 3421361, at *3 (N.D. Cal. June 22, 2016)..................24

*Cullen v. Netflix, Inc.*,
  880 F. Supp. 2d 1017 (N.D. Cal. 2012) ........................................................21

*DeLeon v. Wells Fargo Bank, N.A.*,
  10-CV-01390-LHK, 2010 WL 4285006, (N.D. Cal. Oct. 22, 2010)........................23

*Dodson v. Tempur-Sealy International, Inc.*,
  13-cv-04984-JST, 2014 WL 1493676 (N.D. Cal. April 16, 2014).........................14

*Edmunson v. Procter & Gamble Co.*,
  10-CV-2256-IEG, 2011 WL 1897625 (S.D. Cal. May 17, 2011) ....................21, 23

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) .........................................................................7

**Page(s)**

**Federal Cases (Cont'd)**

*Hadley v. Kellog Sales Co.*,
  273 F. Supp. 3d 1052 (N.D. Cal. 2017) ...............................................4, 21

*Hemy v. Perdue Farms, Inc.*,
  CV-11-888, 2013 WL 1338199 (D.N.J., March 31, 2013).....................................22

*Kellman v. Whole Foods Market, Inc.*,
  313 F. Supp. 3d 1031 (N.D. Cal. 2018) ...............................................14

*L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc.*,
  114 F. Supp. 3d 852 (N.D. Cal. 2015) ........................................... *passim*

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) ...........................................................3

*In re Sony Gaming Networks and Customer Data Security Breach Litigation*,
  996 F. Supp. 2d 942 (S.D. Cal. 2014)......................................................20

*Solomon v. North American Life and Casualty Insurance Company*,
  151 F.3d 1132 (9th Cir. 1998) ...........................................................24

*Tait v. BSH Home Appliances Corp.*,
  10–00711-DOC, 2011 WL 394138 (C.D. Cal. Aug. 31, 2011)..............................20

*United States v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) .................................................4, 15, 16

*Vess v. Ciba-Geigy Corp. U.S.A.*,
  317 F.3d 1097 (9th Cir. 2003) .............................................................4

*Williams v. Gerber Products Co.*,
  552 F.3d 934 (9th Cir. 2008) ................................................... *passim*

**State Cases**

*Brady v. Bayer Corporation*,
  26 Cal.App.5th 1156 (2018) .............................................................10

*Chapman v. Skype Inc.*,
  220 Cal.App.4th 217 (2013) ...............................................................7

**State Statutes**

California's False Advertising Law, California Business & Professions Code §
  17500, *et seq.* ................................................................. *passim*

California's Unfair Competition Law, California Business & Professions Code §
  17200, *et seq.* ................................................................. *passim*

**Rules**

Fed. R. Civ. P. 8(a)(2) .................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ................................................................................. *passim*

Fed. R. Civ. P. 9(b) ........................................................................................ *passim*

Fed. R. Civ. P. 11 ....................................................................................................2

**Regulations**

21 C.F.R. 558.363(d)(1)(ii)(B) ...............................................................................18

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

# INTRODUCTION

Plaintiffs respectfully request that this Court deny Defendant Sanderson's Motion to Dismiss, which is the fourth attempt to adjudicate Plaintiffs' claims on the pleadings. Plaintiffs challenge Sanderson's representations that its process for creating its chicken products and the products themselves are "100% Natural." Plaintiffs' allegations are directed at Sanderson's failure to meet reasonable consumer expectations for products advertised as "100% Natural," and provide the factual bases for why Sanderson's representations are false and misleading in violation of California's consumer protection laws.

The factual bases as to why "100% Natural" is false are (A) Sanderson's chicken products do contain ████████████████████████████████████; (B) Sanderson uses pharmaceuticals, including routine antibiotic use; (C) Sanderson's unnatural process contributes to ████████████████████████████████████████████ ████████, and Sanderson misleads consumers about what the real public health threat is by diverting attention to USDA residue regulations; and (D) Sanderson's chickens are confined indoors and do not go outdoors into a natural environment, and the birds are not treated in a way that comports with consumer understanding of Sanderson's representations about its handling of the animals. The problems at Sanderson that form the basis of Plaintiffs' factual allegations are not isolated incidents of pharmaceuticals or farm hands gone astray; they are systemic issues that are inherent to Sanderson's pharmaceutically-driven process. And while it is legal for residues to remain in the product after slaughter if the residues are below the regulatory limits; and it is legal to use pharmaceuticals, including routine antibiotics in all flocks, and including in ways that contribute to antibiotic resistant bacteria; and it is legal to confine birds to sheds and mistreat them during the slaughtering process; it is **not** legal in California for Sanderson to mislead and deceive consumers regarding its practices.

Sanderson does not defend this suit by arguing that "100% Natural" is true. Because it cannot. Instead, Sanderson has pointed to a small number of partially true statements tucked into a few places online and separate from the other places where Sanderson advertises. This is as persuasive as saying a stopped clock is right twice a day. Sanderson does not address the

1  magnitude of its "100% Natural" advertising which deceives consumers via TV, magazines,

2  radio, webpages, and billboards.

3      Now that the case has been pending on the Court's docket for more than a year, it is

4  time to complete written discovery, schedule depositions, and move to the merits. Plaintiffs

5  pled more than enough facts to support their allegations, and Defendant can no longer seek to

6  try the case via a motion to dismiss. The Court should deny Defendant's Motion to Dismiss in

7  its entirety.

8

9                          **PROCEDURAL BACKGROUND**

10     Plaintiffs filed this case on June 22, 2017. ECF No. 1. Defendant moved to dismiss on

11  August 2, 2017, ECF No. 23. The Court did not need to adjudicate that motion because

12  Plaintiffs filed their First Amended Complaint (FAC), ECF No. 31. Defendant moved to

13  dismiss a second time. ECF No. 32. This Court denied Defendant's Motion to Dismiss in its

14  entirety on February 9, 2018. The Court ruled that Plaintiffs successfully alleged their standing,

15  that the state law consumer protection claims could proceed and were not preempted, and that it

16  was plausible that consumers were misled. ECF No. 48. On plausibility, this Court held:

17          Here, plaintiffs plausibly allege a reasonable consumer could find Sanderson's
18          marketing and advertising materials deceptive. Plaintiffs point to surveys
            indicating a majority of consumers believe: a) a "natural" poultry product is
19          produced without the use of antibiotics or other drugs at any point; and b) it is
            important to reduce antibiotic use in food production and improve the living
20          conditions of animals. In light of this information (and various other
            allegations), it is plausible a reasonable consumer could be misled by Sanderson's
21          use of words and phrases like "natural," "there's only chicken in our chicken,"
            and "no antibiotics to worry about here," and might purchase Sanderson's
22          products based on a flawed understanding of how Sanderson's chickens are
            raised.

