Mark McKane, P.C. (SBN 230552)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Gregg F. LoCascio, P.C. (admitted *pro hac vice*)
Michael Glick (admitted *pro hac vice*)
Kathleen A. Brogan (admitted *pro hac vice*)
Terence J. McCarrick (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C.  20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

*Attorneys for Defendant*
*Sanderson Farms, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FRIENDS OF THE EARTH, and CENTER FOR FOOD SAFETY,<br><br>              Plaintiffs,<br><br>     vs.<br><br>SANDERSON FARMS, INC.,<br><br>              Defendant. | CASE NO. 3:17-CV-03592 (RS)<br><br>**DEFENDANT SANDERSON FARMS, INC.'S AMENDED REPLY IN SUPPORT OF RULE 12(h)(3) MOTION REGARDING LACK OF STANDING AND SUBJECT MATTER JURISDICTION**<br><br>Judge: Honorable Richard Seeborg<br>Hearing Date: May 30, 2019<br>Time:  1:30 p.m.<br>Location: Courtroom 3, 17th Floor<br>              450 Golden Gate Avenue<br>              San Francisco, CA 94102 |

# TABLE OF CONTENTS

**Page(s)**

I.    **PLAINTIFFS DID NOT DIVERT RESOURCES IN RESPONSE TO SANDERSON'S ADS.**............................................................................................**2**

     A.    Plaintiffs Cannot Establish Standing Based On Actions Before Learning Of The Ads. ................................................................................................................3

     B.    Plaintiffs Cannot Establish Standing Based On Activities Between August 1, 2016 And Filing This Lawsuit. ...........................................................................5

     C.    Plaintiffs Cannot Establish Standing Based On Litigation Conduct...................10

     D.    Plaintiffs Cannot Establish Standing Based On An Alleged Ongoing Injury.....................11

II.   **PLAINTIFFS CANNOT RELY ON IMPROPER AND SELF-SERVING DECLARATIONS AND UNPRODUCED DOCUMENTS TO SUPPORT STANDING.**......................................................................................................**12**

**CONCLUSION** ..............................................................................................................**15**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Legal Def. Fund v. Hormel Foods Corp.*,
 2016 CA 004744 B, slip op. (D.C. Sup. Ct. Apr. 8, 2019) ......................................10

*Ark. ACORN Fair Housing, Inc. v. Greystone Dev., Ltd.*,
 160 F.3d 433 (8th Cir. 1998) ................................................................................3

*Bennett v. City of S.F.*,
 2014 WL 122160 (N.D. Cal. Jan. 13, 2014) ........................................................13

*CDN Inc. v. Kapes*,
 197 F.3d 1256 (9th Cir. 1999) ..............................................................................14

*City of Oakland v. Wells Fargo Bank, N.A.*,
 2018 WL 3008538 (N.D. Cal. June 15, 2018) ................................................2, 6, 9

*DaimlerChrysler Corp. v. Cuno*,
 547 U.S. 332 (2006) ..............................................................................................5

*E. Bay Sanctuary Covenant v. Trump*,
 909 F.3d 1219 (9th Cir. 2018) ..............................................................................11

*Fair Housing of Marin v. Combs*,
 285 F.3d 899 (9th Cir. 2002) ..............................................................................3, 9

*Gerlinger v. Amazon.com, Inc.*,
 526 F.3d 1253 (9th Cir. 2008) ..............................................................................4

*Halo Mgmt., LLC v. Interland, Inc.*,
 2004 WL 1781013 (N.D. Cal. Aug. 10, 2004) ......................................................13

*Hartline v. Nat'l Univ.*,
 2018 WL 1014611 (E.D. Cal. Feb. 22, 2018) ........................................................15

*Khan v. K2 Pure Solutions, LP*,
 2013 WL 6235572 (N.D. Cal. Dec. 2, 2013) ........................................................12

*M.W. v. United States Dep't of Army*,
 2017 WL 10456732 (N.D. Cal. Dec. 15, 2017) ......................................................7

*Olney v. Job.com*,
 2014 WL 4629062 (E.D. Cal. 2014) ....................................................................14

*Project Sentinel v. Evergreen Ridge Apts.*,
 40 F. Supp. 2d 1136 (N.D. Cal. 1999) ................................................................2, 3

*Robinson v. United States*,
  586 F.3d 683 (9th Cir. 2009) ..................................................................................4

*Smith v. Pac. Props. & Dev. Corp.*,
  358 F.3d 1097 (9th Cir. 2004) ..............................................................................2, 9

*Trend Micro Inc. v. RPost Holdings, Inc.*,
  2014 WL 1365491 (N.D. Cal. Apr. 7, 2014) ........................................................11, 12

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982)...................................................................................................12

*Vazquez v. Cent. States Joint Bd.*,
  2009 WL 1530709 (N.D. Ill. June 1, 2009) ............................................................14

*Zhang v. Am. Gem Seafoods, Inc.*,
  339 F.3d 1020 (9th Cir. 2003) ................................................................................13

**Rules**

Fed. R. Civ. P. 37..........................................................................................................13

1   Discovery has made clear that Plaintiffs lack standing to pursue their claims.  Facing dismissal,

2   Plaintiffs try to rewrite the record by offering self-serving declarations and never-before-produced

3   evidence that contradict Plaintiffs' document productions, sworn interrogatory responses, deposition

4   testimony, and prior pleadings.  Yet despite all that, Plaintiffs do not—and cannot—dispute that:

- **Sanderson's advertising did not require them to take any action.**  *See* ECF 193-3 (CFS Dep.) 85:14-16 ("[Q.] You agree that Sanderson's advertising didn't require CFS to do anything at all; correct?  A. Yes.").