23  ECF 48 at 10.

24     After the motion to dismiss was denied, Sanderson moved for Rule 11 sanctions against

25  Plaintiffs and their counsel, which this Court also denied. ECF No. 66.

26     Discovery is in progress pursuant to the Case Management Scheduling Order. The Case

27  Management Scheduling Order, ECF No. 58 at 1, set the deadline for Plaintiffs to amend

28  without leave of Court. Plaintiffs filed the Second Amended Complaint (SAC), ECF No. 78, on

June 25, 2018, within the deadline set by the Court to amend without seeking leave. Defendant moved to dismiss a third time. ECF No. 79. The Court heard oral argument on that motion to dismiss on August 30, 2018, ECF No. 103, and on September 11, 2018, the Court granted Defendant's motion and granted Plaintiffs leave to amend. ECF No. 105. Plaintiffs filed the Third Amended Complaint (TAC) on October 2, 2018, ECF No. 114-3, and Defendant filed its fourth motion to dismiss on October 16, 2018, ECF No. 120.

## STATEMENT OF ISSUES

1.  Whether Defendant's "100% Natural" advertising is actionable?

2.  Is it plausible that reasonable consumers could be misled by Defendant's "100% Natural" advertising?

3.  Have Plaintiffs sufficiently pleaded facts to support their claim that "100% Natural" is false, misleading or deceptive?

## STANDARD OF REVIEW

A motion to dismiss will be denied under Federal Rule of Civil Procedure 12(b)(6) unless the pleadings fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "The complaint 'does not need detailed factual allegations,' but instead only needs enough factual allegations 'to raise a right to relief above the speculative level.'" *Bohac v. General Mills, Inc.*, 12-cv-05280, 2014 WL 1266848, at *3 (N.D. Cal. Mar. 26, 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P.

9(b). "Knowledge," by contrast, "may be alleged generally." *Id*. While the plaintiff "must allege the who, what, when, where, and how of the misconduct charged. . . including what is false or misleading about a statement, and why it is false," Rule 9(b) "does not require absolute particularity or a recital of the evidence." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (internal citations and quotations omitted). Furthermore, a "complaint also need not identify representative examples . . . to support every allegation." *Id*.

Claims under California consumer protection statutes including California's False Advertising Law (FAL), California Business & Professions Code § 17500, *et seq.*, and Unfair Competition Law (UCL), *id.* § 17200, *et seq.*, are governed by the "reasonable consumer test." *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008). This standard requires that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Hadley v. Kellog Sales Co.*, 273 F. Supp. 3d 1052, 1079 (N.D. Cal. 2017) (internal quotations omitted).

## ARGUMENT

### I. PLAINTIFFS' FALSE ADVERTISING AND UNFAIR COMPETITION CLAIMS ARE ACTIONABLE AND SUFFICIENTLY STATED IN THE AMENDED COMPLAINT.

Plaintiffs plausibly allege violations of the UCL and FAL in accordance with Rule 8's requirement of "a short and plain statement," and satisfied Rule 9(b) by pleading with "particularity the circumstances constituting fraud or mistake." A key purpose of pleading requirements is to provide adequate notice to a defendant of their alleged wrongdoing, which Plaintiffs have done. As Defendant noted, "the circumstances constituting the alleged fraud [must] 'be specific enough to give defendants notice of the particular misconduct . . ..'" *Vess v. Ciba-Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003); MTD 5. Here, Defendant is acutely aware that Plaintiffs challenge the "100% Natural" and related representations as false and misleading in light of the reality of its process for creating its chicken products not matching reasonable consumer expectations.

Defendant's motion has very little to do with whether Plaintiffs' TAC complies with Rules 8, 9(b), or states a claim upon which relief can be granted per Rule 12(b)(6). Instead, the

1  motion is an attempt to distract from the straightforward "100% Natural" allegations and an

2  attempt to challenge the sufficiency of the known evidence before discovery is complete. For

3  example, Plaintiffs clearly plead that consumers are misled by Sanderson's marketing.

4  Consumers are exposed to the "100% Natural" advertising in a plethora of ways; some

5  consumers see TV ads; some read a magazine ad while making the grocery list; some hear a

6  radio spot on their way to the store. Sanderson's production practices may comply with existing

7  regulations, but its advertising cannot contain false and misleading representations that lead a

8  consumer to believe that Sanderson's practices are something other than they are. In California,

9  deceptive advertising is unlawful. Defendant points to specific statements that continue to

10  mislead as "cherry-picking" by Plaintiffs of their "100% Natural" representations. These

11  allegations cannot be dismissed as a matter of law by Defendant relying on "cherry-picking" of

12  its own because Defendant's entire "100% Natural" advertising scheme is in violation of

13  California law.

14      **A.      "100% Natural" Is Actionable.**

15      The heart of Plaintiffs' claim is that reasonable consumers have expectations regarding

16  poultry products described as "natural" and "100% Natural," TAC ¶¶ 47-53, and by using this

17  tagline—or "slogan" (*see* MTD 13)—as a critical component of Defendant's marketing scheme,

18  TAC ¶¶ 40-45, Defendant deceives reasonable consumers about the realities of Sanderson's

19  *process* for creating its chicken products. *See* TAC ¶¶ 1-8. In reality, Sanderson's process for

20  creating its chicken products do not meet reasonable consumer expectations for products

21  described as "100% Natural" in marketing and advertising. *See* TAC ¶¶ 54-78. Sanderson

22  knows, or reasonably should know, that by advertising its chicken products as "100% Natural," it

23  is making false, misleading or deceptive statements. TAC ¶¶ 79-82. Thus, by advertising its

24  products as "100% Natural," Sanderson violates the FAL and UCL. TAC ¶¶ 81-92.

25      In its motion to dismiss, Defendant spends little time addressing the heart of Plaintiffs'

26  claim. When Defendant does reach the heart of the issue, it states that the "mere '100% natural'

27  slogan—in the abstract" is not enough to support Plaintiffs' claim, and that in "the full context"

28  of Sanderson's advertising the phrase "100% Natural" is not misleading. MTD 13-14, 20 n.9. In

1   *L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc.*, the court explained why this argument

2   does not "hold water." 114 F. Supp. 3d 852, 863 (N.D. Cal. 2015). There, a group of taxi

3   services challenged various statements made by Uber about the safety of rides on Uber's

4   platform under the Lanham Act, the UCL, and the FAL. *Id.* at 859. First, Defendant Uber argued

5   that the statements were "non-actionable puffery." *Id.* at 860. The court noted that "puffery"

6   occurs when a "claim is extremely unlikely to induce consumer reliance," but "a statement that is

7   quantifiable, that makes a claim as to the specific or absolute characteristics of a product, may be

8   an actionable statement." *Id.* at 860-61 (citing *Newcal Indus., Inc. v. Ikon Office Solution*, 513

9   F.3d 1028, 1053 (9th Cir. 2008)). The court determined that "[a] reasonable consumer reading

10  these statements in the context of Uber's advertising campaign could conclude that an Uber ride

11  is objectively and measurably safer than a ride provided by a taxi or other competitor service."

12  *Id.* at 861. Uber next argued that the "complaint should be dismissed because it impermissibly

13  and misleadingly takes statements out of context," and that the complaint "focused on general,

14  subjective statements amounting to puffery, while ignoring specific, factual statements relating

15  to safety." *Id.* at 863. The court held to the contrary, deciding that this argument works only "if

16  the statements concerning safety that are challenged in Plaintiffs' complaint are not actionable."