- **They did not divert any resources "because of" Sanderson's advertising.**  *See* ECF 193-2 (FoE Dep.) 128:7-9 ("Q. FoE didn't publish the Chain Reaction reports because of Sanderson's advertising; right?  A. Correct."); *id.* at 128:15-18 ("Q. FoE didn't campaign against Darden and Olive Garden because of Sanderson's advertising; right?  A. No."); *id.* at 128:24-129:5 ("Q. And FoE made public statements about routine antibiotic use because it opposes routine antibiotic use; right?  A. Yes.  Q. FoE didn't make those statements because of Sanderson advertising; right?  A. No."), and

- **They would have taken *the exact same actions* even if Sanderson had never published the ads involved in this case.**  *See id.* at 129:24-130:3 ("Q. Assuming that Sanderson had never aired any of the ads in this case, FoE would still pressure customers of Sanderson to switch to other suppliers that don't use routine antibiotics; right?  A. Yes.").

This is a false advertising case.  To establish standing, Plaintiffs bear the burden of identifying some injury (or diversion) fairly traceable to the ads they now challenge.  But *none* of Plaintiffs' so-called diversions—either before or after they learned about the ads—discussed, let alone targeted, Sanderson's advertising.  *First*, any activities Plaintiffs undertook before August 1, 2016 (the date they swore they learned of Sanderson's ads) cannot logically constitute diversions in response to those ads.  Plaintiffs concede they did not, and could not have, diverted resources to counteract Sanderson's ads before they had ever viewed them, and the Court should reject Plaintiffs' *post hoc* attempt to walk back their sworn interrogatory responses.  *Second*, the record is clear that Plaintiffs' actions between August 1, 2016 and the filing of this lawsuit were not advertising-related diversions at all.  Rather, Plaintiffs' efforts, including those related to Darden, the Chain Reaction reports, and general antibiotics advocacy, were both unrelated to Sanderson's ads and mere continuations of preexisting initiatives.  Indeed, Plaintiffs' contention that Sanderson's actions caused them to modify their behavior before they ever saw the challenged ads proves the ads themselves did not cause a diversion.  Even crediting every stray mention of Sanderson in Plaintiffs' document productions—which are few, far between, and unrelated to advertising—the mere mention of Sanderson or general antibiotics advocacy is not enough to prove standing without evidence

Plaintiffs acted because of the ads at issue.  While Plaintiffs now contend their non-Sanderson-specific conduct and publications were, in fact, designed to combat the "effect of" Sanderson's ads, they notably fail to identify a single contemporaneous communication in which they purported to even discuss Sanderson's ads (or their effect) prior to this litigation, let alone plans to divert resources in response.  At this stage, Plaintiffs can no longer rely on allegations alone, and the Court need not accept their implausible say-so, especially when it contradicts the contemporaneous record.  ***Third***, Plaintiffs cannot manufacture standing based on conduct that is plainly litigation-related, including press releases about this suit or conference presentations given under the heading "Litigation."  Nor can Plaintiffs' boilerplate allegations of "ongoing injury" satisfy Article III; if Plaintiffs did not have standing the day this case was filed, none of their after-the-fact activities can establish it now.  ***Finally***, even though Plaintiffs' reliance on a host of never-before-produced materials cannot salvage their claims, such reliance at this stage is telling.  Those materials should be ignored.

At base, the Plaintiff organizations disapprove of Sanderson's animal-raising practices—and may even dislike Sanderson's advertising (although there is no indication from Plaintiffs' pre-litigation activities to support that proposition).  But that does not suffice to create an Article III injury, and certainly not one traceable to Sanderson's ads.  Plaintiffs lack standing and the Court should dismiss this case.

# I.   PLAINTIFFS DID NOT DIVERT RESOURCES IN RESPONSE TO SANDERSON'S ADS.

To show standing under a diversion-of-resources theory, Plaintiffs must show both: "(1) frustration of [their] organizational mission; and (2) diversion of [their] resources to combat *the particular* [unlawful activity] in question."  *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (emphasis in original).  Put differently, in this false advertising case, Plaintiffs must prove that their "diversion [was] made necessary" by Sanderson's advertising.  *See Project Sentinel v. Evergreen Ridge Apts.*, 40 F. Supp. 2d 1136, 1140 (N.D. Cal. 1999).  It is not enough for Plaintiffs' alleged diversions to merely "relate" to the subject matter of Sanderson's antibiotics and animal-raising practices; Plaintiffs must demonstrate a causal nexus between their alleged diversions and the ads they challenge here in federal court.  *See id.*; *Smith*, 358 F.3d at 1105; *City of Oakland v. Wells Fargo Bank, N.A.*, 2018 WL 3008538, at *1 (N.D. Cal. June 15, 2018) (dismissing case where diversions were targeted to separate, albeit related, issues to the challenged conduct).  "Absent specific facts establishing distinct and palpable injuries *fairly traceable* to

[Sanderson's] advertisements"—which Plaintiffs fail to identify here—they "cannot satisfy [their burden] to establish the injury in fact."  *See Ark. ACORN Fair Housing, Inc. v. Greystone Dev., Ltd.*, 160 F.3d 433, 435 (8th Cir. 1998) (emphasis in original); *Fair Housing of Marin v. Combs*, 285 F.3d 899, 904 (9th Cir. 2002) (citing *Ark. ACORN*, 160 F.3d at 434).