17  *Id.* Having already found that the statements were actionable, the court reiterated that "Plaintiffs

18  need not allege that every factual statement in Defendants' advertising materials is false in order

19  to state a false advertising claim." *Id.* Thus, specific statements that Uber screens criminal

20  records for many years did not defeat the challenge to the general allegations regarding the safety

21  of Uber's rides contained in Uber's advertising. *Id.*

22          The context surrounding specific instances of "100% Natural" advertising similarly does

23  not change the fact that Sanderson's "100% Natural" claims are actionable. For instance,

24  Sanderson argues that the "100% Natural" advertising on its homepage is clarified by the context

25  of the website as a whole such that as a matter of law the context of these advertisements

26  compels the conclusion that consumers are not likely to be deceived. *See* MTD 10. But,

27  "Plaintiffs need not allege that every factual statement in Defendants' advertising materials is

28  false in order to state a false advertising claim." *L.A. Taxi*, 114 F.Supp.3d at 863. The reality that

1   portions of Sanderson's advertising may contain true statements surrounding the use of "broth,"

2   "seaweed," "salt," etc., does not provide any context that subverts the claims that consumers

3   expect that antibiotics and other pharmaceuticals are not used in the process of creating a chicken

4   product that is marketed and advertised as "100% Natural." As *L.A. Taxi* illustrates, this

5   argument would only make sense if "natural" was a claim that was non-actionable "puffery."

6         When Sanderson advertises "100% Natural," it fails to qualify or state conditions to avoid

7   misleading consumers, in contrast with *Freeman v. Time, Inc.,* the decision which Defendant

8   relies on in making this argument. *See* MTD 10. In *Freeman*, the Ninth Circuit held that

9   statements such as "[i]f you return your entry with the Validation Seal attached and your entry

10  includes the grand prize winning number, MICHAEL FREEMAN IS GUARANTEED TO BE

11  PAID THE ENTIRE $1,666,675.00!" contained conditional and qualifying language

12  "immediately next to the representations it qualifies and no reasonable reader could ignore it"

13  such that it was not reasonable for a consumer to be deceived that they would actually be

14  receiving the prize money. 68 F.3d 285, 287, 289-90 (9th Cir. 1995). There is no factual

15  similarity between the advertising at issue in *Freeman* and the present case. Here, Sanderson's

16  "100% Natural" representations contain no qualifying or conditional language.

17        In *Chapman v. Skype Inc.*, also relied on by Defendant, the court found that the use of the

18  term "unlimited" in the context of Skype's representations concerning its calling plans, even with

19  a disclosure, was actionable because "the trier of fact reasonably could conclude that consumers

20  are likely to be deceived." 220 Cal.App.4th 217, 227 (2013). Thus, Sanderson's reliance on this

21  case to support its contextual defense is confounding.

22         Defendant does not even attempt to argue that "100% Natural" is non-actionable

23  "puffery," nor could it because "100% Natural" is a critical component of Sanderson's

24  advertising scheme. Furthermore, courts have consistently held that phrases such as "natural,"

25  "all natural," and "100% natural" are actionable under the FAL and UCL. For instance, in *Bohac*

26  *v. General Mills, Inc.*, the court found that General Mills' use of the terms "100% Natural," "all

27  natural," and "natural" in its "labeling, packaging, marketing, advertising, and promotional

28  materials" was actionable under the FAL and UCL and did not amount to non-actionable

1   "puffery." 12-cv-05280, 2014 WL 1266848, at *1, *3-5 (N.D. Cal. Mar. 26, 2014). The court

2   determined that the terms "are not merely general in nature" and contain "specific factual

3   representation[s]." *Id*. at *6. In making this determination, the court noted that "several courts

4   have found the terms 'all natural' and 'natural' to be potentially deceptive and actionable

5   statements." *Id*. at *4, *6 (citing *Williams*, 552 F.3d at 939 (finding "all natural" actionable); *Von*

6   *Koenig v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066, 1080 (E.D. Cal. 2010) (finding it

7   plausible that "All Natural" statements deceived consumers); *Jou v. Kimberly-Clark Corp.*, 13-

8   03075 JSC, 2013 WL 6491158, at *5-8 (N.D. Cal. May 26, 2011) (finding "pure & natural" to be

9   actionable and just as plausible to deceive as "natural," "100% Natural," and "all natural"

10  claims); *Wilson v. Frito-Lay N. Am., Inc.*, 12-cv-1586 SC, 2013 WL 1320468, at *12-13 (N.D.

11  Cal. Apr. 1, 2013) (finding "All Natural" claims actionable under the FAL and UCL); *Astiana v.*

12  *Ben & Jerry's Homemade, Inc.*, 10-cv-4387 PJH, 2011 WL 2111796, at *3-4 (N.D. Cal. May 26,

13  2011) (finding "all natural" plausibly deceptive); *Hitt v. Ariz. Beverage Co., LLC*, 08-cv-809

14  WQH, 2009 WL 449190, at *6-7 (S.D. Cal. Feb. 4, 2009) (finding "natural" beverages to be

15  actionable)). Moreover, the court reasoned that "[w]hether a business practice is deceptive is

16  generally a question of fact not amenable to determination on a motion to dismiss," and found

17  that "[t]his is not the rare situation in which granting a motion to dismiss is appropriate." *Id*. at

18  *4.

19          Similarly, the present case is not among the rare circumstances where dismissing

20  allegations based on deception is appropriate. Here, Plaintiffs allege that reasonable consumers

21  expect that chicken products advertised as "100% Natural" are the product of a process that (A)

22  does not lead to any pharmaceutical residues remaining in the product; (B) does not involve

23  pharmaceuticals, including antibiotics, being given to animals, and especially not on a routine

24  basis; (C) does not contribute to antibiotic resistant bacteria; and (D) allows for animals to go

25  outdoors and be raised in their natural environment. TAC ¶ 4. These allegations regarding

26  consumer expectations are bolstered by consumer surveys regarding meat and poultry products

27  in which a majority of consumers think "natural" or other similar terms indicate that these

28  expectations are met. TAC ¶¶ 47-53. After listing consumer expectations, Plaintiffs allege that

1    Sanderson's process for creating its chicken products does not meet those consumer

2    expectations. TAC ¶¶ 54-76. In reality, (1) "Sanderson's Chicken Products have ███████

3    ████████████," TAC ¶ 54; (2) "Sanderson's process routinely uses unnatural, synthetic

4    pharmaceuticals, including antibiotics," ¶ 55; (3) "Sanderson's process contributes to unnatural

5    antibiotic resistant bacteria ██████████████," ¶ 56; and (4) "Sanderson raises its

6    birds indoors in intensive confinement," ¶ 57.

7         Plaintiffs' allegations and the facts supporting them significantly align with *Brazil v.*

8    *Dole Packaged Foods, LLC*, where the Ninth Circuit in an unpublished opinion found that the

9    district court incorrectly granted summary judgment to defendant. 660 Fed.Appx. 531, 533 (9th

10    Cir. 2016). There, the Plaintiff alleged that "Defendants deceptively described their fruit

11    products as 'All Natural Fruit'" and cited as support the description itself, "his own testimony,"

12    "consumer surveys," and "non-binding policy on the use of the word 'natural' in food labels." *Id*.