### A. Plaintiffs Cannot Establish Standing Based On Actions Before Learning Of The Ads.

Plaintiffs could not—and did not—divert resources to counteract Sanderson's advertising before Plaintiffs learned of the ads challenged in this case.  Here, both Plaintiffs stated in sworn interrogatory responses that they "first became aware of the Sanderson Farms' advertisements" at issue on August 1, 2016.  ECF 193-7, -8 (Irrog. 5).  Those answers did not distinguish between ads on Sanderson's website as opposed to elsewhere, and were not provided by accident or confusion.  Rather, both were verified under penalty of perjury by attorneys employed by each organization—FoE's in-house Legal Director, Marcelin Keever, and former CFS counsel of record in this case, Adam Keats.  ECF 193-7 at 5; ECF 193-8 at 6.  Not only did Plaintiffs never amend those sworn responses, they doubled down on their position in depositions.  *See, e.g.*, Ex. 32 (FoE Dep.) 67:15-25.[1]

Notwithstanding Plaintiffs' unambiguous representations that they did not learn of the challenged ads until August 2016, Plaintiffs now claim that certain evidence establishes standing "dating as early as 2015."  ECF 207 at 15; *see also id.* at 13 ("Sanderson's advertising was frustrating Plaintiffs' missions even before August 1, 2016.").  Plaintiffs provide no support for that illogical contention.  To be sure, Plaintiffs challenge aspects of Sanderson's website that debuted before August 1, 2016.  *Id.* at 18.  But under a diversion-of-resources theory, the relevant question is when Plaintiffs *learned* of the challenged conduct—here, the Sanderson ads they now claim mislead consumers.  That is because—as a matter of law and common sense—a diversion must "spr[ing] from [a] plaintiff's efforts to counteract the effect of the defendant['s] allegedly illegal practices" to support standing.  *Project Sentinel*, 40 F. Supp. 2d at 1140.  And contrary to the argument they now make, Plaintiffs previously conceded they could not, and did not, divert resources in response to Sanderson's advertising before August 2016.  FoE Dep. 68:1-11 ("Q. Ms. Keever, you'd agree that FoE could not divert any resources in response to Sanderson advertising if it had

---

[1] "Ex." citations refer to exhibits attached to the Declaration of Michael Glick filed with this reply.  Other than excerpts attached to this reply, "FoE Dep." and "CFS Dep." citations refer to ECF 193-2 and -3.

1    not yet seen that advertising; right?  A. Yes. … Q. And FoE did not, in fact, divert resources to counteract

2    Sanderson advertising before August 1, 2016; correct?  A. That's my understanding.").

3        Notwithstanding Plaintiffs' opposition, which seeks to limit their admission to only Sanderson's

4    television ads, Plaintiffs' discovery responses made no such distinction.  Interrogatory No. 5 specifically

5    asked Plaintiffs to "[i]dentify when [they] first became aware of the Sanderson advertisements identified"

6    in the complaint, and both Plaintiffs uniformly answered "August 1, 2016" without distinguishing between

7    ad types (*i.e.*, "Bob & Dale" vs. website).  ECF 193-7, -8 (Irrog. 5).  And when Sanderson asked Plaintiffs

8    at deposition to confirm when they saw Sanderson's webpage, Plaintiffs' counsel (who verified the

9    interrogatory responses) objected that "[t]he interrogatories speak for themselves."  Ex. 32 (FoE Dep.)

10   307:20-308:4.  Plaintiffs may not now ignore or try to amend their discovery responses to avoid dismissal.

11       Given the clear discovery record, the Court should not suspend disbelief and accept Plaintiffs'

12   claim to have diverted resources in response to ads they did not know existed.  *See, Robinson v. United*

13   *States*, 586 F.3d 683, 685 (9th Cir. 2009) ("[T]he party asserting subject matter jurisdiction has the burden

14   of proving its existence.").  Plaintiffs provide no case law supporting the proposition that a plaintiff can

15   divert resources by choosing to engage in activities *before* learning of the defendant's allegedly unlawful

16   conduct.  Under Plaintiffs' theory, any preexisting initiative—if even tangentially related to the subject

17   matter of a lawsuit—could be rebranded a diversion after the fact.  Such a rule would make a mockery of

18   Article III.  If anything, the fact Plaintiffs claim to have diverted resources prior to learning of Sanderson's

19   ads only confirms their later activities were merely a continuation of pre-existing initiatives.

20       Nothing in the Court's February 2018 motion to dismiss order is to the contrary.  Plaintiffs

21   repeatedly suggest that the Court has already that held they diverted resources before August 1, 2016.

22   ECF 207 at 14-15.  The Court did nothing of the sort.  Taking Plaintiffs' allegations as true (as it was

23   required to do at that stage), the Court simply recognized (without the benefit of discovery) that Plaintiffs

24   *alleged* that Sanderson's website "prompted their diversion of resources" before certain challenged TV

25   ads debuted.  ECF 48 at 7.  But the time for Plaintiffs to "rest on 'mere allegations'" is over, and the

26   discovery record (including Plaintiffs' sworn representations as to when they learned of *all* the ads in

27   question) proved otherwise.  *See Gerlinger v. Amazon.com, Inc.*, 526 F.3d 1253, 1255-56 (9th Cir. 2008).

28   Plaintiffs have therefore failed to carry their burden based on activities undertaken prior to August 1, 2016.

### B.   Plaintiffs Cannot Establish Standing Based On Activities Between August 1, 2016 And Filing This Lawsuit.

Plaintiffs' opposition does nothing to satisfy their burden of demonstrating a diversion of resources in response to Sanderson's advertising—the challenged conduct in this case—even after August 1, 2016. As an initial matter, Plaintiffs' reliance on activities *before* August 1, 2016—when they say they learned of the challenged ads—proves that Plaintiffs' *post*-August 1, 2016 efforts were not, in fact, a diversion. Plaintiffs' own documents confirm that their Darden campaign, the Chain Reaction reports, and their general public commentary about antibiotics use and animal welfare started well before, and continued after, they knew about Sanderson's ads.  *E.g.*, ECF 207-10 (summary of statements and initiatives).  And both Plaintiffs expressly testified that they were carrying out initiatives on these issues as a part of their organizations' missions *years* before they learned of any Sanderson advertising.  *E.g.*, CFS Dep. 18:1-9, 19:13-16, 19:24-20:4, 24:20-23, 25:19-26:9; FoE Dep. 19:4-20:15, 22:5-23:4, 43:12-44:15, 48:5-25.