13    The Ninth Circuit determined that "[t]aken together, this evidence could allow a trier of fact to

14    conclude that Dole's description of its products as 'All Natural Fruit' is misleading to a

15    reasonable consumer." *Id*. Here, Plaintiffs' claims, supported by surveys on consumer

16    understanding of "natural" that is contrary to how Sanderson uses the term, similarly plausibly

17    allege that the use of the phrase "100% Natural" is deceptive under the FAL and UCL because it

18    is false and misleading to the reasonable consumer.

19         Sanderson's assertion that false and misleading statements can be ignored if a defendant

20    also makes some true statements in a separate context finds no support in the law. "100%

21    Natural" is actionable language and it will be up to the ultimate trier of fact to decide whether in

22    this instance its use is deceptive. Moreover, the advertising here looks nothing like that in

23    *Freeman* and other cases where the context of the advertisement immediately cured any possible

24    deception for the reasonable consumer. For similar reasons, as discussed below, Sanderson's

25    self-described "disclosures" provide no cure for the deception inherent in their "100% Natural"

26    claims.

27

28         **B.**    **Sanderson's "100% Natural" Advertising Does Not Contain "Disclosures" as a Matter of Law.**

Sanderson advertises using the "100% Natural" description in the homepage of its current website, ¶ 41; in a dedicated "100% Natural" webpage, *id*.; in "several TV commercials," ¶ 42; "on its current newsletter subscription webpage," ¶ 43; in "a monthly 100% Natural Newsletter," ¶ 44; "in print magazines," ¶ 45; and "via billboards," *id*. None of these avenues of "100% Natural" advertising make any disclosures concerning unnatural practices, such as routine pharmaceutical use, including antibiotics.

Sanderson's motion disregards the reality of consumers' experiences with its advertising. According to Sanderson, the reasonable consumer reviews and analyzes different representations across media and then performs specific investigations into the terminology used in the advertisements. Recent case law rejects this depiction of the reasonable consumer. As stated by a California appellate court addressing vitamin shoppers:

> We respectfully part company with *Howard* and *Goldman* because both cases rest on the assumption that reasonable consumers of vitamins are back-label scrutinizers. We think that assumption untenable. It may well be that many people—including some judges and lawyers—would make such an inquiry. It may well be that engineers and scientists and the vitamin cognoscenti would make such an inquiry. But we are convinced other consumers—knowing they have very little scientific background—would rely upon the representation of a known brand with 70 years of goodwill and credibility behind it. We think it likely they would consider that known brand—presumed to be the employer of doctors, biologists, and pharmacologists—to be a better judge of what vitamins and minerals should be taken than they are.

*Brady v. Bayer Corporation*, 26 Cal.App.5th 1156, 1174 (2018). Like here, reasonable poultry shoppers do not have poultry expertise and it is likely that they would rely on Sanderson's brand name, presume that Sanderson is the employer of veterinarians and food safety experts, fail to scrutinize the incomplete website statements or YouTube video transcripts, and instead trust that "100% Natural" is what they expect it to be.

Defendant argues that Plaintiffs' have "cherry-picked" statements from across its advertising "that supposedly lend" the impression that Sanderson does not administer antibiotics. MTD 9. Sanderson argues that among its webpages are those that "conspicuously and unequivocally disclose Sanderson's use of antibiotics." *Id*. In addition, Defendant points to Plaintiffs' pleadings before Magistrate Judge Kim where Plaintiffs have represented that

1  Sanderson has publicly admitted its antibiotic use.[1] None of these arguments address the heart of

2  Plaintiffs' claim, however, that "100% Natural" claims raise consumer expectations about the

3  process in which chicken products are produced. None of the sources of Sanderson's advertising

4  discussed in ¶¶ 40-46 of Plaintiffs' TAC contain any disclosure of Sanderson's pharmaceutical

5  use or the conditions in which Sanderson's chickens are raised.

6       The case law makes clear that the "disclosures" Sanderson refers to are insufficient to

7  dismiss a claim under the FAL and UCL. For instance, in *Bohac*, the court found that the

8  defendant's use of the terms "100% Natural," "all natural," and "natural" in its "labeling,

9  packaging, marketing, advertising, and promotional materials" was actionable under the FAL

10 and UCL, and rejected the defendant's argument that any ambiguity created by those phrases

11 was dispelled by a review of the assertions themselves. 2014 WL 1266848, at *8. There, the

12 judge "fail[ed] to see how the ingredients list necessarily informs the consumer that the products

13 include non-natural ingredients." *Id*. at *9. "The mere presence of these ingredients in the

14 ingredients list does not clearly refute the explicit message that reasonable consumers may take

15 from the rest of the packaging: that the products are made with *only* natural ingredients." *Id*.

16 (emphasis in original). In making this determination, the *Bohac* court primarily relied on the

17 holding in *Williams*, where the Ninth Circuit rejected the argument that "reasonable consumers

18 should be expected to look beyond misleading representations on the front of the box to discover

19 the truth from the ingredient list in small print on the side of the box." 552 F.3d at 939. Thus, the

20 fact that Sanderson may provide incomplete and passing references to the use of antibiotics in its

21 chicken production process and images of some chicken sheds in some place not adjacent to its

22 "100% Natural" advertisements that appear online, on TV, in print, and on billboards, cannot be

23 a basis for dismissal of Plaintiffs' claim under the FAL and UCL. If reasonable consumers are

24 not expected to turn a box around to read an ingredient list that may refute a "natural"

25 representation that appears on the front of the box, then clearly consumers should not be

26

27 [1] Ironically, Plaintiffs had to fight Defendant to remove the confidentiality designation of its
   interrogatory response on using antibiotics. Sanderson is extremely selective on its public
28 statements regarding pharmaceuticals, as demonstrated by its evasive response to the consumer
   who was ██████████████████████ TAC ¶ 81.

expected to look at completely unrelated statements in unrelated forums to investigate the truth of Sanderson's use of pharmaceuticals, including antibiotics and its intensive confinement of chickens.

Even for the limited number of statements for which there is arguably a disclosure, the disclosures are insufficient as a matter of law. <u>First</u>, Sanderson includes a link on its "100% Natural" webpage that takes the reader to a different webpage, which is part of the website's FAQ. This Court earlier determined that this specific webpage is not misleading because it provides statements regarding Sanderson's antibiotic use. MTD 11. But the "disclosure" on one page of Sanderson's website cannot cure the false and misleading assertions on a separate page of Sanderson's website, let alone television, radio, and magazine advertising, in light of the holdings in *Bohac* and *Williams* discussed above.[2] Even if this webpage somehow cured the other webpage of its deceptive nature, it would not follow that all of Sanderson's "100% Natural" advertising that spans many mediums and contains no reference to this FAQ page would be rendered non-actionable by this purported "disclosure." Sanderson's reliance on *Castagnola v. Hewlett-Packard Co.*, *see* MTD 11, actually helps Plaintiffs because that case demonstrates a proper website disclosure, unlike Sanderson's disclosures. There, the plaintiffs presented a webpage that included photographs of related goods and services that they alleged contained a misleading checkout process. C-11-05772-JSW, 2012 WL 2159385, at *1 (N.D. Cal. June 13, 2012). The court dispensed of this claim because directly below the potentially misleading statements were disclosures such that "any ambiguity… [was] dispelled by the webpage as a whole." *Id.* at *9 (internal citations and alterations omitted). This case supports Plaintiffs' argument that the "disclosure" at issue here is entirely distinguishable from those disclosures that courts have given weight because in *Castagnola*, unlike with Sanderson, the disclosure provided was directly adjacent to the potentially misleading information and appeared on the very same webpage. By contrast, a Sanderson consumer must click through many

---

[2] The FAQ page does nothing in the way of providing a basis for dismissing Plaintiffs' allegations concerning the "routine" use of antibiotics detailed in ¶ 61 of the TAC. The FAQ merely admits to antibiotics use, and asserts that it is judicious and not unnecessary. ECF 79 at 10-11.