Plaintiffs' opposition therefore boils down to the dubious (and unsupported) claim that they "adjusted" preexisting campaigns to counteract Sanderson's advertising.  ECF 207 at 4-5, 16-17.  That is demonstrably false.  To start, it bears repeating that Plaintiffs have not identified a single—not one— contemporaneous internal or external email sent by an employee of *either* Plaintiff organization between August 1, 2016 and the filing of this lawsuit commenting on Sanderson's ads, suggesting consumer confusion from those ads, and/or proposing to take action in response.  The complete absence of such communications is, like the dog that did not bark, highly probative of the lack of diversion.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) ("[W]e presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." (citation omitted)).[2]

The contemporaneous evidence produced in discovery confirms that Plaintiffs planned to target Sanderson before they saw *any* of the advertisements at issue.  Ex. 33 (July 28, 2016 Eml. at FOE_0000281) (identifying Sanderson as a "target," including for identification in the Chain Reaction report, before they saw the ads).  And Plaintiffs did so based on Sanderson's public defense of its

---

[2] Plaintiffs attach emails in which *representatives of other entities* comment on Sanderson's advertising. ECF 207-8 at FOE_0000312-17.  But Plaintiffs offer no suggestion that *their* employees or officers said anything in response, and passively receiving someone else's commentary cannot suffice as an Article III-worthy diversion.  Ex. 32 (FoE Dep.) 103:2-5 ("Q. And FoE doesn't claim in this case that efforts by Mr. Wilson or other third parties were a diversion of FoE's resources; right?  A. No.").

antibiotics use, *not* its advertising.  *E.g.*, *id.* (citing 2015 *Wall Street Journal* article about Sanderson's antibiotics practices as basis for targeting); ECF 207-14 (2015 email attaching the article); Keever Decl. ¶ 6 ("Friends of the Earth ... knew of Defendant's position on antibiotics as early as August 2015 ....").[3] That Plaintiffs carried out a preexisting plan to publicly target Sanderson therefore is not evidence of an advertising-related diversion at all.  *See City of Oakland*, 2018 WL 3008538, at *1.  None of the alleged "diversions" identified by Plaintiffs were anything more than a continuation of initiatives already underway, and Plaintiffs cannot recast those activities years later as a response to Sanderson's ads:

    ***Darden Campaign.***  Plaintiffs point to action alerts, blogs, internal efforts, graphics, and invoices regarding Plaintiffs' campaign against Darden Restaurants to claim FoE was "counteract[ing]" Sanderson's advertising.  ECF 207 at 4-5, 15-17; ECF 207-8, -10.   But Plaintiffs conceded in their opposition—and discovery made plain—that FoE's Darden initiative began in 2015, *see* ECF 207 at 3, and Plaintiffs' assertion that it "adjusted" that campaign after learning of Sanderson's ads in August 2016 is counterfactual.  As early as 2015, the stated goal of the Darden initiative was to "research and expose direct links between Darden's food purchases and on the ground harmful impacts (like antibiotics in food)," *see* ECF 207-8 at FOE_0000176, and contemporaneous correspondence confirms FoE and the non-party organizations involved in the Darden campaign were investigating Darden's suppliers, including Sanderson, *before* August 2016, *see id.* at FOE_0000312 (noting "at one point" previously, FoE's Deputy Director had found a Darden-Sanderson connection).  Thus, Plaintiffs' citation to a handful of Darden-related materials after August 1, 2016 that happen to mention Sanderson in passing—although still not Sanderson's advertising—proves nothing: those efforts were planned before FoE ever saw the Sanderson ads they now challenge, and Plaintiffs cannot relabel those efforts as a diversion now.[4]

    The record also refutes Plaintiffs' assertion that FoE "focused on Darden because [it] is a large institutional buyer" of Sanderson chicken.  ECF 207 at 3.  For one thing, FoE unequivocally testified that

---

[3] The "Keever Decl." and "Spector Decl." cites refer to ECF 207-13 and 207-17, respectively.

[4] FoE's repeated citation to an August 3, 2016 blog post regarding McDonald's and barely mentioning Sanderson should be rejected for the same reasons.  Sanderson does not even supply McDonald's and the post, like the other scant mentions of Sanderson in Plaintiffs' writings, does not even discuss Sanderson's ads.  That may explain why, when asked in discovery to identify all documents they created in response to the challenged ads, Plaintiffs did not identify this post, despite supplementing their response once and listing a variety of other press releases and blog posts.  *See* ECF 207-2 at Irrog. 7.

the Darden campaign was not a Sanderson-specific initiative.  *See* FoE Dep. 78:17-21 ("Q. It's fair to say that FoE had encouraged Darden to use suppliers that didn't raise their meat with routine antibiotics even before it had seen Sanderson's ads; correct?  A. Yes."); *see also id.* at 97:2-101:11 (conceding that Sanderson's advertising and practices were not the basis for targeting Darden).  Documents describing FoE's Darden initiative confirm the same.  ECF 207-8 at FOE_0000175-77; FoE Dep. 81:15-24 ("Q. This article doesn't call on Darden or Olive Garden to pressure Sanderson to change its ads; right? A. No.  Q. FoE calls on Darden and Olive Garden to change their suppliers; correct? A. Yes.  Q. FoE did that before they saw the ads at issue; correct? A. Yes.").  In fact, nothing distinguishes FoE's Darden-related activities *before* it learned of Sanderson's ads—action alerts, letters to Darden's CEO, graphics, and the like—from its activities *after* it viewed those ads, and therefore, there is no indication at all that the Darden campaign was designed to "counteract" any alleged consumer misunderstanding resulting from Sanderson's ads.  *See* ECF 207-8, -10; ECF 193-22, -23, -26 to -29.  That is underscored by FoE's admission that it would have campaigned for Darden to stop buying Sanderson chicken *regardless* of whether it ever published the challenged ads.  FoE Dep. 78:5-11.  FoE's Darden campaign thus cannot support standing.  *See M.W. v. U.S. Dep't of Army*, 2017 WL 10456732, at *9-*10 (N.D. Cal. Dec. 15, 2017) (holding organization "cannot convert its ordinary program costs into an injury in fact" and finding plaintiff's "internal meetings and deliberations concerned" preexisting programs and that an additional "lone intake call did not perceptibly impair the [plaintiff's] ability to carry out its mission, and thus did not injure the [plaintiff]").