1  webpages of potentially false and misleading advertising to find a link to another webpage that—

2  at best—provides a partial disclosure of the true extent of Sanderson's antibiotic use. This

3  "disclosure" cannot be grounds for dismissal when Plaintiffs challenge the entirety of

4  Defendant's "100% Natural" advertising.

5       <u>Second</u>, Defendant argues that Plaintiffs "attempt to cherry-pick from Sanderson's

6  'Animal Welfare' page, including the embedded 'How We Grow Our Chicken' video." MTD 11.

7  Plaintiffs have already indicated this video contains some factually true information. However,

8  "[t]he California Supreme Court has recognized that [the FAL and UCL] prohibit not only

9  advertising which is false, but also advertising which although true, is either actually misleading

10 or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams*, 552

11 F.3d at 938 (internal quotations and alterations omitted); *L.A. Taxi*, 144 F.Supp.3d at 860. Here,

12 as explained in the TAC, Sanderson purportedly "discloses" antibiotic use, but its statements are

13 still deceptive and incomplete. Sanderson says that the "only time we inject antibiotics" is a

14 single time under the shell, but fails to disclose that Sanderson's broiler chickens are not injected

15 with antibiotics but are instead fed antibiotics routinely (described in TAC ¶ 61). After being

16 subject to Sanderson's "100% Natural" advertising, this "disclosure" is potentially misleading

17 because it continues to obfuscate the true extent of the "routine" use of antibiotics in Sanderson's

18 production process. As previously explained, the reasonable consumer does not expect that

19 products advertised as "100% Natural" are derived from a process that involves the use of

20 antibiotics, especially the routine use of antibiotics that Sanderson administers. TAC ¶¶ 47-53.

21 This video does not cure this misrepresentation, and as Plaintiffs illustrate, creates confusion of

22 its own. *See* TAC ¶ 67 ("One YouTube viewer expressed confusion by stating, 'is the only time

23 we use antibiotics. I thought you guys said all Chickens in the US are supposedly antibiotic free

24 or that you guys don't use them?'") (internal quotations omitted). This video does not correct

25 Sanderson's false and misleading representations; it merely confuses the viewer more about

26 Sanderson's practices.[3]

27

28 ─────────────────
[3] Sanderson knows that its advertising is confusing and deceptive. *See* TAC ¶68 ("Sanderson's
own documentation analyzing consumer understanding of its advertisements reveals, ███████████

1    The case law cited to by Sanderson, MTD 12, is readily distinguishable: *Castagnola* for

2    the reasons discussed above, and *Carrea v. Dryer's Grand Ice Cream, Inc.* because it involved

3    the potentially deceptive phrase "Original Vanilla" that appeared directly adjacent to the phrase

4    "Artificially Flavored" such that no consumer would reasonably suspect that "Original Vanilla"

5    refers to a natural ingredient. 475 F. App'x 113, 115 (9th Cir. 2012). Sanderson's advertising

6    contains no such qualifying language directly adjacent to its "100% Natural" assertions and this

7    Court should reject the applicability of that case just as the court did in *Bohac* under a much

8    more similar set of facts. 2014 WL 1266848 at *5.[4]

9    Third, Defendant argues that the "Bob and Dale" TV commercials discussed in ¶ 68 of

10   the TAC are not misleading because the statement "must be cleared of antibiotics" is a disclosure

11   of antibiotic use. MTD 13. As Plaintiffs illustrate, however, this advertisement does not correct

12   the false "100% Natural" assertions that pervade Sanderson's advertising, including in this very

13   commercial, and while containing some factually accurate information, Sanderson's own

14   documentation reveals consumer confusion surrounding this advertisement. *See* TAC ¶ 68. These

15   representations are actionable. *See Williams*, *supra*, 552 F.3d at 938; *L.A. Taxi*, *supra*, 144

16   F.Supp.3d at 860; *Kellman v. Whole Foods Market, Inc.*, 313 F. Supp. 3d 1031, 1049 (N.D. Cal.

17   2018) ("A perfectly true statement couched in such a manner that it is likely to mislead or

18   deceive the consumer, such as by failure to disclose other relevant information, is actionable

19   under [the FAL and UCL]); *Dodson v. Tempur-Sealy International, Inc.*, 13-cv-04984-JST, 2014

20   WL 1493676, at *5 (N.D. Cal. April 16, 2014) ("The FAL encompasses not just false statements,

21   but also those that 'may be accurate on some level, but will nonetheless tend to mislead or

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (emphasis added). Perdue is known in the marketplace
     for switching to 'no antibiotics ever' and Sanderson has significantly confused consumers into

23   thinking that Sanderson, despite its routine use of antibiotics, and Perdue have the same practices
     regarding antibiotics."

24   [4] Sanderson attempts to describe this video as a disclosure again in the context of Plaintiffs'
     allegations concerning the unnatural process in which Sanderson raises its chickens. MTD 17.

25   Once again, the false statement is "100% Natural" which reasonable consumers expect, among
     other things, to mean that chickens are allowed to go outdoors and were raised in their natural

26   environment. TAC ¶¶ 49-50. This video, while potentially containing some accurate depictions

27   of Sanderson's process for raising its chickens, does not do anything in the way of curing the
     representation that Sanderson's chicken production process allows for chickens to go outdoors

28   that is created by the "100% Natural" assertions that pervade Sanderson's advertising scheme.

deceive.'").

Furthermore, Sanderson's so-called "disclosures" do not line up in the medium (TV, magazines, etc.) in which the false statements are made, nor do the purported disclosures refute the four sets of factual allegations in the TAC. Sanderson does not point to any disclosure regarding the ████ or any disclosures warning consumers about the risks associated with the ████████████████████

### C. Plaintiffs' Amended Complaint Pleads Facts Sufficient as to All Four Sets of Factual Allegations to Allege that "100% Natural" is False.