   ***Chain Reaction Reports.***  Plaintiffs likewise claim they adjusted their annual Chain Reaction reports to "counteract" Sanderson's alleged misinformation.  ECF 207 at 3-4.  But Plaintiffs cannot overcome their unambiguous Rule 30(b)(6) testimony confirming that none of the Chain Reaction reports were published "because of" Sanderson's ads.  FoE Dep. 128:4-9 ("FoE published the Chain Reaction reports because it cares about supplier practices; correct?  A. Regarding antibiotics, yes.  Q. FoE didn't publish Chain Reaction reports because of Sanderson's advertising; right? A. Correct."); CFS Dep. 43:14-16 ("Q. CFS didn't prepare this report because of Sanderson's advertising. Fair?  A. Correct.").  Rather, by their own terms, those reports were designed to address the sourcing policies of restaurants and antibiotics practices regardless of any nexus to Sanderson, let alone its advertising.  ECF 193-8 to -10; CFS Dep. 51:16-52:2, 52:10-21; FoE Dep. 116:22-117:5.  The absence of such a connection is confirmed

by the fact that the 2016 report—published weeks after Plaintiffs learned of Sanderson's ads and were supposedly "adjusting" their efforts—made no mention of Sanderson (just like the 2015 report).

Nor does the post-litigation reference to Sanderson in the September 2017 report (Chain Reaction III) make a difference.  Plaintiffs identified Sanderson as a "target" for inclusion in Chain Reaction before they had ever seen the Sanderson advertising they now claim caused them to divert resources.  Ex. 33 at FOE_0000281.  And Plaintiffs made that decision because of Sanderson's antibiotic use (as described in a 2015 *Wall Street Journal* article), *not* its advertising.  *E.g.*, *id.* (citing the WSJ article); ECF 207-14.  In any event, Chain Reaction III does not even allege Sanderson's ads are misleading, but instead simply calls on restaurants to "source [their] chicken from a supplier that has ... a responsible antibiotics *use* policy"—a request Plaintiffs made of those same restaurants years earlier.  ECF 193-11 (emphasis added); ECF 193-9 at 7.  And the fact that Plaintiffs also claim Chain Reaction I (which does not mention Sanderson and was published more than a year before Plaintiffs learned of the allegedly offending ads) as a diversion underscores that Chain Reaction III was merely a continuation of preexisting advocacy efforts.

**General Antibiotics Advocacy.**  Plaintiffs' reliance on a host of general publications regarding antibiotics likewise fails.  Those publications uniformly fail to mention Sanderson (let alone its ads), and cannot come close to satisfying Article III.  For instance, Plaintiffs assert that a blog post about antibiotics use in turkey—an animal Sanderson does not raise or advertise about—"would have taken an entirely different tone" but for Sanderson's advertisements.  ECF 207 at 20; Spector Decl. ¶ 28. Setting aside that a change in the "tone" of a blog post Plaintiffs were publishing anyway cannot constitute an Article III diversion, the Court need not credit Plaintiffs' self-serving claim.  Months earlier, CFS had published a blog post regarding the end of routine antibiotics use in chicken, yet failed to mention Sanderson or its advertising at all.  *See* Ex. 34 (CFS Feb. 24, 2017 Blog Post).  Moreover, Plaintiffs never explain how the "tone" of CFS's turkey article would have changed if not for Sanderson's ads.  That is unsurprising: even a cursory look at Plaintiffs' websites[5] confirms they published countless press releases and blog posts regarding antibiotics in animal agriculture and restaurant supply chains dating from 2014, 2015, and early

---

[5]   CFS   Website,   https://www.centerforfoodsafety.org/search/antibiotics;   FOE   Website, https://foe.org/?s=antibiotics&order=ASC.

2016, before ever coming across Sanderson's ads. *See, e.g.*, ECF 207-10. Such publications were a central aspect of Plaintiffs' animal-agriculture initiatives, which were undertaken well before they viewed the ads challenged in this case and which are indistinguishable from the "diversions" they cite now. *E.g.*, CFS Dep. 24:20-23; Ex. 35 (CFS Dep.) 25:7-15, 78:18-79:2; FoE Dep. 19:4-20:15, 43:12-44:15.

Incredibly, Plaintiffs state that "[e]ach and every blog post and action alert after [they] became aware of these advertisements contained statements" about animal welfare and antibiotics use and thus constituted a diversion. ECF 207 at 20. But such generalized commentary making no mention of Sanderson or its advertising is plainly insufficient. For purposes of standing, it is not enough for Plaintiffs to have engaged in actions merely related to the allegedly illegal conduct; the test is whether Plaintiffs diverted resources "to combat the *particular* [unlawful activity] in question." *Smith*, 358 F.3d at 1105 (emphasis added); *City of Oakland*, 2018 WL 3008538, at *1 (dismissing case where the alleged diversions were targeted to separate, but related issues, and "not ... the particular [unlawful activity] in question"). Plaintiffs' reliance on a blog post regarding the CDC's "Antibiotics Awareness Week" is a case in point. ECF 207 at 20. That article makes no mention of Sanderson or its advertising or even chicken, and instead displays a graphic of farmers injecting antibiotics into a cow. ECF 207-20. In this regard, Plaintiffs' theory has no limiting principle: by their logic, Plaintiffs would have standing to challenge ads from Tyson, Perdue, or a turkey or cattle producer, relying on the same posts as evidence of diversion because the topics are somewhat related. Article III requires more.