Plaintiffs' claim is that Sanderson's "100% Natural" advertising is false and misleading in violation of the FAL and UCL. Despite this, Defendant appears to think that the factual allegations regarding Sanderson's process in the TAC are separate claims. There is no support for this position in any case cited by Defendant or otherwise. Because this claim is based in fraud, Plaintiffs must allege the "who, what, when, where, and how" regarding the "100% Natural" advertising, in addition to "what is false or misleading about [the "100% Natural"] statement[s], and why it is false." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (internal citations and quotations omitted). Here, Plaintiffs allege the following in their TAC:

- **Who**: Defendant Sanderson. ¶¶ 2, 28.
- **What**: Falsely and misleading advertises its Chicken Products as "100% Natural" and deceives reasonable consumers in violation of California consumer protection statutes. ¶¶ 3, 5, 40-45, 59, 66-68, 73, 75-76, 78, 89-92.
- **When**: "[W]ithin the applicable statute of limitations, and many continue as of this filing." ¶ 46.
- **Where**: In advertising that appeared on Sanderson's website, TV commercials, newsletters, print magazines, and billboards. ¶¶ 3, 40-46.
- **How**: Via this advertising, such as by concealing the ██████████ in some of its chicken and not disclosing the ████ adjacent to or contemporaneously with the misleading statements, including "100% Natural"; by concealing the routine use of pharmaceuticals, including antibiotics, and not disclosing it adjacent to or

contemporaneously with the misleading statements, including "100% Natural"; and by misleading consumers into thinking that the FDA and USDA require that there are NO residues in the chicken after they leave the farm; by concealing and not disclosing adjacent to or contemporaneously with misleading statements, including "100% Natural" that its chickens ███████████████████, and by concealing or not disclosing adjacent to or contemporaneously with misleading statements that its birds are raised exclusively indoors in intensive confinement.

In addition, Plaintiffs explain "what is false or misleading" about these statements: Sanderson's process for creating its chicken products do not meet reasonable consumer expectations for poultry products advertised as "100% Natural." TAC ¶¶ 5-7. Finally, Plaintiffs provide factual allegations detailing "why" precisely these statements are false or misleading. *See* TAC ¶ 6 ("As detailed *infra*, ¶¶ 59-68, in reality Sanderson's unnatural industrial production practices include the routine use of pharmaceuticals, including antibiotics, to all birds in a flock ███████████ ███████████████████████████████████████████████████████ ██████. This routine use of multiple antibiotics contributes to the growth of antibiotic resistant bacteria, ████████████████████████, as detailed *infra* ¶¶ 69-76. In addition, as detailed *infra* ¶¶ 77-78, living conditions for Sanderson's chickens do not meet the reasonable consumer expectation for poultry advertised as "100% Natural.").

Plaintiffs have satisfied, indeed surpassed, the pleading requirements. *See United Healthcare Insurance Co.*, 848 F.3d at 1180 (Rule 9(b) "does not require absolute particularity or a recital of the evidence…[a] complaint also need not identify representative examples. . . to support every allegation."). Plaintiffs are required by the pleading standards to allege—not prove—their claims.

**1.** ███████████████████████████████**, Do Not Meet Consumer Expectations for "100% Natural."**

Sanderson's "100% Natural" slogan is false and misleading because "Sanderson's own ███████████████████████████████████████████████████████ ██████████████████ TAC ¶ 63. Sanderson's routine pharmaceutical use, including



REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1  antibiotics, given to all birds in a flock

2  . *Id.* ¶ 6. Specifically, Plaintiffs allege that

3  " and that

4  Defendant's "

5

6  ." *Id.* ¶¶ 54, 60. To the extent that Sanderson questions whether

7  "indicates positive results" means Plaintiffs are alleging that the

8  Plaintiffs answer the question yes; they allege that

9  . MTD 7; TAC ¶ 63.

10       Plaintiffs are challenging Sanderson's false advertising to the California market. The

11  false advertising and the chicken products clearly reach California. Despite this, Sanderson

12  asserts that "what remains is mere speculation as to whether or not there is any unnatural residue

13  in any of Sanderson's [Chicken Products], let alone chicken that is sold in California." MTD 7.

14  This misconstrues Plaintiffs' factual allegations regarding process. Sanderson is trying to dismiss

15  something Plaintiffs do not allege, i.e. that Sanderson products sold in California contained

16  residues, but this is a false advertising case, not a products liability suit. Plaintiffs allege that

17  Sanderson's pharmaceutically driven process—in which

18  —is not natural. When Sanderson ignores its own facts and promises to California

19  consumers that Sanderson chicken is somehow still "100% Natural," it deceives reasonable

20  consumers who do not think that "100% Natural" could possibly mean chicken products that are

21  produced through a *process* in which

22  . It is irrelevant whether a bird with

23  residues ended up in California when all of Sanderson's flocks, including the ones destined for

24  California grocery stores, .[5]

25       The allegations regarding mislabeling medicated poultry feed at the Kinston, North

---

[5] Whether a product containing unnatural residues was shipped to California is not relevant to Sanderson's false advertising, even if it may be relevant to a products liability suit. At the pleading stage, it is impossible for Plaintiffs to know the details regarding Defendant's production and distribution networks and alleging that chicken products containing residues arrived in California far surpasses Rule 8 and Rule 9(b)'s pleading requirements.

Carolina plant fleshes out the connections between a poor process and resulting residues, TAC ¶ 62, and Sanderson's failure to see the forest through the trees of its false advertising on process and residues. While Sanderson would like to pretend there is "no basis to infer a connection between such mislabeling and any actual residues," MTD at 8, that ignores the federal regulations such as 21 C.F.R. 558.363(d)(1)(ii)(B), that require a withdrawal period in order to provide reasonable assurances that animals have metabolized the pharmaceutical prior to slaughter. TAC ¶ 61.[6] It is a fair inference at the pleading stage that if Sanderson is using medicated feed during the withdrawal from pharmaceuticals period—contrary to the purposes of the federal regulations on pharmaceuticals in farmed animals—that there is a link between their faulty process and residues that have appeared in their own test results.

Ironically, while Sanderson is now downplaying the importance of the withdrawal period to prevent residues in the face of allegations that Sanderson failed to adhere to the law, Sanderson invoked the federally mandated withdrawal period used in its advertising to assure consumers that its chicken was "100% Natural." Defendant promised that a federal law requires that chickens be clear of residues before they leave the farm. *See* TAC ¶ 59, 64. Sanderson has misstated the level of protection that consumers can expect from the regulation, because the regulations do permit residues in the chicken products as long as they are below the regulatory tolerance for the specific residue,[7] and Sanderson misleads consumers into thinking that Sanderson respected the withdrawal period on which it relies to claim "100% Natural" when the allegations raise the reasonable inference that it has not.

The factual allegations regarding residues have always been tied to the problematic process that Sanderson hides from the public. As this Court stated regarding the FAC:

> In addition to their reasonable efforts to confirm the factual basis for their allegations, plaintiffs correctly point out that their claims are ***not solely*** based on

---

[6] Plaintiffs served discovery requests regarding mishandling of medicated feed, to which Sanderson has not responded. Even without the discovery responses, Plaintiffs have alleged sufficient details for Sanderson to be on notice regarding the factual allegations as to why the "100% Natural" representation is false.