Nor should the Court credit Plaintiffs' bald claim that their generic posts were required to address the "effect of" Sanderson's advertising or otherwise "correct[] the record." ECF 207 at 15, 18, 23. There is no indication on the face of any of Plaintiffs' publications to suggest such a connection, and once again, *neither Plaintiff produced a single contemporaneous email or document* discussing a need or desire to publish articles to "counteract" Sanderson's ads. In this respect, Plaintiffs' case bears no resemblance to *National Council of La Raza v. Cegavske*—a motion to dismiss case—where the plaintiff alleged that they "expended additional resources" that would have been spent elsewhere "but for" the challenged conduct, 800 F.3d 1032, 1039-40 (9th Cir. 2015), or *Fair Housing Council of Marin v. Combs*—a default judgment case—where the plaintiff actually diverted resources "to counteract" the specific alleged misconduct, 285 F.3d 899, 905 (9th Cir. 2002). Plaintiffs offer no proof here of "new" or "additional" activities, and

certainly no "evidence" (other than self-serving declarations) that their actions resulted from Sanderson's ads or alleged consumer confusion.

Plaintiffs' failure to identify activities undertaken in specific response to Sanderson's advertising makes this case remarkably similar to a recent case decided after the filing of Sanderson's motion.  *See Animal Legal Def. Fund v. Hormel Foods Corp.*, 2016 CA 004744 B, slip op. at *1-*2 (D.C. Sup. Ct. Apr. 8, 2019) (Ex. 36).  There, the court found after discovery that the Animal Legal Defense Fund (ALDF)— represented by some of the same counsel that initiated this case—lacked standing to pursue false advertising claims based on Hormel's "Make the Natural Choice" advertising campaign.  After explaining that "[t]he key issue [for organizational standing] is not *whether* ALDF engaged in [certain] activities but *why* it did so," the court noted that "on this key issue, ALDF"—like Plaintiffs here—"offers nothing other than its declarants' post-discovery say-so." *Id.* at *15 (emphasis in original).  The court specifically noted the absence of "any affirmative, independent evidence such as a contemporaneous internal memoranda from ALDF staff to the board stating that the organization needed to spend more money ... because of Hormel's Natural Choice advertising," and held that:

> ALDF's conclusory, self-serving statements about the alleged causal connection between Hormel's marketing and ALDF's activities do not create a genuine dispute of material fact when these activities do not directly address Hormel's marketing of Natural Choice products, and these statements are both inconsistent with ALDF's earlier discovery responses and unsupported by any concrete affirmative evidence.

*Id.* at *15-*16.  The court credited the fact that, as here, none of the so-called "diversion" activities identified by ALDF "explicitly addressed" the targeted advertising campaign, *id.* at *15, and found that the identified activities (which included blogging) were either part of ALDF's standard operations (such that they could not constitute an advertising-based diversion), and/or had started before the targeted ad campaign launched, demonstrating that the plaintiff "would have engaged in this advocacy even if Hormel did not advertise some of its meat products as a natural choice." *Id.* at *17-*19.  So too here.

### C.    Plaintiffs Cannot Establish Standing Based On Litigation Conduct.

Plaintiffs' contention that they do not rely on litigation-related expenses to try to establish standing is patently incorrect.  ECF 207 at 22-23.  To the contrary, Plaintiffs rely both on litigation press releases, *e.g.*, ECF 207-8 at FOE_0000238-39, and graphics used in the PR efforts announcing this lawsuit, *e.g.*,

ECF 207-11 at 2 & ECF 207 at 2-3 (referring to statements the day of the lawsuit and following days).

Those press releases and posts were plainly litigation-driven.  ECF 207-8 at FOE_0000238-39 (release

titled "Nonprofits Sue Third-Largest Poultry Co. for False Advertising of Drug-Contaminated Chicken");

Ex. 37 (June 20, 2017 Eml. at CFS_0000479) ("Attached are the four social media graphics we'd like to

use to promote the lawsuit.").  Indeed, Plaintiffs have admitted as much in prior pleadings.  *See* ECF 146

at 9 ("Almost all public interest lawsuits are accompanied by press statements by the plaintiff explaining

their case and their allegations.").  The same goes for FoE's citation to a "natural" chicken survey

conducted weeks *after* initiating this litigation, as well as CFS's post-litigation presentation that provided

an update on this lawsuit (under the heading "Litigation").  ECF 193-30 at CFS_0000126-28.  Such

transparent litigation-oriented efforts cannot possibly establish standing.  ECF 48 at 4 ("An organization

cannot 'manufacture' an injury by sustaining litigation costs ...."); *see also E. Bay Sanctuary Covenant v.*

*Trump*, 909 F.3d 1219, 1241 (9th Cir. 2018).  Having failed to establish standing based on pre-litigation

conduct, Plaintiffs cannot now rely on litigation-related speeches, press releases, social media posts, or

other efforts to claim standing.[6]

### D.  Plaintiffs Cannot Establish Standing Based On An Alleged Ongoing Injury.

Without evidence that they diverted resources before or after August 1, 2016 to specifically address

Sanderson's advertising, Plaintiffs cannot rest on boilerplate allegations of "ongoing injury."  As a legal

matter, "[s]tanding must be present *at the time suit is brought*."  *Trend Micro Inc. v. RPost Holdings, Inc.*,

2014 WL 1365491, at *7 (N.D. Cal. Apr. 7, 2014) (emphasis added).  "If the plaintiff lacks Article III

standing when the complaint was filed, the suit must be dismissed, and the jurisdictional defect cannot be

cured after the inception of the lawsuit."  *Id.* (citation omitted).  And nothing in the Court's motion to

dismiss order requires a different result.  There, the Court accepted Plaintiffs' allegations at the pleading

stage about ongoing injury—"*i.e.*, that plaintiffs [were] continuing to divert resources to counteract

---

[6] Plaintiffs cannot rely on these press releases and posts for another reason: they have repeatedly represented that the USDA data described in those publications is irrelevant and no longer a part of the case.  *E.g.*, ECF 136 at 5 ("[T]he Third Amended Complaint ... does not mention the USDA test results at all."); ECF 146 at 2 ("What Plaintiffs said or didn't say about certain USDA data after filing the complaint is wholly irrelevant to the actions they complain of and the relief they seek ....").  If such data has no connection to Plaintiffs' false advertising claims, publications based on that data cannot qualify as an Article III diversion.