[7] Plaintiffs requested, but the government has not released, the complete data set from the USDA's National Residue Program with numerical results for every test of Sanderson's chicken. The FAC referenced a data set with numerical results for only some of Sanderson's product.

the argument that Sanderson's products are not "100% Natural." They also allege that Sanderson's advertising misleads consumers about its ***process for raising chickens.*** In other words, plaintiffs' case does not live or die in its entirety, as Sanderson suggests, on plaintiffs' ability to prove that there are trace amounts of antibiotics in Sanderson's products.

ECF No. 66 at 3 (emphasis added).

### 2.  Pharmaceutical Use, Including Routine Antibiotics Use, Does Not Meet Consumer Expectations for "100% Natural."

Sanderson's "100% Natural" slogan, which reasonable consumers understand to mean "no antibiotics or other drugs were used," TAC ¶ 49, is false and misleading because Sanderson deceives consumers regarding drug use, including routine antibiotic treatment. Sanderson does not contest Plaintiffs' factual allegations that consumers think that antibiotics were never used in meat or poultry advertised as natural, and Sanderson does not contest that it routinely uses antibiotics contrary to reasonable consumer expectations. Instead, Sanderson argues that it is not plausible that a consumer could be misled because Sanderson partially discloses its use of antibiotics—always omitting routine use—in some places on its website. MTD 9. The wholesale failure of Sanderson's disclosures is discussed generally above in section I.B; the specific failures with regard to antibiotic use are explained here.

Sanderson's deception is highlighted by the infographic on which it relies to claim that it is "explicit and conspicuous" about antibiotic use. MTD 9-10. Contrary to the claims of being unambiguous, the infographic requires powers of analytical deduction that go beyond the reasonable consumer. The infographic headline is "No Additives or Artificial Ingredients. Not Ever." In order not to be misled, the consumer would need to parse what Sanderson means by "additive" and "ingredient" and question whether Sanderson considers that pharmaceuticals administered to chickens are not "additives" or "ingredients," and therefore a promise of no additives or artificial ingredients is actually saying nothing about drug use. A reasonable consumer, in light of Sanderson's "100% Natural" slogan, could plausibly think that Sanderson's no additives or artificial ingredients statement means no synthetic pharmaceuticals. And Sanderson does nothing to correct this misunderstanding. The infographic addresses eight points to clarify what it means by "no additives or artificial ingredients" but fails to address antibiotics. Once Sanderson has advertised "100% Natural," and played into consumer expectations

1    regarding that term meaning no antibiotics used, it cannot be silent on antibiotic use and call that

2    silence a disclosure. Sanderson could have, but did not, make a clear statement such as "when we

3    say natural, we mean routine use of antibiotics."

4        Silence is not disclosure. *See In re Sony Gaming Networks and Customer Data Security*

5    *Breach Litigation,* 996 F. Supp. 2d 942, 991 (S.D. Cal. 2014) (denying a motion to dismiss a

6    FAL claim where defendant had claimed to take reasonable steps to secure users' personal

7    information, but omitted information about deficiencies in the product's security system); *Tait v.*

8    *BSH Home Appliances Corp.*, 10–00711-DOC, 2011 WL 394138, at *2 (C.D. Cal. Aug.

9    31, 2011) (denying a motion to dismiss FAL claims when plaintiffs claimed defendant's

10   representations—that its washing machine was "Xxtra Sanitary" and "high efficiency"—were

11   misleading because the machines accumulated mold and bacteria and required extra cleaning).

12       **3.    The ███████████████████████████ Is a**
         **Threat to Public Health, and Does Not Meet Consumer Expectations**
13       **for "100% Natural."**

14       Sanderson's "100% Natural" slogan is false, misleading and deceptive because of

15   antibiotic resistant bacteria ████████████████████ that is related to routine antibiotics

16   use and crowded, intensive confinement of chickens. This bacteria definitely does not meet

17   consumer expectations of "natural." Furthermore, consumer surveys indicate that 65% of

18   consumers are concerned about antibiotic use leading to antibiotic resistant bacteria. TAC ¶ 69.

19   While Sanderson claims its product is natural, Plaintiffs squarely allege that unnatural, ███████

20   ████████████████████████████████████████ TAC ¶¶ 70-71.

21       Plaintiffs point to specific false and misleading statements that appear to be targeted at

22   the majority of consumers who are concerned about antibiotic use in animal agriculture: "No

23   antibiotics to worry about here" and "by federal law, all chickens must be clear of antibiotics

24   before they leave the farm." Sanderson's lackluster defense is that these statements refer only to

25   the presence of residues in the meat, and not to antibiotic resistant bacteria. MTD 20. First, these

26   specific statements support the overall "100% Natural" scheme, because these statements

27   reinforce consumers' impressions that Sanderson's chickens do not carry unnatural antibiotic

28   resistant bacteria if there are no antibiotics to worry about. Whether a consumer thinks that

1    Sanderson is promising no antibiotics ever, or that the antibiotics have cleared the chickens

2    before they leave the farm, or no antibiotics to worry about, that does not preclude Plaintiffs'

3    theory that consumers expect that "100% Natural" chickens do not carry antibiotic resistant

4    bacteria. Second, Sanderson's contention that these statements address residues only and not

5    antibiotic resistant bacteria is precisely why these statements are misleading: Sanderson suggests

6    to consumers that the only issue with the antibiotics use is the presence of pharmaceutical

7    residues in the shrink-wrapped package on the grocery store shelves, while the real issue for

8    public health is Sanderson's misinformation on the antibiotic resistance bacteria. TAC ¶¶ 69, 73.

9         After advertising its products as "100% Natural" despite the reality that its process

10   creates antibiotic resistant bacteria ███████████████, Sanderson digs the hole deeper.

11   It contends that "we are aware of no credible scientific research that supports the notion that the

12   use of antibiotics that are important to human medicine when treating chickens contributes to the

13   development of human bacterial infections that are resistant to treatment . . .." TAC ¶ 75. This

14   assertion further leads the consumer to believe that there is no scientific evidence. Sanderson

15   argues that the reasonable consumer would view this statement as a mere statement of opinion

16   about whether the science is "credible," and claims such opinion is not actionable under the UCL

17   and the FAL. MTD 23. The cases Sanderson cites are not on point. *See Bruton v. Gerber*

18   *Products Co*., 12-cv-0242-LHK, 2014 WL 172111, at *11 (N.D. Cal. Jan. 15, 2014) (emphasis

19   added) ("the Court *cannot* conclude as a matter of law that no consumer would rely on Gerber's

20   'Healthy' label statements."); *Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173

21   F.3d 725, 731 (9th Cir. 1999) (statement that business was "too small" was "puffery." *Circle*

22   *Click Media LLC v. Regus Mgmt. Grp. LLC*, 12-04000 SC, 2013 WL 57861, at *10 (N.D. Cal.

23   Jan. 3, 2013) (statements such as "[s]imple, easy and flexible" were "non-actionable puffery

24   since they are vague and highly subjective."); *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1026

25   (N.D. Cal. 2012) ("meaningfully" is vague and subjective.); *Hadley v. Kellog Sales Co.*, 273 F.

26   Supp. 3d 1052, 1088 (N.D. Cal. 2017) ("full and focused" and "good decision" are non-

27   actionable "puffery."); *Edmunson v. Procter & Gamble Co.*, 10-CV-2256-IEG, 2011 WL

28   1897625, at *3 (S.D. Cal. May 17, 2011) (statement that a product is "superior" is subjective).