Sanderson's evolving, but still misleading, advertising efforts." ECF 48 at 7. The discovery record has not borne those allegations out, and an unidentified "ongoing injury" cannot establish standing now.

Nor should the Court entertain Plaintiffs' claim that "if [Sanderson's] theories are accepted, nobody could hold [it] accountable ...." ECF 207 at 24. That is both false and legally irrelevant. As Plaintiffs concede, "[t]here is not any doubt that an individual consumer who purchased Sanderson chicken in reliance on the false advertising has an injury in fact in order to confer standing and pursue consumer protection claims." *Id.* at 11. Moreover, "[t]he assumption that if [Plaintiffs] have no standing to sue, no one would have standing, is not a reason to find" Article III is satisfied. *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982) (citation omitted). Plaintiffs identify no basis in law for relaxing the long-recognized requirements for standing just because nonprofit organizations are suing a corporation in this case; to the contrary, the parties in this suit are equals under the law, and Plaintiffs cannot avoid Article III's injury or traceability requirements.[7]

## II.   PLAINTIFFS CANNOT RELY ON IMPROPER AND SELF-SERVING DECLARATIONS AND UNPRODUCED DOCUMENTS TO SUPPORT STANDING.

Separate and apart from the merits, Plaintiffs' opposition confirms they will go to any length—including by filing self-serving, counterfactual declarations and unproduced evidence—to manufacture standing. While Plaintiffs cannot establish standing even on the basis of their new evidence, the Court should ignore much of that evidence and make clear that Plaintiffs cannot flout the discovery rules.

*Plaintiffs' Declarations.* Plaintiffs cannot manufacture standing with self-serving declarations that contradict the record. In numerous respects, Plaintiffs' Keever and Spector declarations are "wholly inconsistent with [each witness's] deposition testimony, and [their] explanation for this discrepancy (namely, that the declaration puts [their] deposition testimony into 'context') is entirely untenable." *See Halo Mgmt., LLC v. Interland, Inc.*, 2004 WL 1781013, at *6 n.15 (N.D. Cal. Aug. 10, 2004). Those

---

[7] Plaintiffs' reliance on California-specific statutory standing law is ill-founded. ECF 207 at 9-10. "[I]n federal court, a plaintiff must still demonstrate Article III standing to seek injunctive relief, even if [they] would otherwise have standing in state court." *Khan v. K2 Pure Solutions, LP*, 2013 WL 6235572, at *2 (N.D. Cal. Dec. 2, 2013) (citation omitted). "While the UCL does have a requirement of economic harm in order to establish *statutory* standing ... that is different from whether the plaintiffs have *constitutional* standing under Article III to seek *injunctive* relief." *Id.* (emphasis in original) (rejecting reliance on *Kwikset Corp. v. Sup. Ct. of Orange Cty.* to establish federal jurisdiction).

declarations "attempt[] to put an entirely different—and inconsistent—gloss on the … facts" elicited throughout discovery, by trying to "dress up the 'devil' in more appealing attire." *Id.*  For instance, though Plaintiffs try to put a new spin on their Darden, Chain Reaction, and other initiatives in order to connect them—however tangentially—to Sanderson, the fact remains that Plaintiffs have already testified that those activities were not undertaken "because of" Sanderson's ads.  *See, e.g.*, FoE Dep. 128:7-9 ("Q. FoE didn't publish the Chain Reaction reports because of Sanderson's advertising; right?  A. Correct.").  "Ninth Circuit law does not permit declarants / deponents to change [their] testimony so glibly." *Halo Mgmt.*, 2004 WL 1791013, at *6 n.15; *see also Bennett v. City of S.F.*, 2014 WL 122160, at *5 (N.D. Cal. Jan. 13, 2014).  More fundamentally, a party cannot disregard its discovery obligations only to seek to supplement the record in opposing a post-discovery motion.  *See* Fed. R. Civ. P. 37(c)(1); *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028 (9th Cir. 2003) (no abuse of discretion in excluding document that was not produced "until after the discovery cut-off date and after [the relevant] deposition").  In that regard, it is telling that both declarations are notably longer than Plaintiffs' interrogatory responses on standing issues, *compare, e.g.*, Keever Decl. (17 pages), *with* ECF 207-2 (6 pages), and were made on the basis of purportedly conferring with far more individuals than either declarant spoke to in preparing for their Rule 30(b)(6) testimony, *compare* Ex. 32 (FoE Dep.) 8:1-9:2, 11:22-24; Ex. 35 (CFS Dep.) 8:2-15, 10:20-23, *with* Keever Decl. ¶ 3; Spector Decl. ¶ 3.[8]

Worse still, the declarations substantially rely on information from individuals Plaintiffs stipulated they would not use to prove standing.  During discovery, Sanderson issued deposition subpoenas to Kari Hamerschlag (an FoE employee) and Cameron Harsh (a former CFS employee) to assess issues, including standing.  Notwithstanding that Plaintiffs identified these individuals as having knowledge of their claims in both their initial disclosures and in response to interrogatories, Plaintiffs objected that such depositions would be duplicative and irrelevant.  After numerous meet and confers, Sanderson agreed to withdraw the deposition subpoenas based upon Plaintiffs' written agreement that "[t]hey will not rely (at any stage) on Ms. Hamerschlag or Mr. Harsh to prove any element for which they bear the burden of proof, including,

---

[8] It also bears noting that none of the nine new individuals consulted by Plaintiffs to prepare their declarations were previously identified in Plaintiffs' initial disclosures or in response to Sanderson's interrogatory asking Plaintiffs to identify all persons with material knowledge of their allegations.

but not limited to ... in support of either Plaintiff's alleged standing." Ex. 38 (Mar. 11, 2016 Stipulation Eml.).   However, as soon as it suited them, Plaintiffs reneged on that promise, and relied on those witnesses for that very purpose. *See* Keever Decl. ¶ 3; Spector Decl. ¶ 3.