Here, in contrast, "100% Natural" has a concrete meaning for the reasonable consumer, and as discussed above, is not "puffery." Whether Sanderson gave an opinion or made a statement of purported fact, either could be misleading in this instance because the reasonable consumer could interpret the statement as supporting its "100% Natural" representations.

### 4.   Birds Raised Exclusively Indoors Do Not Meet Consumer Expectations for "100% Natural."

Eighty-three percent of consumers think that "natural" means that the animals were raised in a natural environment, and fifty percent of consumers think that natural specifically means that the animals went outdoors. TAC ¶ 77. When Sanderson advertises that it is "100% Natural," it is false and misleading because Sanderson's birds are raised exclusively indoors and in crowded, intensive confinement conditions. This fact is demonstrated by Sanderson's recent report that it lost 2.1 million birds in Hurricane Florence who were housed in 70 grow-out sheds; that is approximately 30,000 birds per shed. TAC ¶ 77.

In addition to misleading consumers who expect that Sanderson's animal living conditions are natural, Sanderson makes a specific statement about how it "believes in raising [its] chickens humanely to ensure their safety, nutrition and overall health." TAC ¶ 78. The claim to humane treatment is false, and Plaintiffs point to specific instances in which birds were not treated in the way that meets consumer expectations of humane treatment. Sanderson does not deny the inhumane treatment and does not contend that such treatment is natural. Instead, the best that Sanderson can do is argue that the abuse occurred at the slaughter plant instead of the grow-out facility, MTD 15, as if consumers who are concerned about humane handling are only concerned about specific locations. Sanderson's argument that slaughter plant abuse does not count ignores the 2016 Consumer Report Survey that demonstrates that consumers think that "humanely raised" claims means that slaughter is equally humane. TAC ¶ 78. This understanding has also been applied by a court in another poultry case. In *Hemy v. Perdue Farms, Inc.,* the Court found "that it is plausible for the reasonable consumer to construe the Humanely Raised label as speaking to Perdue's processes up until the time of death, including slaughter." CV-11-888, 2013 WL 1338199, at *7 (D.N.J., March 31, 2013). The Court found so because "the internet survey is sufficient to show a plausible claim for relief where the components of the

1    survey quoted in the Third Amended Complaint factually support the contention that a

2    reasonable consumer may believe that the slaughtering process is encompassed by Perdue's

3    Humanely Raised label." *Id.* Therefore, Plaintiffs have adequately alleged facts in support of

4    their allegation that Sanderson misleads consumers regarding its humane treatment of the birds.

5
6    **II.    PLAINTIFFS' AMENDED COMPLAINT COMPLIES WITH THIS COURT'S
         ORDER GRANTING LEAVE TO AMEND.**

7        The allegations regarding the public health threat of antibiotic resistant bacteria are not

8    new to the TAC. *See* FAC ¶¶ 29-34, 72; SAC ¶¶ 4, 11-17. The TAC simply articulates with

9    greater clarity how these factual allegations are linked to "why" Sanderson's "100% Natural"

10   advertising is false and misleading than in past pleadings, and as such is not a new theory as

11   Defendants contend. MTD at 18. In granting leave to amend, this Court explicitly permitted

12   Plaintiffs to amend their complaint in such a way as to better connect their factual allegations to

13   the claim of false and misleading advertising. Otherwise, an amendment would be inherently

14   futile as Plaintiffs would be forced to allege the same facts in the same way to support their

15   claim, and not address the Court's invitation to improve the pleading. Moreover, the case law

16   that Defendant cites reveals the absurdity of its contentions. *See* MTD 18.

17       First, in *DeLeon v. Wells Fargo Bank, N.A.*, the plaintiffs filed suit asserting seven claims

18   for relief and the court granted leave to amend "only as to Plaintiffs' claim under the [UCL], and

19   Plaintiffs' request for a permanent injunction." 10-CV-01390-LHK, 2010 WL 4285006, at *1

20   (N.D. Cal. Oct. 22, 2010). The plaintiffs then proceeded to file an amended complaint that

21   alleged four new claims for "intentional misrepresentation, negligent misrepresentation,

22   negligence, and breach of contract." *Id*. The court held that the prior order was "limited in scope"

23   to "allege additional facts" and not to assert new claims for the first time. *Id*. at *3, *5. Here, by

24   contrast, Plaintiffs have merely restructured facts previously alleged to align with the claim

25   asserted, the same claim that Plaintiffs have asserted all along: Sanderson's "100% Natural"

26   advertising is false and misleading under the FAL and UCL.

27       Second, in *Chaquico v. Freiberg*, the defendants argued that the plaintiff improperly

28   amended his jurisdictional allegations as the Court granted leave to amend for the sole purpose

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

of allowing plaintiff to "allege additional facts in support of his Lanham Act" claim. 17-cv-02423-MEJ, 2017 WL 4805578, at *8 (N.D. Cal. Oct. 24, 2017). The court determined, however, that plaintiff's addition "does not add a new claim," but only "an additional basis for jurisdiction." *Id*. Here, similarly Plaintiffs have not asserted a new claim.

Third, in *Cover v. Windsor Surry Company*, in their amended complaint, plaintiff alleged a new claim for the first time under an entirely different statute. 14-cv-05262-WHO, 2016 WL 3421361, at *3 (N.D. Cal. June 22, 2016). Therefore, the court dismissed this new claim under this new statutory framework because the plaintiff failed to first secure consent or seek leave of court to amend. *Id*. Here, Plaintiffs rely solely on the same claim regarding Sanderson's "100% Natural" advertising under the same statutory framework of the FAL and UCL as it did in its prior complaint. Thus, *Cover* does not support Defendant's argument in this case.

Fourth, Defendant cites *Solomon v. North American Life and Casualty Insurance Company* where the Ninth Circuit upheld the denial of leave to amend due to prejudice. 151 F.3d 1132, 1139 (9th Cir. 1998). But here, the court already granted Plaintiffs leave to amend, and as just explained, Plaintiff has done nothing that has exceeded that leave.

To the extent that this Court disagrees or finds Plaintiffs' allegations otherwise insufficient, Plaintiffs ask this Court for leave to amend once more to cure any deficiencies found.

## CONCLUSION

The case law construing the FAL, UCL and Federal Rules of Civil Procedure are clear: Plaintiffs have satisfied their pleading requirements and Defendant's Motion to Dismiss must be denied.

DATED: October 30, 2018.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1 | Respectfully submitted,

**CENTER FOR FOOD SAFETY**          **ELSNER LAW & POLICY, LLC**

_____          _____
Kellan Smith (CSB No. 318911)          Gretchen Elsner (Pro Hac Vice)
Adam Keats (CSB No. 191157)          150 Washington Avenue, Suite 201
303 Sacramento Street, 2nd Floor          Santa Fe, NM 87501
San Francisco, CA 94111          Telephone: (505) 303-0980
Telephone: (415) 826-2770          gretchen@elsnerlaw.org
akeats@centerforfoodsafety.org
ksmith@centerforfoodsafety.org

_Counsel for Plaintiffs_