"The Ninth Circuit has recognized such private written stipulations as binding and enforceable by the [C]ourt." *Olney v. Job.com*, 2014 WL 4629062, at *5 (E.D. Cal. 2014). "[P]arties may stipulate to procedures ... limiting discovery so long as [it] does not alter a discovery deadline set by the Court or interfere with the time set ... for hearing a motion, or for trial." *Id.*; *see also CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th Cir. 1999) ("Because stipulations serve both judicial economy and the convenience of the parties, courts will enforce them absent indications of involuntary or uninformed consent."). The parties' stipulation plainly covers the Keever and Spector declarations, which were concededly both made in reliance on both Ms. Hamerschlag and Mr. Harsh in an effort "to prove [an] element for which [Plaintiffs] bear the burden of proof" (*i.e.*, standing). Such breach infects the entirety of the declarations. Plaintiffs "must pay [the] price [of] shield[ing] [Ms. Hamerschlag and Mr. Harsh] from deposition: they cannot protect [them] from deposition during the pretrial phase, only to [effectively] offer [them] as a witness [now]." *Vazquez v. Cent. States Joint Bd.*, 2009 WL 1530709, at *5 (N.D. Ill. June 1, 2009).

*Undisclosed Documents & Information.* Plaintiffs also rely upon documents and information they did not identify or produce in discovery. As to documents, Plaintiffs, for example, submit invoices regarding certain advocacy initiatives. *See* ECF 207-15, -16. Setting aside the fact none of those invoices remotely mention Sanderson, Plaintiffs never produced such documents in discovery, notwithstanding Sanderson's specific requests that Plaintiffs produce (i) documents "sufficient to show the amount of money ... devoted to projects ... and/or activities as a result of any of Sanderson's advertisements," and (ii) "[a]ll documents [Plaintiffs] prepared in response to or as a result of Sanderson's business or activities, including ... any of the Sanderson advertising identified in the [c]omplaint." ECF 207-6 RFP 15-16. After lodging certain objections to those requests, Plaintiffs made clear that "[t]o the extent that [Sanderson] seeks documents regarding Plaintiffs' standing, Plaintiff is producing documents." *Id.* at RFP 16. Thus, if such invoices were truly incurred because of Sanderson's ads—and they were not—Plaintiffs should have produced them. The same goes for Plaintiffs' reliance on unproduced emails. ECF 207-14, -18. It is too late for Plaintiffs to rely on such unproduced materials now. *E.g.*, *Hartline v. Nat'l Univ.*, 2018 WL

1014611, at *4 (E.D. Cal. Feb. 22, 2018) (The "plaintiff will be barred from using unproduced documents at trial, as well as with respect to pre-trial motions ....").

Similarly, Plaintiffs again try to rewrite history by claiming activities never before identified as "diversions" (despite having multiple chances to do so in discovery) were actually undertaken in response to Sanderson's ads.  To take just one example, CFS identifies an August 2, 2016 Facebook post that merely re-posted a *New York Times* article about Sanderson's antibiotics use.  *See* Spector Decl. ¶ 17.  But CFS never identified that post as a "diversion" in their interrogatory responses.  ECF 207-3.  Indeed, when asked to admit that Plaintiffs had viewed that *New York Times* article before filing suit, Plaintiffs "object[ed] because this request is irrelevant to Plaintiffs' claims."  *See* Ex. 39.  Plaintiffs' after-the-fact attempt to use that two-sentence Facebook post to establish standing now should also be rejected.

***Documents Withheld on First Amendment Grounds***.  Finally, Plaintiffs attempt to show standing based on a handful of documents initially withheld on a claim of First Amendment privilege.  *See* ECF 207-8 at FOE_0000312-13, 15-17; Keever Decl. ¶¶ 30-31.  But that is in direct contradiction to Plaintiffs' representations to Magistrate Judge Kim when litigating the privilege issue.  Back then, they stated:

> *Plaintiffs do not intend to use these documents ... to establish standing* (which is Plaintiffs' burden to prove), or for any other purpose ... Plaintiffs can stipulate to as much and presently state that these documents will not be used to support ... standing in the present litigation.  *After all, on their face it is not clear how they could support Plaintiffs' standing even if Plaintiffs wished to use them for that purpose.*

ECF 139 at 8 (emphasis added).  The Court should hold Plaintiffs to that representation, and even if it does not, Plaintiffs' prior statements confirm their use of such documents is yet another revisionist attempt to manufacture standing by any means.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Sanderson's motion, the Court should dismiss this case for lack of subject matter jurisdiction.

DATED: May 14, 2019

Respectfully submitted,

/s/ *Michael A. Glick*

Michael A. Glick

Mark McKane, P.C. (SBN 230552)
mark.mckane@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California  94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Gregg F. LoCascio, P.C. (admitted *pro hac vice*)
gregg.locascio@kirkland.com
Michael Glick (admitted *pro hac vice*)
michael.glick@kirkland.com
Kathleen A. Brogan (admitted *pro hac vice*)
kathleen.brogan@kirkland.com
Terence J. McCarrick (admitted *pro hac vice*)
terence.mccarrick@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C.  20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

*Counsel for Defendant*
*Sanderson Farms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of May, 2019, I arranged for the filing of this pleading through ECF, which sent notice to all counsel of record.


*/s/ Michael A. Glick*
Michael A. Glick